IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
PLANO DIVISION

| | | |
|---|---|---|
| CONSTANCE SWANSTON and | § | |
| WOMEN'S ELEVATED SOBER LIVING | § | |
| LLC. and SHANNON JONES | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CASE NO. 4:19-CV-00412-ALM |
| | § | |
| CITY OF PLANO, TEXAS | § | |
| | § | |
| Defendant | § | |

## AMENDED COMPLAINT

Constance Swanston, Women's Elevated Sober Living LLC and Shannon Jones file this Amended Complaint as follows:

## I.  PARTIES

1.      Constance Swanston ("Swanston") is an individual residing in the Eastern District of Texas. She is the managing member of Women's Elevated Sober Living LLC..

2.      Women's Elevated Sober Living LLC ("Elevated") is a Texas Limited Liability Company that provides support services for drug and alcohol addicts who are in recovery and qualify as "handicapped" under the provisions of the Fair Housing Act. Its principal place of business is at 7849 Cassion Drive, Frisco, Texas 75034-0209 in the Eastern District of Texas.

3.      Shannon Jones ("Jones") is an individual residing in the Eastern District of Texas at 7312 Stoney Point, Plano, Texas. She is a resident and house manager of a recovery home operated by Women's Elevated Sober Living at that address.

4.      The City of Plano is a unit of government organized under the Constitution and laws of the State of Texas. See Tex. Local Gov't Code §5.004. Under the City's Home Rule Charter

the City has the capacity to sue or be sued. The City - including its Board of Adjustment and other divisions and departments - is a "public entity" within the meaning of the ADA, 42 U.S.C. § 2131(1), 28 C.F.R. §35.104, and is therefore subject to Title II and V of the ADA, 42 U.S.C. §12132, and its implementing regulation, 28 C.F.R. Part 35. The City promulgates, interprets, and enforces ordinances and zoning code, and otherwise provides municipal services. The City is responsible for the acts of its agents and employees and is responsible for the enforcement of its zoning.

## II. JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and 42 U.S.C. §§ 12133 because the claims herein are based on the private cause of action granted in 42 U.S.C. §3613(a) and 42 U.S.C. §12188 and therefore arise under the laws of the United States.

6.     Venue is proper in this Division and District pursuant to 28 U.S.C. §1391(b)(2) because the events or omissions giving rise to the claims alleged in this Complaint occurred and are occurring in this district in Plano, Texas, and the Defendant is located for venue purposes in Collin County, Texas.

## III. FACTS

### A.     Introduction

7.     Elevated operates a sober living home (the "Home") in the single family residence located at 7312 Stoney Point Dr., in Plano, Texas. It operates the Home under an arrangement with Swanston, who is also one of the owners of Elevated.

8.     Ms. Jones has lived in the Home for two months. Ms. Jones' addiction to substances and alcohol affects her ability to work, self-care, maintain relationships, sleep, and socialize. She has been sober from substances for nine years and alcohol for 17 months. Residing at the Home

ameliorates the effects of her addiction by providing Ms. Jones a family like atmosphere that promotes a peer supportive environment that does not make her feel isolated, accountability from other residents, and structure and rules. If the City persists and insists in closing the Home, Ms. Jones' housing of her choice will be unavailable to her.

9.      Elevated opened the Home in November of 2018. The Home reached its nominal capacity, 15 residents, within a few weeks because there is an extreme shortage of sober living homes for women in the Plano area. At times Elevated has had as many as 19 residents while its owners tried to help women in need of a sober living environment.

10.     The Home operated without comment or objection from its neighbors until March of 2019. At that time a complaint was filed with the City of Plano by an individual – Kendal Reed – who did not live in the neighborhood but had been named as a defendant in an unrelated lawsuit filed by Elevated concerning a different sober living home.

11.     The City, after some correspondence concerning the use of the Home and the number of residents, told Elevated that operating the Home with 15 residents violated the SF-7 zoning restriction for the neighborhood in which it was located. Elevated then applied to the Plano Board of Adjustment for a reasonable accommodation in the form of a variance that would permit up to 15 unrelated women to live in the Home.

12.     On May 28, 2019, after a hearing in which more than 50 local homeowners voiced their sometimes violent objections to the Home on the basis that it would house "undesireables" and "criminals," the Board denied the requested variance. This lawsuit is the result of that denial.

   **B.      The applicable statutes and regulations.**

   **1.      Fair Housing Act Amendments**

13.     In 1988, Congress passed the Fair Housing Act Amendments, 42 U.S.C. §3601, et seq., to extend the guarantee of fair housing to persons with disabilities. Congress did so to change

the "stereotypes that have served to exclude [persons with disabilities] from American life." Congress recognized that people with disabilities have been denied housing because of "misperceptions, ignorance, and outright prejudice". Congress pronounced that the Fair Housing Amendments Act is a showing of the national commitment to stop the "unnecessary exclusion of persons with handicaps from the American mainstream."

14.     Congress authorized the Secretary of the United States Department of Housing and Urban Development to promulgate regulations to implement the FHA.  42 U.S.C. §3614A.

15.     Under the FHA, disability means, a "physical or mental impairment which substantially limits one or more of a person's major life activities, a record of such impairment, or being regarded as having such an impairment."  42 U.S.C. §3602(h).  The term "physical or mental impairment" includes "alcoholism" and "drug addiction (other than addiction caused by current, illegal use of a controlled substance)."  24 C.F.R. §100.201.

16.     Congress specifically noted the necessity for protecting those in recovery from addiction and the irrationality of any housing discrimination directed at recovering addicts and alcoholics:

> Just like any other person with a disability, such as cancer or tuberculosis, former drug-dependent persons do not pose a threat to a dwelling or its inhabitants simply on the basis of status. Depriving such individuals of housing, or evicting them, would constitute irrational discrimination that may seriously jeopardize their continued recovery.

H.R. REP. 100-711, 22, 1988 U.S.C.C.A.N. 2173, 2183.

17.     The FHA makes it is unlawful to discriminate against, make unavailable or deny a dwelling to a person because of their disability or that of someone that will live in the home.  42 U.S.C. §3604(f)(1).

18.     The FHA further provides that it is unlawful to discriminate "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling", because of the disability of persons residing in or intending to reside in a dwelling. 42 U.S.C. §3604(f)(2).

19.     The FHA prohibits making, publishing, or causing to be published any statement that indicates a preference in sale or rental of a dwelling based on disability. 42 U.S.C. §3604(c).

20.     The Fair Housing Act Amendments were passed in part because Congress recognized that local governments have used their regulatory authority in ways that curtail community access for persons with disabilities. Thus, the prohibition of discrimination against people with disabilities specifically applies to zoning determinations and practices and even to policies that appear neutral on their face but have an effect of discriminating.

21.     The federal regulations implementing the FHA specifically prohibit, as a discriminatory activity, providing municipal services differently because of a disability. 24 C.F.R. §100.70(d)(4).

22.     The federal regulations implementing the FHA further make it unlawful, because of disability, "to restrict or attempt to restrict the choices of a person by word or conduct in connection with seeking, negotiating for, buying or renting a dwelling so as to . . . discourage or obstruct choices in a community, neighborhood or development." 24 C.F.R. §100.70(a).

**2.      Americans with Disabilities Act**

23.     On July 12, 1990, Congress enacted the ADA, 42 U.S.C. §12101 et seq., (ADA), establishing the most important civil rights laws for persons with disabilities in our nation's history.

24.     Congress found that "discrimination against individuals with disabilities persists in . . . access to public services." 42 U.S.C. §12101(a)(3). Congress recognized that "individuals with disabilities continually encounter various forms of discrimination, including outright

intentional exclusion . . . , segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. §12101(a)(5).

25.　　A major purpose of the ADA is to provide a national mandate to eliminate discrimination against individuals with disabilities, and to provide clear, strong, consistent and enforceable standards to address discrimination against individuals with disabilities. 42 U.S.C. §12101(b)(1) and (2).

26.　　Congress amended the ADA in 2008. The Americans with Disabilities Amendments Act of 2008, 42 U.S.C. §§12101, et seq.

27.　　The ADA requires that no qualified individual with a disability, because of such disability, be excluded from participation in or be denied the benefits of the services, programs, or be subjected to discrimination by any such entity. 42 U.S.C. §12132.

28.　　A public entity may not from administer a licensing program in a manner that subjects qualified individuals with disabilities to discrimination because of disability, nor may a public entity establish requirements for a license that subject qualified individuals with disabilities to discrimination on the basis of disability. 28 C.F.R. §35.103(6).

29.　　It is unlawful for a public entity to make selections that have the purpose or effect of discriminating when it selects the site or location of a facility. 28 C.F.R. §35.130(b)(4)(I).

**C.　The work of Elevated helping addicts in recovery**

30.　　Elevated is in the business of helping drug and alcohol addicts in recovery remain sober while they regain the skills needed for independent living. The individuals served by Elevated are in recovery from addictions that significantly limited one or more of their major life activities. Thus, they thus have a "handicap" as defined in the Fair Housing Act.

31.     Jones is a handicapped individual. She is in recovery from addiction but cannot live independently without a very high risk that she will fall back into addiction. Because of this risk she cannot use or enjoy a dwelling other than in the context of a sober living facility.

32.     The services provided by Elevated are critical for the residents because they cannot live independently or with their natural families and rely on the peer pressure of living with others in recovery to maintain their freedom from addiction and ability to work and participate in society.

33.     A large body of scientific evidence proves that sober living facilities greatly reduce the risk that an individual in recovery will relapse into the use of drugs or alcohol. Residents of sober living facilities are almost twice as likely to remain sober after two years of recovery compared to individuals who only participate in a twelve-step program or other form of after-care treatment. This is consistent with a 2010 study in the Journal of Substance Abuse Treatment showing that recovering addicts who passed through a structured residential environment were significantly less likely to face relapse or arrest as well as other studies showing similar benefits.[1]

34.     It is equally well established that the presence of sober living facilities has no negative impact on property values.[2]

35.     In order to confirm that individuals applying to live in an Elevated sober living house are handicapped as defined in the Fair Housing Act Elevated takes the following steps:

  a.  Elevated requires that applicants have been free from drugs or alcohol for at least 20 days and confirms this with a drug and alcohol test before the application is accepted. This confirms that they are in recovery and are not current users of drugs or alcohol.

---

[1] See, "Building Recovery: State Policy Guide for Supporting Recovery Housing" published by the National Council for Behavioral Health at www.thenationalcouncil.org. and sources cited in Polcin, Douglas L., Henderson, Diane, Trocki, Karen, Evans, Kristy, and Wittman, Fried, "Community Context of Sober Living Homes" published by the National Institutes of Health.
[2] See, "Building Recovery: State Policy Guide for Supporting Recovery Housing" published by the National Council for Behavioral Health at www.thenationalcouncil.org.

b. Elevated requires that applicants explain in their application how their addiction has substantially limited a major life activity.

c. Elevated engages in an extensive interview with the applicant to determine that the applicant is committed to remaining sober and needs the services Elevated provides in order to do so. This interview confirms that they applicant is not able to live independently while remaining sober, which constitutes a substantial limitation on the major life activity of caring for oneself.

d. Elevated requires residents to sign a house contract agreeing to abide by all the rules of the house, including those that promote accountability and participation in events intended to help residents regain the ability to live independently.

e. Elevated subjects residents to drug and alcohol tests on a weekly basis to confirm that they remain in recovery while in an Elevated sober living home. Residents who fail these tests are evicted.

36. These steps only confirm what is almost always the case; that is, that recovering addicts are substantially impaired in numerous major life activities.

37. Jones along with other residents and future residents of the Home are also handicapped because they are regarded as impaired by the City of Plano. In particular, because they suffer the impairment of addiction the City of Plano is denying them the ability to find shelter. The ability to find shelter is itself a major life activity. The combination of an impairment and conduct that limits a major life activity creates "regarded as" handicap.

38. Elevated residents share bedrooms, bathrooms, the living room, and the kitchen just like any other family. They purchase their groceries together every week, often eat meals together, and spend their free time together just like a family would.

39. Elevated facilitates transportation for residents when needed, provides assistance with work and employment opportunities (such as resume drafting, interview skill building), off site counseling, and access to drug and alcohol education groups to aid the residents in their recovery and prevent relapse.

40. Without the support services provided by Elevated and the family atmosphere created by sharing the living space the residents would be homeless or at a significantly increased

risk of relapsing in their addiction to alcohol or drugs. Thus, they are not able to "use and enjoy a dwelling" without the sober living environment provided by Elevated.

**D. The City's restrictions on sober living homes are facially discriminatory.**

41.     The City of Plano, like many municipalities, has a zoning ordinance that not only distinguishes between single family residential, multi-family residential, industrial and commercials uses, but also distinguishes between types of single family residential uses. The zoning ordinance creates the following single-family zoning categories:

- SF-20 – requiring a minimum lot size of 20,000 square feet.
- SF-9 – requiring a minimum lot size of 9,000 square feet.
- SF-7 – requiring a minimum lot size of 7,000 square feet.
- SF-6 – requiring a minimum lot size of 6,000 square feet.
- UR – requiring a minimum lot size of 5,000 square feet.
- PH – requiring a minimum lot size of 4,000 square feet.
- SF-A – requiring a minimum lot size of 2,250 square feet.

42.     The various single family categories all have the same minimum size for a house – 800 square feet – but the maximum varies according to the lot size. In the SF-A zoning districts the lot coverage cannot exceed 65% of the minimum 2,250 square foot lot. In PH zoning districts the lot coverage cannot exceed 60% of the lot size. In the SF-6, SF-7 and SF-9 districts the lot coverage is 45%. For SF-20 up to 25% of the lot can be covered by a main house. In all of these districts two story houses are permitted, so the maximum house size for these districts is:

- SF-A – 2,925 square feet
- PH – 4,800 square feet
- SF-6 – 5,400 square feet
- SF-7 – 6,300 square feet
- SF-9 – 8,100 square feet
- SF-20 – 10,000 square feet.

43. In the City of Plano there is a distinct geographic division between lot size requirements. Almost all the single-family residential zoning west of Highway 75 is SF-7 or SF-9 with a very small scattering of SF-6 zoning. East of Highway 75, on the other hand, a large part of the single family zoning is for SF-6 size or smaller lots.

44. All of these single family zoning districts permit two uses that are relevant to this lawsuit; "Single Family Residence" and "Household Care Facility." A "Single Family Residence" is defined as a "dwelling" designed and constructed for occupancy by one family. A "Household Care Facility" is defined as a dwelling unit that provides residence for up to eight disabled individuals plus two caretakers. In a single family zoning district a Household Care Facility will necessarily occupy a single family residence.

45. A different provision of the Plano City Code – Section 404.4 of the International Property Maintenance Code ("IPMC") as adopted - limits the number of individuals who can live in a Single Family Residence based on the size and number of bedrooms and living areas, but its restrictions are not related to the definition of either "Single Family Residence" or "Household Care Facility."

46. It is notable that the number of individuals who can live in a Household Care Facility is not adjusted in any way for the size of the house in which they live. Up to ten people can live in a Household Care Facility in a 2,925 square foot house in the SF-A zoning district, but no more than ten people can live in a Household Care Facility in the 10,000 square foot house permitted in the SF-20 zoning district. This is in direct contrast to the Single Family Residence use, which has no limit on the number of individuals who can live in a house other than the limit imposed by the IPMC.

47.     A similar irrationality appears when the minimum dwelling size is considered. In every single family zoning district the minimum dwelling size is 800 square feet.  An 800 square foot dwelling can be configured to permit 10 residents or more under the limits imposed by the IPMC. The Plano Zoning Ordinance would therefore allow up to 10 unrelated disabled individuals to live in an 800 square foot house in the SF-A zoning district but would forbid 11 unrelated disabled individuals to live in a 10,000 square foot house in the SF-20 zoning district. There is no rational relationship between the number of individuals permitted in a Household Care Facility and the size of the single family residence in which they reside.

48.     Although the number of unrelated individuals who can live in a Household Care Facility is limited to ten regardless of the size of the house there is no similar limit on the number of related individuals who can live in a single family residence. A single family dwelling is defined as one occupied by a "household." A household is defined to include:

> A domestic unit that resides in and shares in common a single dwelling unit and consists of one or more individuals related by blood, marriage, adoption or recognized legal union or guardianship, and not more than 4 adult unrelated individuals, plus any minor children, or persons residing in a household care facility.

"Related by blood" is not defined, but under Texas law the phrase "related by consanguinity," which is the equivalent, includes all the descendants of a common ancestor. (Family Code §573.022). Under this definition third or fourth or fifth or even sixth cousins are "related by blood" and can constitute a single household. Nor is there any limit on the number of individuals in such a household. It could be five, ten, twenty, thirty or more. According to the City of Plano staff, for example, the IPMC would permit the Home could be occupied by up to 34 individuals provided no more than 4 unrelated adults were included. There is also no restriction on the number of related adults in the household or the number of cars they can own.

49.     On its face the zoning ordinance discriminates between two different types of group living arrangements. It permits a "family" of any size within the limits of the IPMC but limits individuals who require a household care facility to at most ten regardless of the size of the house.

50.     It is evident the 10 person limit for a Household Care Facility is not related in any way to health or safety concerns, because the size of a Household Care Facility is limited not by the IPMC or the size of the house.

51.     Neither does the 10 person limit for a Household Care Facility have a rational connection to any other legitimate government purpose. The usual justification for restricting unrelated individuals from living in "single family" zoning districts is the supposed social benefits of having neighborhoods occupied by single families. The Supreme Court explained the justification in *Village of Belle Terre v. Boraas*, 416 U.S. 1, 9 (1974):

> A quiet place where yards are wide, people few, and motor vehicles restricted are legitimate guidelines in a land-use project addressed to family needs. . . .The police power is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people.

52.     If single family zoning is intended to guarantee that yards are wide, people few, and motor vehicles restricted so the residents can enjoy the blessings of quiet seclusion the definition of "family" must be rationally related to those supposed benefits.  In *Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 499–500 (1977) the Supreme Court considered single family zoning that narrowly defined "family" to exclude certain blood relatives (brother and sister for example) but without other limits on the size of the "family" or the number of vehicles associated with the household. The City argued that the restrictions served to avoid over-crowding, traffic problems and parking congestion. The Court found the ordinance had only "a tenuous relation to alleviation of the conditions mentioned by the city" because instead of restricting the number of

cars or residents the ordinance restricted the relationships of the members of the household. Thus, the Court observed, the ordinance would forbid a brother and sister to live together even if they owned no cars but would permit other family configurations that owned many cars. Because the restrictions were not rationally related to their supposed purpose they could not withstand scrutiny as a rational exercise of municipal power.

53.     The situation with the City of Plano zoning ordinance is the same. If traffic, parking and congestion are the relevant concerns then the definition of "Household" has only a tenuous relationship to the conditions it supposedly attenuates because it does not restrict the size of the family or the number of cars in the household.

54.     The City of Plano's parking regulations perfectly illustrate how tenuous the relationship is between the definition of "Household" and the goals it supposedly serves. The City of Plano parking regulations require that all residences have off-street parking, but for single family detached homes, regardless of size, only two off-street parking spaces are required. If the assumption is that merely being related by blood guarantees a "family" will never have more than two cars this parking regulation is absurd, for under the City's definition a family can include four unrelated adults and an unlimited number of related adults or children old enough to drive. There is no reason to assume that ten unrelated adults living together are likely to own more cars than the same number of related adults. If street parking or the number of cars is the City's concern then its decision to regulate based on the difference those who are related and those who are not is irrational.

55.     This is not a merely abstract concern. At the time of the Board of Adjustment hearing there was testimony from a neighbor opposed to the requested variance that within a few houses of the Home on the same street were houses occupied by single family households with

seven and six cars respectively. The testimony was that the Home never had more than eight associated cars and at the time of the hearing had only five. The facts demonstrate that family relationship is not a useful way to determine how many cars will be present at a single house.

56.     There is also no reason to believe limiting the number of residents in a Household Care Facility to ten while allowing an unlimited number of related individuals in a Single Family Residence is a rational way to reduce congestion or eliminate noise. At the Board of Adjustment hearing there was testimony that the previous occupant of the Home was a single multi-generational family with 15 members who were noisy and failed to maintain the property. The same witness testified that the 15 women now living in the Home are quiet, friendly, and made good neighbors. There is also evidence that several other houses in the immediate neighborhood also have occupancies of 15 or more members of a single family though whether they are "good neighbors" or "bad neighbors" is not known. In any case, family relationships are clearly not a rational proxy for either a smaller number of residents or a better quality of neighbor.

57.     The irrationality of the existing occupancy limits for Household Care Facilities is further confirmed by Plano's adoption in February of 2019 of a "Backyard Cottage" ordinance. This ordinance allows the construction of a backyard cottage of up to 1,100 square feet in all of the single family zoning districts. It permits the backyard cottage to be rented to third parties who are not related to the occupants of the main house. The ordinance does not place any limits on the number of residents beyond those imposed by the International Property Maintenance Code. It does require at least one off-street parking space, bringing to three the total spaces required for a single family detached house, regardless of size. It also, oddly, forbids parking in tandem to create the additional parking space although nothing forbids the owner of the main house from stacking as many cars as can be fit in the driveway.

58.     Although the "Backyard Cottage" ordinance does not set an explicit limit on the number of residents, it defines the "backyard cottage" as a "dwelling unit," which is itself defined as the living quarters of a "family." This is the same definition used for a Single Family Residence, meaning a backyard cottage can be occupied by a single "Household." The definition of "Household" includes both traditional families and all the residents of a Household Care Facility. Thus, a Household Car Facility with 10 unrelated adults can be placed in a "backyard cottage" or, under the ordinance, it can be placed in the main house with as long as the owner occupies the cottage. The result is that up to 14 unrelated adults can live on a single lot in any of the single family residential zoning districts provided only that ten of them occupy one dwelling and four occupy the other. It is difficult, in fact impossible, to imagine that 14 unrelated adults living in one very large house as a sober living home will be more disruptive or create more parking problems for the neighborhood than 14 unrelated adults occupying two dwellings on the same lot, especially if in addition to the four unrelated adults in one dwelling there can be any number of related adults and children.

59.     These irrationalities all flow from the fact that the definition of "family" is so loose that does not provide a rational distinction between different kinds of group living arrangements. For example, two women who were married to each other and had six adult children could live with four other single women who each had three adult children in any house in Plano that would accommodate 24 individuals under the IPMC. At the same time half as many unrelated adults could not. Because Texas recognizes adult adoption a group of otherwise unrelated adults could by-pass the restrictions on occupancy by merely having one of them adopt all the others.

60.     The zoning restrictions on sober living homes are not only irrational, they also have a very distinct discriminatory effect. Larger, more expensive houses cannot be economically

operated as sober living facilities with only ten individual residents. Even more important, a vital component of the sober living environment is the constant presence of other residents, for they both provide support and accountability. In a house like the Home that has seven bedrooms and two large living area restricting the number of residents to ten means that residents will easily find ways to be alone and isolated. That in turn creates a higher likelihood of relapse into addiction, the very thing sober living is supposed to avoid. As a result, the limitation on unrelated adults in a Household Care Facility effectively eliminates sober living facilities from the zoning districts that have larger lots and homes, including SF-7 and SF-9.

61.     The facts in Plano confirm that this kind of discrimination in fact occurs. Based on publicly available information there are no ten person sober living homes in SF-7 or SF-9 zoning districts in Plano; they are instead located in SF-6 or smaller lot size districts.

62.     The result is noticeable geographic segregation of the disabled. There do not appear to be any ten person or smaller sober living homes in the City of Plano west of Highway 75. By zoning almost all the available land west of Highway 75 as SF-7 or SF-9 the City has insured that those with disabilities will be restricted to living in East Plano, far away from the wealthy neighborhoods in which they are not wanted because of they are regarded as undesirables. They are equally far away from the dining and entertainment opportunities that are, for economic reasons, located close to wealthier neighborhoods.  Instead of creating zones of quiet seclusion and clean air the Plano zoning ordinance merely creates zones that exclude the disabled.

**E.     The City's zoning restrictions have a disparate impact on the disabled.**

63.     The City may claim its ordinance does not discriminate because it allows unrelated disabled adults to live together in a single family house in groups of up to ten while unrelated adults without a disability are limited to five. This argument fails to take into account the already limited living opportunities available to those recovering from addiction or having other

disabilities. For non-disabled adults the entire spectrum of housing options is possible, including traditional multi-family housing and boarding houses. Limiting the number of unrelated adults who can live in a Single Family Residence does not significantly limit the housing opportunities for those without disabilities. Recovering addicts on the other hand have only two practical options; sober living in a single family house or institutionalization in a rehabilitation facility. The City's zoning scheme therefore has a far greater impact on unrelated disabled adults than it has on non-disabled unrelated adults.

**F.     The City's unlawful denial of a reasonable accommodation.**

49.     Elevated filed a request for accommodation to operate the Home with up to 15 unrelated women following the procedures provided for such requests by the City of Plano Code. Section 5.00.2 E(ii) of the City of Plano Zoning Code provides:

> The Board of Adjustment shall conduct a hearing to determine whether the request for reasonable accommodation should be granted. The applicant or applicant's representative shall have the burden to demonstrate that: (a) The applicant (or the person on whose behalf the applicant is requesting the accommodation) suffers from a disability as defined by the Fair Housing Amendment Act and (b) The applicant (or the person on whose behalf the applicant is requesting the accommodation) demonstrates that the accommodation is both reasonable and necessary. An accommodation under this section is "necessary" if without the accommodation the applicant will be denied an equal opportunity to obtain the housing of his or her choice.

50.     Under the Plano Zoning Code, Section 5.00.2 E(iii): "If the applicant demonstrates the matter set out in Sec. 5.200.2E.ii.a and Sec. 5.200.2E.ii.b, the request for reasonable accommodations shall be granted by the Board of Adjustment unless the accommodation would fundamentally alter the city's land use and zoning patterns or if the use's impact on its surroundings is greater than that of other uses permitted in the district."

64.     For all the reasons described above the residents of the Home are disabled and the request for accommodation was both reasonable and necessary, thus satisfying the first two requirements of the Code quoted above.

65.     Also as described above, the last occupants of the Home before Elevated purchased the Home were a family of 15 people. The current residents of the Home act as the functional equivalent of a family and the requested accommodation would not therefore fundamentally alter the city's land use and zoning patterns or have a greater impact on its surrounding than other permitted uses.

66.     On May 28, 2019 the City acting through the Board of Adjustment bowed to public pressure, much of it expressed in bigoted terms, and denied Elevated's request for a reasonable accommodation in the form of a variance allowing up to 15 unrelated women to live in the Home.

**G.     Retention of counsel and conditions precedent.**

67.     In order to exercise their rights under the Fair Housing Act and Americans with Disabilities Act Kearins and Elevated have been compelled to hire Richard Hunt and Jeanne Huey of Hunt Huey PLLC, to whom they have agreed to pay a reasonable fee.

68.     All conditions precedent to the filing of this complaint have occurred or been performed.

69.     Plaintiffs are "aggrieved persons" for purposes of both the FHA and ADA.

**IV. Claims for Relief**

**A.     Count One – Disparate Treatment under the Fair Housing Act**

70.     Plaintiffs reallege and incorporate by reference every allegation above.

71.     The City of Plano Zoning Ordinance and related city statutes and regulations illegally discriminate against individuals with disabilities and those associated with them in violation of the Fair Housing Act because they treat the disabled differently than those without

disabilities with respect to place of residence. Plaintiffs are therefore entitled to the following relief:

   a.   A permanent injunction enjoining the City, its officers, employees, agents, attorneys and successors, and all persons in active concert or participating with any of them, from enforcing any restriction on the use of the Home other than restrictions applied to ordinary "Households" as defined in the Zoning Ordinance,

   b.   A declaration that the City of Plano Ordinance and related city statutes and regulations are void because they violate the anti-discrimination provisions of the Fair Housing Act,

   c.   Judgment in favor of the Plaintiffs Swanston and Elevated only for economic, non-economic and punitive damages as provided in the Fair Housing Act,

   d.   Recovery of costs and attorneys' fees as provided in the Fair Housing Act, and

   e.   Additional relief as described below.

   **B.**   **Count Two – Disparate Impact under the Fair Housing Act**

72.   Plaintiffs reallege and incorporate by reference every allegation above.

73.   The City of Plano Zoning Ordinance and related city statutes and regulations illegally discriminate against individuals with disabilities and those associated with them in violation of the Fair Housing Act because even if facially neutral they have the effect of reducing the housing opportunities available to the disabled and segregating the disabled from the community as a whole. Plaintiffs are therefore entitled to the following relief:

   a.   A permanent injunction enjoining the City, its officers, employees, agents, attorneys and successors, and all persons in active concert or participating with any of them, from enforcing any restriction on the use of the Home other than restrictions applied to ordinary "Households" as defined in the Zoning Ordinance,

b. A declaration that the City of Plano Ordinance and related city statutes and regulations are void because they violate the anti-discrimination provisions of the Fair Housing Act,

c. Judgment in favor of the Plaintiffs Swanston and Elevated only for economic, non-economic and punitive damages as provided in the Fair Housing Act,

d. Recovery of costs and attorneys' fees as provided in the Fair Housing Act and

e. Additional relief as described below.

**C.    Count Three – Failure to accommodate under the Fair Housing Act**

74.    Plaintiffs reallege and incorporate by reference every allegation above.

75.    The City of Plano illegally discriminated against the Plaintiffs by denying their request for reasonable accommodation. Plaintiffs are therefore entitled to the following relief:

a. A permanent injunction enjoining the City, its officers, employees, agents, attorneys and successors, and all persons in active concert or participating with any of them, from enforcing of any restriction on the use of the Home as a sober living home with up to 15 residents,

b. Judgment in favor of the Plaintiffs Swanston and Elevated only for economic, non-economic and punitive damages as provided in the Fair Housing Act,

c. Recovery of costs and attorneys' fees as provided in the Fair Housing Act and

d. Additional relief as described below.

**D.    Count Four – Violations of the Americans with Disabilities Act.**

76.    The present and future residents of the Home are "qualified individuals with disabilities" within the meaning of the ADA, 42 U.S.C. §§12102 and 12131(2) and 28 C.F.R. §35.104.

77.    The City is a public entity within the meaning of the ADA, 42 U.S.C. §12131(1) and 28 C.F.R. §35.104.

78.    The actions of the City to exclude the present and future residents of the Home from living in the Home constitutes discrimination in violation of Title II of the ADA, 42 U.S.C. §12132, and its implementing regulation, 28 C.F.R. Part 35, by

a.  excluding individuals with disabilities from participation in and denying them the benefits of the services, programs, or activities of a public entity based on disability, in violation of Title II of the ADA. 42 U.S.C. §12132, and its implementing regulation, 28 C.F.R. §35.130(a);

b.  affording qualified individuals with disabilities an opportunity to participate in or benefit from the services of a public entity that are not equal to those afforded others, in violation of Title II of the ADA, 42 U.S.C. §12132 and 28 C.F.R. §35.130(b)(1)(ii);

c.  limiting a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service, in violation of Title II of the ADA, 42 U.S.C. §12132, and its implementing regulation, 28 C.F.R. §35.130(b)(1)(vii);

d.  failing to make reasonable modifications in policies, practices, or procedures necessary to avoid discrimination on the basis of disability, in violation of Title II of the ADA, 42 U.S.C. §12132, and its implementing regulation, 28 C.F.R. §35.130(b)(7);

e.  utilizing methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability, in violation

of Title II of the ADA, 42 U.S.C. §12132, and its implementing regulation, 28 C.F.R. §35.130(b)(3); and

 f. excluding or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association, in violation of Title II of the ADA, 42 U.S.C. §12132, and its implementing regulation, 28 C.F.R. §35.130(g).

79. The City acted intentionally, willfully, and in disregard for the rights of the named Plaintiffs. Plaintiffs are therefore entitled to the following relief:

 a. A permanent injunction enjoining the City, its officers, employees, agents, attorneys and successors, and all persons in active concert or participating with any of them, from enforcing any restriction on the use of the Home as a sober living home with up to 15 residents,

 b. Judgment in favor of the Plaintiffs Swanston and Elevated only for economic, non-economic and punitive damages as provided in the Americans with Disabilities Act,

 c. Recovery of costs and attorneys' fees as provided in the Americans with Disabilities Act and

 d. Additional relief as described below.

## V. ADDITIONAL RELIEF REQUESTED

80. In addition to the relief requested above Plaintiffs pray that the Court enter:

 a. A permanent injunction enjoining the City, its officers, employees, agents, attorneys and successors, and all persons in active concert or participating with any of them, from retaliating against the Plaintiffs for having pursued their housing

discrimination complaints under the Fair Housing Act and the Americans with Disabilities Act;

b. Ordering the City to adopt procedures for the consideration of reasonable accommodation and modification requests that do not politicize such requests or leave them in the hands of volunteers or appointees subject to public pressure, and in particular to turn the consideration of such requests over to the City's staff rather than the Board of Adjustment.

c. Ordering that present and future members of the Board of Adjustment undergo ADA and federal FHA training;

d. Ordering the Defendant to take all affirmative steps to ensure its compliance with the Fair Housing Act and Americans with Disabilities Act, including steps necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate to the extent practicable the effects of its unlawful housing practices as described herein;

e. Ordering the creation of a fair housing coordinator for the City of Plano;

f. Ordering Fair Housing Act and Americans with Disabilities Act training to key City personnel responsible for handling accommodation requests and land use regulations for the City; and

g. Such other and further relief as the Court may find appropriate on the trial hereof.

Dated June 12, 2019.


_____
Richard M. Hunt
Texas State Bar No. 10288700
rhunt@hunthuey.com

HUNT HUEY PLLC
1717 McKinney Ave., Suite 700
Dallas, Texas 75202
Telephone: (214) 641-9182
Facsimile: (214) 279-6124

ATTORNEYS FOR SWANSTON AND
ELEVATED

s/ Rachel B. Cohen-Miller
RACHEL B. COHEN-MILLER
TX State Bar No. 24064301

DISABILITY RIGHTS TEXAS
1420 Mockingbird Lane, Suite 450
Dallas, Texas 75247
Telephone: (214) 845-4069
Facsimile: (214) 630-3472
rmiller@drtx.org

CHRISTOPHER P. MCGREAL
TX State Bar No. 24051774

DISABILITY RIGHTS TEXAS
1420 Mockingbird Lane, Suite 450
Dallas, Texas 75247
Telephone: (214) 845-4056
Facsimile: (214) 630-3472
cmcgreal@drtx.org

ATTORNEYS FOR SHANNON JONES