# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| CONSTANCE SWANSTON, WOMEN'S ELEVATED SOBER LIVING LLC, and SHANNON JONES, | § § § § § | Civil Action No.  4:19-cv-412 |
| | | Judge Mazzant |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| CITY OF PLANO, TEXAS, | § | |
| | § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER AND
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On June 5, 2019, Constance Swanston and Women's Elevated Sober Living LLC filed its original complaint against the City of Plano (Dkt. #1).  One week later, Shannon Jones joined the original plaintiffs in filing an amended complaint (Dkt. #2).  And on April 29, 2020, the three plaintiffs filed a second amended complaint, now the operative complaint in this action (Dkt. #29).  Plaintiffs assert that the City of Plano violated the Fair Housing Act ("FHA") and the Americans with Disabilities Act ("ADA") by enacting an allegedly discriminatory zoning ordinance and subsequently denying Plaintiffs' request for accommodation from the zoning ordinance.

From February 8–9, 2021, the Court held a bench trial in the above-styled matter.  After consideration of the parties' arguments and the evidence, the Court makes the following findings of fact and conclusions of law by a preponderance of the evidence pursuant to Federal Rule of Civil Procedure 52(a)(1).[1]  To the extent that any findings of fact constitute conclusions of law, or

---

[1] In preparing this memorandum opinion and order, the Court carefully considered the pretrial filings, trial testimony, trial exhibits, and post-trial briefing and subsequently applied the Fifth Circuit standard for findings and conclusions under Federal Rule of Civil Procedure 52. *See Eni US Operating Co., Inc. v. Transocean Offshore Deepwater Drilling, Inc.*, 919 F.3d 931, 935–36 (5th Cir. 2019); *see also* 9C CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2579 (3d ed.).  Since the "findings of fact and conclusions of law must be 'sufficient in detail and

any conclusions of law constitute findings of fact, they are adopted as such. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 401 (1990).

## FINDINGS OF FACT

Plaintiffs are two individuals and an entity: Constance Swanston ("Swanston"), Shannon Jones ("Jones"), and Women's Elevated Sober Living LLC ("WESL").  WESL operates a sober living home at 7312 Stoney Point Drive (the "Home"), which is within Defendant the City of Plano, Texas ("Plano").  Swanston is the owner of the Home and the primary operator of WESL, and Jones is a caretaker and resident of the Home.  This suit stems from WESL's existence and operations.

Swanston and her husband, James Kearins, are individuals in recovery from substance use disorders ("SUDs").  Together, they share a personal mission of helping others stay sober and live functioning lives.  One of the primary ways they seek to fulfill this mission is by opening and operating sober living homes.

---

exactness to indicate the factual basis for the ultimate conclusion reached,'" *Rivera v. Kirby Offshore Marine, L.L.C.*, 983 F.3d 811, 819 (5th Cir. 2020) (quoting *Lettsome v. United States*, 434 F.2d 907, 909 (5th Cir. 1970)), the Court "need only make brief, definite, pertinent findings and conclusions upon the contested matters," FED. R. CIV. P. 52(a) advisory committee's note to 1946 amendment.  This standard does not require the Court to "expressly respond like a debate champion to every evidentiary or factual contention made by the losing side." *Richard v. Reg'l Sch. Unit* 57, 901 F.3d 52, 59 (1st Cir. 2018); *see Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (collecting cases).

The facts contained herein are either undisputed or the Court has made such findings based on the credibility or believability of each witness.  In doing so, the Court considered all circumstances under which the witnesses testified, including: the relationship of a witness to Plaintiffs or Plano; the interest, if any, a witness has in the outcome of the case; a witness's appearance, demeanor, and manner of testifying while on the witness stand; a witness's apparent candor and fairness, or lack thereof; the reasonableness or unreasonableness of a witness's testimony; the opportunity of a witness to observe or acquire knowledge concerning the facts to which he or she testified; the extent to which a witness was contradicted or supported by other credible evidence; and whether such contradiction related to an important factor in the case or some minor or unimportant detail.  When necessary, the Court comments on the credibility of a witness or the weight given to a witness's testimony.

Finally, during trial, the Court may have carried various objections made by the parties to certain pieces of evidence.  To the extent the Court refers to such evidence, the objection is overruled if the Court has included and relied on it.  If the evidence was not included, this means the Court either overruled the objection or determined that the evidence was unnecessary for the findings and conclusions made here.

The Home is 5,890 square feet in size and is located in one of Plano's SF-7 zoning districts. With the intention of opening a sober living home in the area, Swanston purchased the Home from her mother for $467,000.  Swanston borrowed the entire purchase price from her mother under an agreement to repay the sale price over fifteen years at a 5% interest rate.  At the same time, she borrowed $20,000 in cash for start-up expenses.  The monthly payment from Swanston to her mother is $4,800, which WESL pays to Swanston for rent when funds are available.

In November 2018, WESL opened the doors of the Home as a sober living home.  Within the Home, WESL offers numerous benefits to its residents other than the general therapeutic atmosphere suitable for individuals in recovery.  There are required weekly meetings of Alcoholics Anonymous and Narcotics Anonymous that supplement residents' regular meetings outside the Home.  Residents of the Home sign an oath to abide by WESL's resident rules while staying at the Home, which includes remaining entirely sober and consenting to daily drug and alcohol testing. Residents share most things, from chores and free time to physical space, such as bedrooms, bathrooms, the living room, and the kitchen.  WESL provides additional services to the Home's residents, such as facilitating transportation, assisting with work and employment opportunities (*e.g.*, resume drafting, interview skill-building), and providing both off-site counseling and access to drug- and alcohol-education groups.

In early 2019, citizens of Plano began inquiring as to WESL's operations at the Home.  The concerned individuals generally took issue with three things: (1) the operation of a commercial enterprise in a single-family residential zoning district, (2) the number of residents living at the Home, and (3) the presence of "alcoholics" living together in the neighborhood.  In March 2019, complainant Kendel Reed ("Reed") contacted Plano requesting official action as to WESL and the

Home.  On March 4, 2019, Plano's Director of Neighborhood Services, Lori Schwarz, informed Reed that Plano planned to open an investigation into the Home.

Plano proceeded to reach out to WESL and, after some back-and-forth communication, informed WESL that the number of residents being housed in the Home exceeded eight (8)—the maximum number of residents allowed in an SF-7 zone by Plano Ordinance No. 2009-6-9 (the "Ordinance").  The Home is considered a "Household Care Facility" under Plano's zoning code, which is defined in relevant part as: "A dwelling unit that provides residence and care to not more than eight persons, regardless of legal relationship, who are . . . disabled . . . , living together with no more than two caregivers as a single household."

Soon thereafter, on April 16, 2019, WESL filed a reasonable-accommodation request with Plano's Board of Adjustment (the "Board").  On the application, WESL stated the following as the reason for the requested variance: "Use of property as Women's Sober Living with an occupancy of 15 individuals – residents will be disabled addicts in recovery."  WESL also attached a declaration to the application briefly summarizing WESL's mission and the disabilities from which residents of the Home suffer, as well as WESL's intake procedure and operations within the Home.

The Board took up WESL's requested accommodation at a public meeting held on May 28, 2019.  At the meeting, Plano's code-compliance officer recommended approval of WESL's request, and Plano's property-standards manager stated that, absent the Ordinance, the size of the Home could sleep thirty-four individuals.  Additionally, Swanston and her attorney presented on the request and took questions from the Board.

Then came the public comments.  Nearly one hundred members of the public attended the meeting, and police were needed for crowd control.  Thirty-three crowd members spoke up to offer

4

their opinions to the Board—all but one urged the Board to deny the request.[2]  The speakers generally expressed concern about: the SUDs of WESL's residents; potential uptick in crime due to WESL residents and visitors; traffic and parking arrangements; emergency-vehicle access; trash collection; visual aesthetics; and WESL's alleged violations of municipal law.   While not exhaustively listed, some of the more notable comments include the following:

- "These people have not been welcome any place they have gone . . . How many [sober living homes] do we want here?  How many are you guys going to . . . allow to move in here?";

- Describing Swanston and WESL as "real estate developers . . . cloaked under a bunch of do-gooderness";

- "I take my dog for a walk every day.  I don't go that way anymore.  I take the long way around because there are undesirables there";

- "I think it's a great mistake to . . . give these people . . . any more variances of any kind. They have not proven themselves to be a good neighbor";

- Stating that WESL residents "flick cigarettes" and "yell things" at passersby;

- "[S]ometimes crime can be an issue . . . , so I'm very concerned about both residents and visitors and whether or not I'll still be safe";

- "There's . . . a reason why there's 25 [sober living homes] in Richardson, because the property values are cheaper in there [sic] and it's a lot easier to operate";

- "[W]e don't want a group home in our neighborhood . . . . [W]e don't want a 15-bed sober house in our neighborhood";

- "Before you vote, I just want you to honestly ask yourself, would you want this next to your house?"

After hearing from Swanston's attorney once more, the Board closed the public hearing and discussed the matter privately.   Following brief deliberation, the Board rejected WESL's

---

[2] Notably, the individual who spoke in favor of granting WESL's requested accommodation resides next door to the Home.

requested accommodation by a vote of eight to zero.  Roughly one week later, Swanston and WESL filed the complaint that opened this action.

## CONCLUSIONS OF LAW

### I.    Jurisdiction and Venue

The Court has subject-matter jurisdiction over this action because Plaintiffs assert causes of action under the FHA and ADA, which arise under federal law.  28 U.S.C. § 1331. Alternatively, the Court has subject-matter jurisdiction pursuant to 42 U.S.C. § 3613(a)(1)(A) and 42 U.S.C. § 12133.  The Court has personal jurisdiction over Plano.  *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024–25 (2021).  Venue is proper in this action because "a substantial part of the events or omissions" giving rise to Plaintiffs' claims occurred in the Eastern District of Texas.  28 U.S.C. § 1391(b)(2).

### II.    Overview of Applicable Law[3]

"Congress enacted the FHA 'to eradicate discriminatory practices within a sector of our Nation's economy' and to clearly pronounce 'a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream.'"[4]  *Swanston v. City of Plano, Tex.*, No. 4:19-CV-412, 2020 WL 7080817, at *2 (E.D. Tex. Dec. 3, 2020) (first quoting *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Comms. Project, Inc. ("TDHCA")*, 576 U.S. 519, 539 (2015); and then quoting *Groome Res., Ltd., L.L.C. v. Parish of Jefferson*, 234 F.3d 192, 201 (5th

---

[3] Two of three Plaintiffs are not similarly situated to the residents of the Home: Swanston does not live there, and WESL is the legal entity operating out of the Home.  Nevertheless, Plaintiffs may bring this suit because they are "aggrieved persons" under the FHA, *see* 42 U.S.C. §§ 3602(f), (i)(1), 3613(a)(1)(A), and they allege disability-based discrimination under the ADA, *see id.* at §§ 12132–33.  *See Swanston v. City of Plano, Tex.*, No. 4:19-CV-412, 2020 WL 6799173, at *2–4 (E.D. Tex. Nov. 19, 2020).

[4] "Today, discrimination on the basis of disability is the most common form of housing discrimination; according to the National Fair Housing Alliance, in 2014, disability discrimination complaints made up over half of all discrimination complaints, while racial discrimination complaints made up approximately one-fifth of such complaints."  Brian J. Connolly, *Promise Unfulfilled? Zoning, Disparate Impact, and Affirmatively Furthering Fair Housing*, 48 Urb. Law. 785, 799 (2016).

Cir. 2000)).  Under the FHA, it is unlawful to sell, rent, or otherwise make unavailable or deny "a dwelling to any buyer or renter because of a handicap" of "that buyer or renter"; "a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available"; or "any person associated with that buyer or renter." 42 U.S.C. § 3604(f)(1)(A)–(C).  For purposes of this subsection, discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Id.* § 3604(f)(3).  "[P]recedent recogniz[es] the FHA's 'broad and inclusive' compass"—accordingly, courts afford the provisions of the statutory scheme "a 'generous construction.'" *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731 (1995) (quoting *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209, 212 (1972)).

Congress enacted the ADA "to remedy widespread discrimination against disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001); *see* 42 U.S.C. § 12101(b)(1)–(4).  Under Title II of the ADA, a "qualified individual with a disability" cannot "be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity" "by reason of such disability."  42 U.S.C. § 12132.  "Congress instructed the Attorney General to issue regulations implementing provisions of Title II, including § 12132's discrimination proscription," *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 591 (1999), and the implementing regulations "mirror" § 12132 by "requir[ing] that all services shall be accessible to the disabled," *Frame v. City of Arlington*, 657 F.3d 215, 245 (5th Cir. 2011) (en banc) (Jolly, J., dissenting in part and concurring in part) (emphasis omitted).  *See* 28 C.F.R. ch. 1, pt. 35, subpt. B.  Given the ADA's expansive aim of "establish[ing] a 'comprehensive national mandate for the elimination of discrimination against individuals with disabilities,'" *Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 239 (5th Cir. 2005) (quoting 42

U.S.C. § 12101(b)(1)), courts generally interpret the ADA broadly, *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 40 (1st Cir. 2018). *See* 28 C.F.R. § 35.101(b).

Three, similar theories of liability exist under the FHA and ADA, and, with one exception,[5] Plaintiffs plead each here: (1) disparate treatment (or intentional discrimination); (2) disparate impact (or discriminatory effect); and (3) failure to make a reasonable accommodation. *Avalon Residential Care Homes, Inc. v. City of Dallas*, 130 F. Supp. 2d 833, 839 (N.D. Tex. 2000) (FHA); *Davis v. Grand Prairie Sports Facilities Dev. Corp., Inc.*, No. 3:06-CV-744, 2007 WL 9711467, at *2 (N.D. Tex. Mar. 27, 2007) (ADA). "For each respective theory, the same analysis generally applies." *Valencia v. City of Springfield, Ill.*, 883 F.3d 959, 967 (7th Cir. 2018); *see Caron Found. of Fla., Inc. v. City of Delray Beach*, 879 F. Supp. 2d 1353, 1364 (S.D. Fla. 2012) ("Due to the similarity of the ADA and the FHA's protections of individuals with disabilities in housing matters, courts often analyze the two statutes as one."); *see also, e.g.*, *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1157–66 (9th Cir. 2013) (disparate treatment); *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1217–18 (11th Cir. 2008) (disparate impact); *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 781–87 (7th Cir. 2002) (failure to make a reasonable accommodation). This is not to say that the FHA and ADA are identical though. *See Schwarz*, 544 F.3d at 1212 n.6. Nevertheless, because the Court does not find the minor distinctions between these statutes impactful on the following analysis, the Court addresses the FHA and ADA claims together.[6] *See Providence Behav. Health v. Grant Rd. Pub. Util. Dist.*, 902 F.3d 448, 455 n.2 (5th Cir. 2018).

---

[5] Plaintiffs do not advance a disparate-impact claim under the ADA (*see* Dkt. #29 at pp. 21–23).
[6] Additionally, the Court conducts the analysis in this manner since the "parties likewise don't differentiate between the FHA and ADA claims." *Quality of Life, Corp. v. City of Margate*, 805 F. App'x 762, 767 n.4 (11th Cir. 2020).

### a.  Disparate Treatment

"'Disparate treatment' is 'deliberate discrimination.'"  *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co. (ICP)*, 920 F.3d 890, 909 (5th Cir. 2019) (quoting *Muñoz v. Orr*, 200 F.3d 291, 299 (5th Cir. 2000)), *cert. denied*, 140 S. Ct. 2506 (2020).  A disparate-treatment claim can be proved through direct or circumstantial evidence.  *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 967 (5th Cir. 2016).  The Court, however, previously granted summary judgment in favor of Plano on the direct-evidence theory; therefore, Plaintiffs can only prevail on their disparate-treatment claim with circumstantial evidence.  *See Swanston*, 2020 WL 7080817, at *5– 7.  Normally, claims of disparate treatment based on circumstantial evidence are analyzed under the familiar *McDonnell Douglas* "burden-shifting evidentiary standard."  *ICP*, 920 F.3d at 910; *see Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) ("The method suggested in *McDonnell Douglas* for pursuing this inquiry . . . is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination."). But because the Court already found that Plano articulated a legitimate, nondiscriminatory reason for enacting the Ordinance,[7] *Swanston*, 2020 WL 7080817, at *8, Plaintiffs are "'left with the ultimate burden of proving discrimination' by demonstrating 'that the reason offered by [Plano] is a pretext for discrimination,'" *id.* at *4 (quoting *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002)).  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (explaining that after a defendant offers a legally sufficient justification for allegedly discriminatory action, "the sole remaining issue [i]s 'discrimination *vel non*'" (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983))).  The "ultimate burden" of persuading

---

[7] As precedent requires, this determination initially did not involve a "credibility assessment."  *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 561 (5th Cir. 2019).  After assessing credibility, the Court still finds the reasons offered for enacting the Ordinance to be legitimate and nondiscriminatory.

the Court that Plano's enactment of the Ordinance "intentionally discriminated against" Plaintiffs "remains at all times with" Plaintiffs.  *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

### b.  Disparate Impact

A disparate-impact claim, unlike those for disparate treatment, "looks at the effects of policies, not one-off decisions."  *City of Joliet, Ill. v. New W., L.P.*, 825 F.3d 827, 830 (7th Cir. 2016); *see Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty.*, ___ F.4th ___, ___, No. 20-40027, 2021 WL 3205481, at *10 (5th Cir. July 29, 2021) (Ho, J., concurring in part and concurring in the judgment) ("It's the difference between securing equality of opportunity regardless of [a protected trait] and guaranteeing equality of outcome based on [that trait].").  The Supreme Court explained that courts should analyze FHA disparate-impact claims using a burden-shifting framework.  *ICP*, 920 F.3d at 903; *see TDHCA*, 576 U.S. at 541 ("[T]he Title VII framework may not transfer exactly to the fair-housing context, but the comparison suffices . . . .").

Under the first step, Plaintiffs must demonstrate a "robust" causal connection between the Ordinance and the disparate impact on qualified individuals with SUDs.  *TDHCA*, 576 U.S. at 543. While the Fifth Circuit has not settled on a standard for the requisite degree of robustness, *see ICP*, 920 F.3d at 903–05, this requirement clarified the Supreme Court's intent "to limit the nature of a disparate impact claim asserted pursuant to the FHA," *Inclusive Cmtys. Project, Inc. v. Heartland Cmty. Ass'n, Inc.*, 399 F. Supp. 3d 657, 666 (N.D. Tex. 2019) (footnote omitted), *aff'd*, 824 F. App'x 210 (5th Cir. 2020).  At the second step, Plano must be given "leeway to state and explain the valid interest served" by the Ordinance.  *TDHCA*, 576 U.S. at 541; *cf. Davis v. District of Columbia*, 925 F.3d 1240, 1251 (D.C. Cir. 2019) ("[U]ltimately, 'the touchstone for disparate-impact liability is the lack of business necessity' supporting the challenged practice."

(quoting *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009))).  At the third and final step, Plaintiffs must show that the interest Plano proffered as justification for the Ordinance could be served in a manner yielding a less discriminatory effect.  *ICP*, 920 F.3d at 902.

Moreover, in FHA disparate-impact cases, the Supreme Court has outlined "adequate safeguards" for consideration by the lower courts to ensure that disability is not "used and considered in a pervasive way" and "to prevent governmental or private entities [from] us[ing] 'numerical quotas'" in contravention of the Constitution.  *TDHCA*, 576 U.S. at 542 (citation omitted); *see Inclusive Cmty. Project, Inc. v. U.S. Dep't of Treasury*, No. 3:14-CV-3013, 2016 WL 6397643, at *11 (N.D. Tex. Oct. 28, 2016).  Absent these safeguards, courts "might displace valid governmental and private priorities, rather than solely 'removing artificial, arbitrary, and unnecessary barriers.'"  *TDHCA*, 576 U.S. at 543 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)).

### c.   Reasonable Accommodation

A claim for failure to make a reasonable accommodation arises when plaintiffs are not granted a reasonable accommodation that is "necessary to allow the plaintiffs to have usage and enjoyment in a facility equivalent to individuals who are not disabled."  *Providence Behav. Health*, 902 F.3d at 459; *see Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 922–23 (10th Cir. 2012) (Gorsuch, J.) ("A claim for reasonable accommodation is yet a different sort of animal.  It does not require the plaintiff to prove that the challenged policy intended to discriminate or that in effect it works systematically to exclude the disabled.").  To prevail on their failure-to-accommodate claim, Plaintiffs must demonstrate that (1) residents of the Home are

"handicapped"; [8] (2) Plaintiffs requested an accommodation and Plano refused it; (3) the requested accommodation was reasonable; and (4) the requested accommodation was necessary to afford WESL residents equal opportunity to use and enjoy the Home. [9]  *Houston v. DTN Operating Co., LLC*, No. 4:17-CV-35, 2017 WL 4653246, at *3 (E.D. Tex. Oct. 17, 2017).  In general, reasonable accommodation "requires a balancing of the interest of and benefit to the handicapped individual against the interest of and burden to [a] municipality in making such accommodations based on the facts of each case." *Robinson v. City of Friendswood*, 890 F. Supp. 616, 621 (S.D. Tex. 1995). As such, "[w]hether a requested accommodation is reasonable is highly fact-specific, and determined on a case-by-case basis . . . ." *Dadian v. Vill. of Wilmette*, 269 F.3d 831, 838 (7th Cir. 2001).

### III.   Disability Status of WESL Residents

A person has a disability if (1) "a physical or mental impairment" "substantially limits one or more" of that person's "major life activities"; (2) there is a "record" of "such an impairment"; or (3) that individual is "regarded as having such an impairment."  42 U.S.C. §§ 3602(h)(1)–(3), 12102(1)(A)–(C).  SUDs are generally considered impairments for purposes of the FHA and ADA. *Oxford House, Inc. v. Browning*, 266 F. Supp. 3d 896, 910–11 (M.D. La. 2017); *see, e.g.*, H.R. REP. NO. 101-485, pt. 2, at 51 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 303, 333 (listing "drug addiction" and "alcoholism" as "specific conditions . . . that would constitute physical or mental impairments" under the ADA).   There is, however, a carveout—the statutes do not cover

---

[8] The Court finds any distinction between a "handicap" under the FHA and a "disability" under the ADA irrelevant here.  *Jackson v. City of Grand Prairie, Tex.*, No. 3:19-CV-2940, 2020 WL 1864641, at *1 n.1 (N.D. Tex. Apr. 13, 2020).

[9] One key difference between the FHA and ADA is that the FHA's protections extend only to "dwellings" while no such limitation exists under the ADA. *Schwarz*, 544 F.3d at 1212 n.6.  The FHA defines a "dwelling" as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families." 42 U.S.C. § 3602(b).  And a "family" includes individuals. *Id.* § 3602(c). Given the uncontroverted evidence presented at trial, WESL qualifies as a dwelling under the FHA. *See Lakeside Resort Enters., LP v. Bd. of Supervisors of Palmyra Twp.*, 455 F.3d 154, 158–60 (3d Cir. 2006).

individuals with SUDs who currently "use" or are "addict[ed] to" a "controlled substance."  42

U.S.C. § 3602(h); *see* 24 C.F.R. § 100.201.  Accordingly, having a SUD is not necessarily the

same as being disabled for purposes of the relevant statutes.  *See Burch v. Coca-Cola Co.*, 119

F.3d 305, 315–16 (5th Cir. 1997).  In addition, the term "major life activities" describes "those

activities that are of central importance to daily life."  *Toyota Motor Mfg., Ky., Inc. v. Williams*,

534 U.S. 184, 197 (2002), *superseded by statute*, ADA Amendments Act of 2008, Pub. L. No.

110-325, 122 Stat. 3553 (2009); *see, e.g.*, 42 U.S.C. § 12102(2)(A).  Moreover, by modifying

"limits" with "substantially," Congress indicated that the burden to a major life activity must not

be de minimis.  *See Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 45 (2d Cir. 2015).  Given

the fact-specific nature of disability's statutory definition, determining whether an individual is

disabled is done on a case-by-case basis.  *Abrams v. Reade*, 419 F. Supp. 2d 476, 482 (S.D.N.Y.

2005).

WESL's residents are disabled in that, among other things, "their inability to live

independently constitutes a substantial limitation on their ability to 'care for themselves.'"  *United

States v. Borough of Audubon, N.J.*, 797 F. Supp. 353, 359 (D.N.J. 1991), *aff'd*, 968 F.2d 14 (3d

Cir. 1992).  The residents' inability to live independently without relapsing—a threshold

requirement for residency at the Home—substantially limits their ability to care for themselves,

which entitles the residents to statutory protection.  *See Oxford House, Inc. v. City of Baton Rouge,

La.*, 932 F. Supp. 2d 683, 689 (M.D. La. 2013).  In addition, several WESL residents took the

stand and testified as to other substantial limitations on major life activities caused by their SUDs.

*See* Trial Test. of K.H., Feb. 9, 2021; Videotape Dep. of K.E., Feb. 9, 2021; Trial Test. of T.H.,

Feb. 9, 2021; *see also* Trial Test. of Dr. John Majer, Feb. 8, 2021 (describing WESL residents'

SUDs as substantially limiting the ability of residents to stay sober, have a social life, and maintain

employment).  Finally, WESL residents are not excluded from statutory protection because they are not current users or abusers of controlled substances.  *See Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1231 n.5 (D.C. Cir. 1997).  WESL maintains a zero-tolerance policy for alcohol and non-prescribed drug use, performing daily drug and alcohol tests to ensure compliance (Dkt. #116 at p. 17).  *See* Trial Test. of Constance Swanston, Feb. 8, 2021; Trial Test. of Shannon Jones, Feb. 8, 2021; Pls.' Ex. 26; *see also McKivitz v. Twp. of Stowe*, 769 F. Supp. 2d 803, 821–22 (W.D. Pa. 2010) (explaining that testing residents for substance use ensures the residents' statutory disability status).

## IV.    Disparate Treatment

After extensively evaluating the evidence presented at trial, the Court concludes that Plano did not intentionally discriminate against Plaintiffs.

Though some evidence of pretext has been presented regarding Plano's actions, given the entire body of facts before the Court, there is still not enough for the Court to conclude that Plano's enactment of the Ordinance *intentionally* discriminated against Plaintiffs.  The Court briefly addresses Plaintiffs' main arguments and why they were ultimately unpersuasive.

First, Plaintiffs spent significant time exploring the history of Plano's ordinances related to housing for individuals in recovery from SUDs, attempting to demonstrate Plano's intent to discriminate through its alleged goal of altering the zoning scheme as minimally as possible (*see* Dkt. #116 at pp. 20–28).  For instance, in their post-trial brief, Swanston and WESL offer variations on that same sentiment:

- The "Ordinance was written to provide the least access [Plano] thought it could get away with under federal and state law" (Dkt. #116 at p. 20);
- "[T]he goal was to do as little as possible for those with disabilities while avoiding litigation" (Dkt. #116 at p. 25);

- "The new definition . . . met the . . . goal[] of . . . giving those with disabilities the absolute minimum that the law would permit" (Dkt. #116 at p. 26).

And on direct examination, Phyllis Jarrell, a former planner for Plano, stated that the aim behind the Ordinance was to enact the proper zoning scheme for Plano and its citizens while not violating federal law.  Trial Test. of Phyllis Jarrell, Feb. 9, 2021.

This line of argumentation is flawed and does not apply the correct standard of law. Plaintiffs are attempting to import a reasonableness element into the disparate-treatment framework.  Plano already put forward valid reasons for the Ordinance.  *See Swanston*, 2020 WL 7080817, at *8.  So Plaintiffs bear the burden to show, by a preponderance of the evidence, that either "a discriminatory reason more likely motivated" Plano's enactment of the Ordinance or that Plano's "proffered explanation" for enacting the Ordinance "is unworthy of credence."  *Burdine*, 450 U.S. at 256; *see Ameristar Airways, Inc. v. Admin. Rev. Bd.*, 650 F.3d 562, 567 (5th Cir. 2011) ("[T]he complainant at all times retains the ultimate burden of persuading the trier of fact."). Contrary to what Plaintiffs imply, under this theory of liability, the FHA and ADA do not require Plano to enact a reasonable zoning scheme—just one that does not deliberately discriminate based on the protected trait covered by the statutes.  *See Anderson v. Winter*, 631 F.2d 1238, 1240–41 (5th Cir. 1980) ("[C]ourts will not strike down state laws regulating economic and social concerns merely 'because they may be unwise, improvident, or out of harmony with a particular school of thought.'" (quoting *Williamson v. Lee Optical*, 348 U.S. 483, 488 (1954))).

To some extent, Plano's reactions over time to various regulatory measures and legal actions are *exactly* the point of the statutes this case involves.  Laws can serve various ends—one of which here is the alteration of individual and collective behavior.  *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 579 (1995) ("[T]he law is free to promote all sorts of conduct in place of harmful behavior.").  And laws typically achieve such ends via positive

and negative incentives—that is, sometimes by carrot, sometimes by stick.  The enactors of the Fair Housing Amendments Act of 1988 knew as much—they specifically sought to extricate from municipal codes nationwide all zoning regulations that intentionally discriminated against individuals with disabilities.  *See* H.R. REP. NO. 100-711, at 24 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2185 ("The Committee intends that the prohibition against discrimination against those with handicaps apply to zoning decisions and practices.").  Adapting to legislative mandates and dealing with litigants pursuant to those mandates, *see, e.g.*, 42 U.S.C. § 3613(a), are precisely what lawmakers intended for municipalities like Plano.  Accordingly, Plaintiffs' argument that Plano sought only to enact a zoning structure that complies with—but does not exceed—the statutory requirements is unavailing.

Another contention Plaintiffs make is that Plano lacked hard evidence to justify enactment of the Ordinance.  For example, in their post-trial brief, Swanston and WESL argue that Plano "never once sought evidence that would link its zoning restrictions on housing for the disabled to the legitimate purpose of single-family zoning; that is, protecting single family neighborhoods from noise, pollution, traffic and similar ills" (Dkt. #116 at p. 20).  They advanced this argument several other times in the same brief (*see* Dkt. #116 at pp. 22, 24, 28), as well as at trial.  *See* Trial Test. of Phyllis Jarrell, Feb. 9, 2021 (testifying that Plano's decisions relevant to the zoning choices at issue were made without gathering and consulting statistics on pertinent data such as crime, traffic, and noise).  Plaintiffs urge the Court to conclude that Plano's lack of reference to data when making zoning decisions is indicative of discriminatory intent toward individuals with disabilities (*see* Dkt. #116 at p. 29).

The Court cannot agree for two reasons.  First, as with the previously addressed argument, Plaintiffs' position misconstrues the applicable burden of proof.  To be certain, the minimal degree

of empirical evidence supporting Plano's amendments to the zoning scheme makes Plano's justifications less worthy of credence—basing its decisions on hard data would make such zoning decisions less susceptible to challenges for pretext.  Nevertheless, the onus remains with Plaintiffs to show that Plano's reasoning was pretextual.  *See, e.g.*, *Roy v. Bd. of Cnty. Comm'rs*, 607 F. Supp. 2d 1297, 1307 (N.D. Fla. 2009) (citing the *plaintiffs'* lack of "statistical proof" as a key reason for not finding pretext).  As such, the Court finds that the general lack of hard data to justify Plano's zoning measures does not demonstrate pretext.

Second, and contrary to Plaintiffs' implication, there is no requirement that Plano's reasoning for amending its zoning scheme must be supported by ironclad metrics (*see* Dkt. #116 at p. 22 n.43).  *See also E.B. Elliott Adv. Co. v. Metro. Dade Cnty.*, 425 F.2d 1141, 1151 (5th Cir. 1970) (stating that the challenged provisions of an ordinance need only "bear a reasonable relationship" to "permissible objectives").  At base, "[z]oning measures must find their justification in the police power exerted in the interest of the public." *Washington ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116, 120–21 (1928).  Once valid reasons under the police power are present, an enactment generally "need only bear a rational relation" to those reasons.  *Duarte v. City of Lewisville, Tex.*, 858 F.3d 348, 354 (5th Cir. 2017).  Such a relationship exists "if there is a problem 'at hand for correction' and 'it *might be thought* that the particular legislative measure was a rational way to correct it.'"  *EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 978 F.3d 418, 438 (6th Cir. 2020) (emphasis added) (quoting *Lee Optical*, 348 U.S. at 488); *see United States v. Comstock*, 560 U.S. 126, 151 (2010) (Kennedy, J., concurring).  The means by which a legislative measure addresses an issue can be rational even when "hypothetical facts" are used, *Record Head Corp. v. Sachen*, 682 F.2d 672, 679 (7th Cir. 1982), "statistical studies" are absent, *Maguire v. Thompson*, 957 F.2d 374, 378 (7th Cir. 1992), or the state actor is "incorrect in its

assessment of the facts it relies on," *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011).  "In other words, a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."  *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993).

The relatively low threshold for this showing is logical given the respective institutional competencies of lawmaking bodies and judicial tribunals.  Individuals with disabilities make up a "large and diversified group" within American society, and determining just how they must be "treated under the law is a difficult and often a technical matter, very much a task for [lawmakers] guided by qualified professionals and not by the perhaps ill-informed opinions of the judiciary." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 442–43 (1985).  The Court, like all other Article III courts, cannot "sit as a super-legislature to weigh the wisdom of legislation nor to decide whether the policy which it expresses offends the public welfare." *Day-Brite Lighting Inc. v. Missouri*, 342 U.S. 421, 423 (1952).  Requiring any further justification from a governmental entity engaged in the lawmaking process might "lead it to refrain from acting at all," *City of Cleburne*, 473 U.S. at 444, which is why a presumption exists "that, *absent some reason to infer antipathy*, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted," *Vance v. Bradley*, 440 U.S. 93, 97 (1979) (emphasis added) (footnote omitted). Plaintiffs simply have not provided sufficient evidence to warrant a finding of pretext.  As such, Plaintiffs' argument regarding the general absence of hard evidence in relation to Plano's enactment of the Ordinance is unpersuasive.

Finally, Plaintiffs argue that "absent evidence casting doubt on the circumstantial evidence presented at trial[,] the Plaintiffs proved their case of intentional discrimination" (Dkt. #116 at p.

28).   Plaintiffs ask the Court to infer that "the lack of evidence at trial reflects an absence of evidence in general," which, in Plaintiffs' view, is indicative of Plano's intent to discriminate (Dkt. #116 at p. 29).   Apart from being another attempt by Plaintiffs to invert the burden of proof, this argument fails for another reason: "Proving the motivation behind official action is often a problematic undertaking."   *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).   Determining the "motivation or intent" behind a legislative enactment is "a paradigmatic fact question," *Prejean v. Foster*, 227 F.3d 504, 509 (5th Cir. 2000), and the corresponding burden for a party to demonstrate discriminatory motive is demanding, requiring "significant probative evidence" of discriminatory intent, *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).   *See Jones v. Gulf Coast Rest. Grp., Inc.*, ___ F.4th ___, ___, No. 21-60052, 2021 WL 3465000, at *3 (5th Cir. Aug. 6, 2021) ("What's more, the plaintiff must produce 'substantial evidence' of pretext.   The quality and weight of the evidence determines whether it is substantial." (citation omitted)); (*see also* Dkt. #115 at p. 6 n.2).   Courts are rightfully weary to paint an entire lawmaking body with a broad-brush desire to blatantly discriminate—doing so brands the lawmakers and their official actions as improper and strongly implies a deliberate effort to treat protected individuals in an alternative (and forbidden) manner.[10]   So despite the evidence elicited by Plaintiffs supporting their circumstantial narrative of Plano's discriminatory intent, the Court finds that the discriminatory intent allegedly exhibited in the Ordinance's enactment does not demonstrate an intentional desire to discriminate.

---

[10] This idea relies on the contested premise that a lawmaking body actually possesses a cogent and identifiable collective intent.   *See United States v. Mitra*, 405 F.3d 492, 495 (7th Cir. 2005) (Easterbrook, J.) ("Legislation is an objective text approved in constitutionally prescribed ways; its scope is not limited by the cerebrations of those who voted for or signed it into law.").   *See generally* Richard H. Fallon, Jr., *Constitutionally Forbidden Legislative Intent*, 130 Harv. L. Rev. 523 (2016).

In sum, the Court finds that, on balance, the evidence presented at trial is insufficient to show that Plano intentionally discriminated against the disabled by enacting the Ordinance.  And even though Plano did not present a supremely strong case to defend its decisions, it presented enough to avoid a finding of discriminatory intent.  *See Metropolis Theater Co. v. City of Chicago*, 228 U.S. 61, 69–70 (1913) ("The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.").  Therefore, the Court finds in favor of Plano on Plaintiffs' disparate-treatment claim.

## V.    **Disparate Impact**

Plaintiffs next urged their disparate-impact claim.  Their effort is unsuccessful for two reasons.

First, Plaintiffs' disparate-impact claim is actually a claim for disparate *treatment*, not disparate impact.  Claims for disparate treatment and disparate impact "take aim at the same evil— discrimination on a prohibited basis—but simply seek to establish it by different means."  *Lewis v. City of Chicago*, 560 U.S. 205, 215 (2010).  The difference is that "disparate treatment requires a showing of discriminatory intent and disparate impact does not," *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1278 (11th Cir. 2000), and these claims "come with different standards of liability, different defenses, and different remedies," *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1365 (2015) (Scalia, J., dissenting).  *See Harrell v. N. Elec. Co.*, 672 F.2d 444, 446 n.2 (5th Cir. 1982).  The Supreme Court instructs courts "to distinguish between these theories" with care. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003).

Bearing this in mind, it is apparent from Plaintiffs' pleadings and evidence that they seek recovery for disparate treatment, not disparate impact.  *See, e.g.*, *Inclusive Comms. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affs.*, No. 3:08-CV-546, 2016 WL 4494322, at *7 (N.D. Tex. Aug.

26, 2016).    Nowhere have Plaintiffs specifically identified a *neutral* policy that has a disproportionately adverse effect on qualified individuals with SUDs.  *See TDHCA*, 576 U.S. at 524.  Along the same lines, the core argument advanced by Plaintiffs is that the Ordinance and Plano's zoning scheme generally run afoul of the FHA by "treat[ing] the disabled differently than those without disabilities" (Dkt. #29 at p. 19).   Considering the nature of this challenge and the Court's previous finding that, "[j]ust on its face, the Ordinance treats unrelated disabled persons better than unrelated non-disabled persons," *Swanston*, 2020 WL 7080817, at *6, this claim is a disparate-impact claim in name only—it is more accurately characterized as a disparate-treatment claim, *see Larkin v. Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 290 (6th Cir. 1996).  *See also, e.g.*, *Richardson v. Porter Hedges, LLC*, 22 F. Supp. 3d 661, 665–66 (S.D. Tex. 2014); *Hackney v. Tex. Dep't of Crim. Just.*, No. 1:07-CV-113, 2009 WL 2391232, at *6 (E.D. Tex. Aug. 4, 2009). Accordingly, Plaintiffs' "disparate-impact" claim cannot succeed for this reason alone.[11]

But assuming momentarily Plaintiffs had identified such a policy, their claim would still fall short for failing to establish the causality element.  The Supreme Court has established that the first step of the disparate-impact analysis—at which the plaintiff must make a prima facie showing that "the challenged practice causes a discriminatory effect"—requires proof of "robust causation." *ICP*, 920 F.3d at 902–03.  Though the Supreme Court and the Fifth Circuit have not precisely defined what this term encompasses, under any of the standards previously explored by the Fifth Circuit, Plaintiffs have not established "robust causation" between a challenged practice and some discriminatory effect.  *See id.* at 903–09; *see also Heartland Cmty. Ass'n*, 824 F. App'x at 213 ("[I]n order to cabin disparate-impact liability, the Supreme Court imposed 'a robust causality

---

[11] Permitting this claim to move forward under the disparate-impact theory would "provide a means to circumvent the subjective intent requirement in [a] disparate treatment case."  *Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.*, 964 F.2d 106, 115 (2d Cir. 1992).

requirement' to 'ensure that . . . imbalance does not, without more, establish a prima facie case of disparate impact.'" (original alterations and citation omitted)).  Absent robust causation, Plaintiffs' disparate-impact claim would also fail.

## VI.   Reasonable Accommodation

The Court finally turns to Plaintiffs' failure-to-accommodate claim.  To refresh, Plaintiffs needed to show that (1) the residents of the Home are disabled, (2) Plaintiffs requested an accommodation and Plano denied it, (3) the requested accommodation was reasonable, and (4) the requested accommodation was necessary to afford WESL residents equal opportunity to use and enjoy the Home.  *See Providence Behav. Health*, 902 F.3d at 459.  The Court has already determined the Home's residents are disabled, *supra* pp. 12–14.  As well, uncontroverted evidence shows that Plaintiffs requested an accommodation, Pls.' Ex. 17; Def.'s Ex. 17A, and Plano denied the requested accommodation, Pls.' Ex. 18.  The Court accordingly turns to the necessity and reasonableness elements.  As is standard, the burden of proof remains with Plaintiffs.  *Elderhaven, Inc. v. City of Lubbock, Tex.*, 98 F.3d 175, 178 (5th Cir. 1996).

### a.   Necessity

In this statutory setting, necessity may take two forms: financial or therapeutic.  *Harmony Haus Westlake, L.L.C. v. Parkstone Prop. Owners Ass'n*, 851 F. App'x 461, 465 (5th Cir. 2021); *see Bryant Woods Inn, Inc. v. Howard Cnty., Md.*, 124 F.3d 597, 605 (4th Cir. 1997) (requiring necessity that makes a group home "financially viable" or "therapeutically meaningful").  But before examining the first half of this statutory element, the Court briefly considers the latter half: "to afford such person equal opportunity to use and enjoy a dwelling."  *See Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 541 (6th Cir. 2014) (describing this aspect of reasonable accommodation as "subsumed within the necessity inquiry").

22

The word "[n]ecessary means 'indispensable, requisite, essential, needful; that cannot be done without.'"  *Harmony Haus*, 851 F. App'x at 465 (quoting *Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 105 (3d Cir. 2018)).   This definition invites an obvious question: necessary to achieve what end?   The statute provides the answer: "to afford such person equal opportunity to use and enjoy a dwelling."[12]  42 U.S.C. § 3604(f)(3)(B); *see Vorchheimer*, 903 F.3d at 107 (explaining that this language "pegs the necessity to the goal of providing the particular tenant with equal housing opportunity").   As then-Judge Gorsuch explained,

> Think of the blind woman who obtains an exemption from a "no pets" policy for her seeing eye dog, or the paraplegic granted special permission to live on a first floor apartment because he cannot climb the stairs. But without an accommodation, those individuals cannot take advantage of the opportunity (available to those without disabilities) to live in those housing facilities.  And they cannot because of conditions created by their disabilities.  These examples show that under the FHA it is sometimes necessary to dispense with formal equality of treatment in order to advance a more substantial equality of opportunity.  And that is precisely the point of the reasonable accommodation mandate:  to require changes in otherwise neutral policies that preclude the disabled from obtaining "the same opportunities that those without disabilities automatically enjoy."

*Cinnamon Hills*, 685 F.3d at 923 (cleaned up) (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 397 (2002)).

The question remains, however, what does it mean to afford a disabled individual equal opportunity to use and enjoy a dwelling?   Plano suggests in its post-trial brief, as it did at trial, that because a significant number of beds were open at sober living homes in the same area as the Home, Plaintiffs' requested accommodation is not necessary to afford individuals in recovery from SUDs an equal opportunity to use and enjoy a dwelling (Dkt. #115 at p. 29).  *See* Trial Test. of Dr. Kevin Gilliland, Feb. 9, 2021.  Legal precedent exists outside the Fifth Circuit supporting this view.  *See, e.g.*, *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains*, 284

---

[12] The Court has already found WESL to be a "dwelling."  *See supra* p. 12 n.9.

F.3d 442, 460 (3d Cir. 2002) ("The "equal opportunity" that [the plaintiff] seeks to provide here is the opportunity for handicapped persons to live in a single-family residential neighborhood."); *Bryant Woods*, 124 F.3d at 605.  Nevertheless, the Court finds this position unpersuasive.

The plain language of § 3604(f)(3)(B) is best understood as referring to an equal opportunity for a disabled individual to live in the housing *of their choice*.  *Yates Real Est., Inc. v. Plainfield Zoning Bd. of Adjustment*, 404 F. Supp. 3d 889, 920 & n.37 (D.N.J. 2019).  Several courts of appeals agree with this interpretation.  *See, e.g.*, *Schwarz*, 544 F.3d at 1225–26 ("[T]he essential question in reasonable accommodation cases is whether the handicapped have an equal opportunity to live in the dwellings of their choice, not simply an opportunity to live somewhere in the City. . . . [T]he availability of another dwelling somewhere within the City's boundaries is irrelevant to whether local officials must accommodate recovering substance abusers in the halfway houses of their choice."); *Oconomowoc*, 300 F.3d at 784.  And although the Fifth Circuit has yet to take a side in this circuit split, a recent panel approvingly cited a Sixth Circuit decision endorsing this understanding of the "equal opportunity" language.  *See Harmony Haus*, 851 F. App'x at 465 (quoting *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d at 541, for the proposition that "[a]n FHA reasonable-accommodation plaintiff must show that, but for the requested accommodation or modification, he likely will be denied an *equal opportunity to enjoy the housing of his choice*" (original alterations omitted) (emphasis added)).

Further, the logical extension of Plano's interpretation of "equal opportunity" yields absurd results.  For instance, take now-Justice Gorsuch's hypotheticals from *Cinnamon Hills*.  Under Plano's interpretation, the dwelling of the blind woman's choosing could deny her an exemption from a "no pets" policy for her seeing eye dog as long as another dwelling within the same geographical area does not impose a policy disallowing her seeing eye dog.  Similarly, the dwelling

of the paraplegic man's choosing could deny him permission to live in a first-floor apartment so long as another dwelling within the same geographical area allows him to reside in a unit on the first floor.   Such outcomes would exacerbate and perpetuate discrimination against those the relevant statutes protect (*see* Dkt. #114 at pp. 23–24; Dkt. #117 at p. 1).   *See also Sapp v. MHI P'ship, Ltd.*, 199 F. Supp. 2d 578, 587 (N.D. Tex. 2002) ("Defendants . . . assert that they are not in violation of the ADA because Defendants had other sales office locations around the city which were ADA-accessible . . . .   Defendants seem to be putting forth a variation on the separate-but-equal approach not viable since *Brown v. Board of Education*."); *Hearings Before the Subcomm. on Const. Rts. of the S. Comm. on the Judiciary on S. 1026, S. 1318, S. 1359, S. 1362, S. 1462, H.R. 2516 and H.R. 10805: Proposed Civil Rights Acts of 1967*, 90th Cong. 73–74 (1967) (statement of Ramsey Clark, Att'y Gen. of the United States) ("Open housing reaches the roots of discrimination.   While there is segregation in housing[,] other basic opportunities are lost to the segregated.").

Consequently, the Court proceeds under the interpretation of § 3604(f)(3)(B) requiring that a reasonable accommodation must afford a disabled individual an equal opportunity to live in the dwelling of their choice.

### i.  Economic Necessity

Plaintiffs first argue the financial necessity for WESL to have fifteen residents.   Given the evidence put forward at trial, the Court finds that Plaintiffs have not proven economic necessity by a preponderance of the evidence.

The Court concludes as such for two general reasons.   First, by purchasing the Home, Swanston was (or should have been) aware of what the transaction meant for WESL.   Swanston purchased the Home with the intention of operating a sober living home, doing so after some, but

25

not extensive, research into what this endeavor would entail financially.  *See* Trial Test. of Constance Swanston, Feb. 8, 2021.  When they made the purchase, they knew or should have known that the Home was located in the SF-7 district of Plano's zoning scheme, in which the Ordinance limits a "Household Care Facility" to "eight persons, regardless of legal relationship, who are . . . disabled . . . living together with no more than two caregivers."  Pls.' Ex. 4; Def.'s Ex. 16; *see Cooksey v. Sinder*, 682 S.W.2d 252, 253 (Tex. 1984) (per curiam).  From the very start, to ensure that the larger space could provide such a valuable service to individuals in recovery from SUDs while remaining financially viable, the Home would need to house a larger number of residents.

The economics of this transaction cannot have come as a surprise to Swanston (*see, e.g.*, Dkt. #28 at p. 6).  Nevertheless, Plaintiffs argue that it is financially *necessary* for more residents to live in the Home.  It makes little sense for Plaintiffs to purchase a large property and *subsequently* seek an exemption from municipal zoning regulations simply because more residents are necessary to remain in the black—this theory of self-inflicted economic necessity is unavailing. *Cf. Zimmerman v. City of Austin, Tex.*, 881 F.3d 378, 389 (5th Cir. 2018).  Taken to its logical conclusion, Plaintiffs' theory would allow them to purchase a multimillion-dollar mansion and be allowed a variance from a valid single-family zoning ordinance so the facility could survive financially.  *See Bryant Woods*, 124 F.3d at 605 ("If Bryant Woods Inn's position were taken to its limit, it would be entitled to construct a 10-story building housing 75 residents, on the rationale that the residents had handicaps."); *see also* JESSE DUKEMINIER ET AL., PROPERTY 968 (8th ed. 2014) (describing "protection of the single family home" as one of the "underlying principles" of "modern city planning").  As such, what Swanston knew or should have known when purchasing the Home is one reason the Court did not find financial necessity.

Additionally, the Court makes its finding based on WESL's current operating scheme.  At trial, Swanston answered questions regarding the financial operations of WESL.  The weekly rate WESL charges its residents, when rent is collected, and whether rent is collected at all are within the discretion of WESL and its operators.  While the Court understands that some of the uncertainty with these variables is part of maintaining a welcoming and therapeutically beneficial environment at WESL, financial necessity is a black-and-white determination—the statutory language makes clear that economic necessity is the amount of net income that is indispensable to the financial operation of an enterprise.  *See Cinnamon Hills*, 685 F.3d at 923.  By setting the weekly rent rate at its current level and allowing discontinuity in the rent-collection process, Plaintiffs have made it extremely difficult to discern whether fifteen residents is financially necessary as compared to eight (*see* Dkt. #115 at pp. 24–25).  Furthermore, WESL's operating expenses are not insignificant, and the Court heard little to no testimony on whether reducing some of these expenses would make WESL financially viable with eight residents.  *See* Pls.' Ex. 31–32; *see also Smith & Lee Assocs., Inc. v. City of Taylor, Mich.*, 13 F.3d 920, 931–32 (6th Cir. 1993).  As well, Plaintiffs have not cited any caselaw indicating that financial necessity allows them to collect "profits sufficient to make it worthwhile given the initial investment and the time and labor required" to operate WESL (Dkt. #116 at p. 14).  Because Plaintiffs did not ultimately show WESL's current operating scheme to preclude the facility from remaining financially viable, the Court is unable to find Plaintiffs' requested accommodation necessary on economic grounds.

### ii.  Therapeutic Necessity

Though financial matters may not make Plaintiffs' request necessary, therapeutic concerns are a different story.  But before proceeding with this analysis, the Court turns its attention to an issue raised about the expert testimony on this element.  Plaintiffs and Plano each offered the

testimony of their own expert witnesses: Dr. John Majer ("Dr. Majer") for Plaintiffs, and Dr. Kevin Gilliland ("Dr. Gilliland") for Plano.  Dr. Gilliland faced challenges from Plaintiffs regarding the admissibility of his testimony (*see* Dkt. #28; Dkt. #31; Dkt. #76 at p. 1).  After evaluating Dr. Gilliland's expert testimony, the Court determines that his opinions, albeit a close call, are admissible here.

But this does not mean that the Court, *in its capacity as the finder of fact*, affords his opinions any weight in determining therapeutic necessity.  In fact, the Court accords minimal weight to the opinions Dr. Gilliland offered for three reasons.  First, though clearly possessing significant knowledge regarding clinical treatment of individuals in recovery from SUDs, the Court finds the setting of his background knowledge to be ill-fitting in the immediate case.  For instance, though well-versed in the world of psychology journals and publications, Dr. Gilliland has not published research on sober living homes, focusing instead on clinic-based research and treatment of those with SUDs (*see* Dkt. #116 at p. 11).  *See also* Def.'s Ex. 32.  Lacking field-work experience while opining on the operation and functionality of a sober living home devalues Dr. Gilliland's testimony, especially since WESL does not administer clinical treatment as part of its services; his only experiences operating group homes are with those that also involve clinical treatment (Dkt. #28 at pp. 3, 7).  *See* Trial Test. of Dr. John Majer, Feb. 9, 2021 (testifying to his twenty-five-plus years of field work with sober living homes and that field work allows experts to access data that is hard to detect); *see also* Trial Test. of Constance Swanston, Feb. 8, 2021 (explaining the services WESL offers).

Second, and by no fault of his own, Dr. Gilliland's testimony is based on an incomplete definition of "necessary" (*see* Dkt. #31 at pp. 1–3).  During direct examination, Dr. Gilliland stated that he made his findings based on a definition of "necessary" Plano's counsel provided to him,

which Dr. Gilliland stated was drawn from the *Vorchheimer* and *Cinnamon Hills* cases.  Trial Test. of Dr. Kevin Gilliland, Feb. 9, 2021.   The definition he used equates "necessary" with "indispensable," "essential," and something that "cannot be done without."  *Id.*; *see Cinnamon Hills*, 685 F.3d at 923; *Vorchheimer*, 903 F.3d at 105.  But as the Court explains below, *infra* pp. 32–33, this conceptualization of "necessary" in context is reductive to the point of error.  As such, the Court cannot accord much weight at all to Dr. Gilliland's testimony.

Third, and perhaps most importantly here, Dr. Gilliland never actually visited WESL or interviewed any of WESL's residents (Dkt. #114 at pp. 30–31).  He stated as much upon questioning from the Court.  Trial Test. of Dr. Kevin Gilliland, Feb. 9, 2021.  While certainly understandable that Dr. Gilliland did not want to "intrude" the residents' space at WESL, *see id.*, not directly evaluating WESL's space and residents severely weakens his testimony.  The reasonable-accommodation inquiry is "fact-specific."  *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 272 (4th Cir. 2013).  In preparing his expert testimony, Dr. Majer visited WESL over two days, toured the whole house, spoke to roughly ten to twelve residents, talked to Swanston and Jones, and familiarized himself with WESL's intake process and house rules.  Trial Test. of Dr. John Majer, Feb. 9, 2021.  Dr. Gilliland did nothing of the sort.  Thus, the Court finds that Dr. Gilliland's testimony is hardly able to speak to the "fact-specific, case-by-case" aspects of the instant matter, which are essential to a reasonable-accommodation claim.  *See Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995).  Accordingly, the Court affords little weight to the expert opinions offered by Dr. Gilliland.

Turning back to the analysis, the Court begins the therapeutic-necessity inquiry with the foundational premise endorsed by both sides: a critical mass of residents must exist to achieve the

therapeutic benefits a sober living home provides.  As such, the pivotal question becomes: how many residents constitutes a critical mass?

Though both may satisfy the necessity requirement under the statutes, economic necessity and therapeutic necessity are altogether different.  The definition of financial necessity is a relatively clear-cut concept:  the amount of net income indispensable to the financial operation of an enterprise.  Therapeutic necessity, however, is significantly less concrete.  To be sure, sobriety is a binary state—either one is or is not using drugs or alcohol.  But to describe sobriety in this fashion is diminutive, casting aside any nuance or complexity inherent to the endeavor of remaining sober.

The externalities of SUDs can be just as debilitating as, if not more so than, the substance itself.  Maintaining relationships, holding gainful employment, taking part in the community, fending for one's self, and even completing daily tasks, can become so difficult as to halt an individual's life altogether.  Simply achieving sobriety, however, is far from the end of the road— attempting to build a revitalized life is a monumental task.  The activities with which an individual in recovery from a SUD struggled while using remain challenging, just in a different way.  What's more, the animus that all too many members of the general public hastily ascribe to individuals in recovery further complicates their reentry to society.  *See, e.g.*, Def.'s Ex. 2; *see also* Brian J. Connolly & Dwight H. Merriam, *Planning and Zoning for Group Homes: Local Government Obligations and Liability Under the Fair Housing Amendments Act*, 47 URB. LAW. 225, 228 (2015) (discussing the roots of community opposition to group homes).  In a way, SUDs, as with other chronic diseases, bear upon individuals as immutable pieces of existence.

In both the clinical-treatment and sober-living fields, the approaches to treating individuals with SUDs and helping their reintegration to society are far from homogenous.  Both Dr. Majer

and Dr. Gilliland testified to this, as well as stating that sober living homes may be critical to some in recovery.  In fact, according to one study Dr. Majer cited, individuals in recovery are five times more likely to abstain from substance use when utilizing a sober living home, while those solely engaging the twelve-step program are 2.8 times as likely to abstain.  This example is just one of many that demonstrate the variability of paths and choices involved on an individual's road to recovery.

What the foregoing means is this—in the context of sober living, therapeutic necessity, as would be involved with any course of treatment, is irreducible to formulae or algorithms, and requires individualized considerations.  There are standard bits and pieces that can possibly benefit the recovery of many individuals with SUDs.  But as hard as one might search, a one-size-fits-all recovery plan for those with SUDs does not exist.  As such, and as is well suited within the reasonable-accommodation framework, the necessity element in a reasonable-accommodation request must be meticulously considered on a case-by-case basis and in light of the evidence presented.  *See Vorchheimer*, 903 F.3d at 109 (explaining that necessity "depends on [a] particular [individual]'s abilities and disability, which may require a fact-intensive inquiry").

The Court begins by examining the offered expert testimony, starting with Dr. Majer.  At trial, Dr. Majer testified that fifteen is the number of residents WESL should house for therapeutic necessity.  Trial Test. of Dr. John Majer, Feb. 9, 2021.  In addition to the knowledge acquired through two-and-a-half decades of field work with sober living homes, Dr. Majer based his opinion on a two-day visit to the Home, during which he fully toured the property; familiarized himself with the intake process and house rules; and spoke with ten to twelve residents, as well as Swanston and Jones.  *Id.*  Dr. Majer also based his opinion on certain differences between WESL and other

sober living homes, such as the presence of a caretaker, the non-democratic nature of the Home, the size of the Home, and the women in recovery from SUDs who reside at WESL.  *See id.*

By contrast, Dr. Gilliland's trial testimony focused less on an alternative to WESL's requested accommodation and more on explaining why fifteen residents is not therapeutically necessary for WESL.  Trial Test. of Dr. Kevin Gilliland, Feb. 9, 2021.  Dr. Gilliland arrived at his conclusion based on a slew of selected academic articles, caselaw provided by Plano's counsel, and his experience in treating individuals with SUDs in a clinical setting—notably, as mentioned previously, he never visited the Home or spoke to its residents.  *See id.*  For the reasons already explained, *supra* pp. 27–29, the Court accords little weight to Dr. Gilliland's expert testimony.

Of utmost importance, Dr. Gilliland's opinions on this element are based on an inaccurate definition of the statutory term "necessary."  According to his trial testimony, Dr. Gilliland used the definition of "necessary" found in *Cinnamon Hills* and *Vorchheimer*, which, as he claims, defined the term as meaning indispensable, essential, and cannot be done without.  Trial Test. of Dr. Kevin Gilliland, Feb. 9, 2021.  Plano's counsel has similarly used this definition throughout the proceedings (*see, e.g.*, Dkt. #115 at pp. 14–16).

The problem with this understanding, however, is the omission of an essential consideration—necessary as compared to what?  As the Fifth Circuit recently confirmed, "When assessing an FHA reasonable-accommodation request, necessity must be considered in the light of '*proposed* alternatives.'"  *Harmony Haus*, 851 F. App'x at 465 (emphasis added) (quoting *Vorchheimer*, 903 F.3d at 105).  In *Vorchheimer*, Judge Bibas captured this idea by extending then-Judge Gorsuch's example of the paraplegic man from *Cinnamon Hills*:

> Giving the paraplegic a first-floor apartment is one way to give him access and thus equal opportunity to use his apartment.  But an elevator would work too.  That alternative would give him access to every apartment, so a first-floor apartment

would no longer be necessary.   The landlord has to offer at least one of the accommodations, but not both.

*Vorchheimer*, 903 F.3d at 108; *see id.* at 108–09 (referencing the fact patterns of two district-court cases as relevant examples).[13]

Herein lies the fatal flaw with the testimony of Plano's expert.  Dr. Gilliland expended great effort explaining why WESL's request of fifteen was not therapeutically necessary, instead of arguing why the request was therapeutically unnecessary *as compared to the number Plano proposed*, which was eight.  As a result, Dr. Gilliland's testimony is of little help to the Court in determining the critical mass of residents that is therapeutically necessary for the Home.

All of this leaves the Court to weigh and consider "whether [WESL]'s requested accommodation and [Plano's] proposed alternative afford equal housing opportunity." *Vorchheimer*, 903 F.3d at 109.  On the one hand, there is WESL's requested accommodation of fifteen.  As Plano and some community members indicate, fifteen residents is a considerable number in a district zoned for single-family use.  *See, e.g.*, Def.'s Ex. 2.  And Dr. Gilliland frequently testified that fifteen is not therapeutically necessary from an absolute perspective.  Yet, Plaintiffs' proposal is based on the testimony of a leading expert in the sober-living field who, after a two-day, onsite visit, became intimately familiar with the Home, its residents, and the operations and processes specific to WESL.

On the other hand, there is Plano's proposed alternative of eight.  Dr. Gilliland testified at various points that eight residents represents the critical mass for therapeutic necessity at WESL—

---

[13] To drive his point further, Judge Bibas provided examples of other jurisprudential domains in which "alternatives ha[ve] long been built into the common law's analyses of necessity." *Vorchheimer*, 903 F.3d at 108.  The Court provides exemplar cases in each area here.  *See, e.g.*, *United States v. Fraser*, 647 F.3d 1242, 1245–46 (10th Cir. 2011) (Gorsuch, J.) (necessity defense in criminal law); *Wegner v. Milwaukee Mut. Ins. Co.*, 479 N.W.2d 38, 42 (Minn. 1991) (public-necessity defense in tort law); *Grandberry v. Bonner*, 653 F.2d 1010, 1014–15 (5th Cir. Unit A Aug. 1981) (manifest-necessity defense in criminal procedure law); *Alley v. Carleton*, 29 Tex. 74, 78–79 (1867) (doctrine of easement by necessity in property law).

but he did not ground this opinion in any case-specific facts, and he offered several figures that could potentially represent therapeutic necessity, ranging both above and below Plano's proposal of eight.  *See* Trial Test. of Dr. Kevin Gilliland, Feb. 9, 2021.  Dr. Majer rebutted Plano's proposed number of residents for WESL on direct examination, explaining that eight residents in the Home will lead to isolation, which counteracts the therapeutic effects of the group setting and potentially endangers the residents' chances of remaining sober.  Trial Test. of Dr. John Majer, Feb. 9, 2021; *see, e.g.*, *Browning*, 266 F. Supp. 3d at 901 (highlighting that "sharing bedrooms" and "having the ability to congregate and socialize in communal living spaces" help residents of sober living homes "avoid feelings of isolation and loneliness—which have been shown to contribute to relapse").  Moreover, as previously addressed, Dr. Gilliland's opinions suffer from other critical flaws that significantly diminishes the weight the Court affords to his testimony.

All in all, after scrupulous and detailed consideration of the immediate facts and applicable law, the Court finds that Plaintiffs' requested accommodation of fifteen is therapeutically necessary.  This outcome is undoubtedly limited to the scenario currently before the Court—and was by no means inevitable.  But given two critical shortcomings in Plano's case, the law mandates that the Court find for Plaintiffs on therapeutic necessity.

First, Plano's strategic approach on this element was to target Plaintiffs' proposal of fifteen and attempt to show that this number was not therapeutically necessary.  Plano may be correct in an absolute sense, but what is necessary is a *relative* inquiry.  It is anyone's guess whether some number between eight and fifteen would have sufficed to form the requisite critical mass for therapeutic necessity at WESL.  But all the Court can compare when considering necessity is the requested accommodation and an "alternative *on offer* [that] satisfies the goal of equal housing opportunity for [a] tenant."  *Vorchheimer*, 903 F.3d at 108 (emphasis added); *see id.* ("[F]ood is

34

necessary to survive. But if soup and salad are on offer, a sandwich is not necessary."). And considering the evidence presented at trial, fifteen wins out over eight.

Which leads to the second point—by denying WESL's request outright, the Board left defense counsel little wiggle room on this element. Eight residents is Plano's proffered alternative to WESL's requested accommodation because that number is the maximum occupancy level the Ordinance allows. Had Plano denied WESL's request but also offered an alternative figure between eight and fifteen, the Court could have considered other occupancy options.[14]  *See id.* at 108–109 ("When defendants have already provided an adequate alternative, 'they need not adopt plaintiff's preferred means of accommodation.'" (brackets omitted) (quoting *Resnick v. 392 Cent. Park W. Condo.*, No. 07-CV-1988, 2007 WL 2375750, at *2 (S.D.N.Y. Aug. 14, 2007)). But absent these alternatives, the Court was left with two options: fifteen or eight (*see* Dkt. #117 at p. 4).[15]

---

[14] Ms. Vorchheimer's case ideally demonstrates this point. There, Vorchheimer used a rolling walker to ambulate, using it "to get from her condo to the lobby and then use her cane from the lobby to her car." *Vorchheimer*, 903 F.3d at 104. Because she "could neither lift her walker, nor fold it, nor put it into her car," Vorchheimer began leaving it in the lobby of her residential building when she left. *Id.* Eventually, Vorchheimer and building management quarreled over whether she could leave her walker in the lobby (as Vorchheimer insisted upon doing). The residential building prohibited her from leaving her walker in the lobby but offered her four alternatives:

> First, she could have staff store the walker and then return it to her in the lobby—she could either phone ahead to have it ready for her, or sit on a bench to await its retrieval. Second, she could have a staffer deliver the walker to her car before she got out of it. Third, she could have the doorman load the walker into and take it out of her car's trunk. Or finally, she could start parking in the building's indoor valet-parking garage, where she could leave her walker near the valet station.

*Id.* Vorchheimer rejected each proposed alternative in light of her disabilities and requested an accommodation. Nevertheless, the Third Circuit found that she did not plausibly plead that her request was necessary because "[a]ll four of the proffered alternatives . . . satisfy [her] medical needs." *Id.* at 112.

[15] Plaintiffs and Plano additionally argue over the meaning of the Fifth Circuit's recent decision in *Harmony Haus* (*see* Dkts. #118–19). However, even if *Harmony Haus* were binding authority, *see* 5th Cir. R. 47.5, the Court finds the opinion distinguishable. *Harmony Haus* based its therapeutic-necessity argument on the "phasing" system utilized in the home. *Harmony Haus*, 851 F. App'x at 466. By contrast, the argument for therapeutic necessity here is based on establishing the critical mass of residents necessary for a therapeutic milieu in the Home (Dkt. #118 at p. 3). *See Harmony Haus*, 851 F. App'x at 465 ("For 'groups of handicapped persons who seek to live together for mutual support,' such as in a sober-living home, 'some minimum size may be essential to the success of the venture.'" (ellipsis omitted) (quoting *Brandt v. Vill. of Chebanse, Ill.*, 82 F.3d 172, 174 (7th Cir. 1996)).

Therefore, the Court, in its role as the factfinder, concludes that the case Plaintiffs put on demonstrates the necessity of fifteen residents at WESL.

### b. Reasonableness

The Court looks now to the remaining element, reasonableness. This element is the substantive core of a reasonable-accommodation claim. *Anderson v. City of Blue Ash*, 798 F.3d 338, 362 (6th Cir. 2015). "An accommodation is reasonable if it is both efficacious and proportional to the costs to implement it." *Oconomowoc*, 300 F.3d at 784. Conversely, an accommodation is unreasonable if it imposes "undue financial and administrative burdens" or necessitates a "fundamental alteration in the nature of a program.'" *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 410, 412 (1979)); *accord United States v. City of Jackson, Miss.*, 318 F. Supp. 2d 395, 412 (S.D. Miss. 2002), *aff'd*, 359 F.3d 727 (5th Cir. 2004). "When evaluating whether an accommodation would impose an undue burden, courts also weigh the respective costs and benefits of the accommodation to the parties, performing a 'balancing of the parties' needs.'" *Schaw v. Habitat for Humanity of Citrus Cnty., Inc.*, 938 F.3d 1259, 1266–67 (11th Cir. 2019) (quoting *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1288 (11th Cir. 2014)). As a highly fact-specific inquiry, the reasonableness determination requires this "complex balancing of factors." *Austin v. Town of Farmington*, 826 F.3d 622, 630 (2d Cir. 2016) (Winter, J.); *see Harmony Haus Westlake, LLC v. Parkstone Prop. Owners Ass'n, Inc.*, 440 F. Supp. 3d 654, 667 (W.D. Tex. 2020) ("The question of whether an accommodation is reasonable is a question of fact determined by a close examination of the particular circumstances."), *aff'd in part, vacated in part, rev'd in part*, 851 F. App'x 461 (5th Cir. 2021). And as with the other elements of their failure-to-accommodate claim, Plaintiffs bear the burden of proof. *Elderhaven*, 98 F.3d at 178.

After evaluating the evidence presented at trial and the parties' post-trial briefing, the Court finds that Plaintiffs' requested accommodation is reasonable.  Starting with the potential for undue financial and administrative burdens, Plaintiffs offered three general points.  First, the evidence at trial indicated that the Home had not caused "any problems with traffic, noise, trash or any other kind of nuisance harmful to the neighborhood" (Dkt. #116 at p. 3).  Second, they point to the fact that the record is devoid of evidence that Plano expended any time or money to deal with WESL and its residents (Dkt. #114 at pp. 19–20).  And third, Plaintiffs operated out of the Home for roughly two years before any sort of consideration was given by Plano or community members to WESL's presence at the Home (Dkt. #114 at p. 18; Dkt. #116 at p. 9).  In that time, only two legitimate complaints were made—one concerning a car parked the wrong direction, and the other pertaining to a car parked to close to a fire hydrant.  Trial Test. of Shannon Jones, Feb. 8, 2021.  Plaintiffs argue that these facts demonstrate the absence of a burden, let alone an undue burden, on Plano in a financial or administrative sense.

As for Plano's position on undue burden, the argument advanced is fairly thin.  Plano asserted that the parking situation near the Home creates safety concerns for driving and might obstruct the road for emergency vehicles (Dkt. #115 at p. 26).  This point is problematic, however—the evidence at trial did not establish that the cars parked on the street belonged to WESL residents.  *See* Def.'s Ex. 3.  For instance, on direct examination, former WESL resident K.H. testified that these cars did not belong to WESL residents.  Trial Test. of K.H., Feb. 9, 2021.  On cross-examination, Richard Miller, a member of the Board and a witness for Plano, testified that there was no way to discern who owned the cars parked on the street.  Trial Test. of Robert Miller, Feb. 9, 2021.  As well, in the time WESL has operated out of the Home, the record does not show that any official complaint was made about parking congestion in the area.  *See* Trial

37

Test. of Shannon Jones, Feb. 8, 2021.  Moreover, even if the trial record had shown parking to be

an issue, Plano's concerns over driving safety and access for emergency vehicles are unconvincing

because granting the requested accommodation would not preclude Plano "from enforcing its Fire

Code if [Plano] determined that [WESL]—just like any resident—was violating the Code or

impeding emergency vehicle access."  *Harmony Haus*, 440 F. Supp. 3d at 668; *see Hovsons, Inc.*

*v. Twp. of Brick*, 89 F.3d 1096, 1105 (3d Cir. 1996) ("The mere fact that the employees and

residents of [the group home] will at times require the assistance of the local police and other

emergency services does not rise to the level of imposing a cognizable administrative and financial

burden upon the community.").  Weighing the positions presented on undue financial and

administrative burdens, the Court finds Plaintiffs to have satisfied their burden on this aspect of

the reasonableness inquiry.  *See, e.g.*, *Oxford House, Inc. v. Town of Babylon*, 819 F. Supp. 1179,

1186 (E.D.N.Y. 1993).

As for the possibility of fundamental alteration to Plano's zoning scheme, Plaintiffs spent

a great deal of time at trial explaining how WESL and the Home seek to create a therapeutically

beneficial environment by structuring the Home's environment as one family.  *See* Trial Test. of

Constance Swanston, Feb. 8, 2021; *see also City of Baton Rouge*, 932 F. Supp. 2d at 693.  In fact,

WESL's residents "live as the functional equivalent of a family" (Dkt. #114 at p. 18; *see, e.g.*, Dkt.

#114 at p. 19).  The Home also externally presents as a single-family residence.  Trial Test. of

Shannon Feb. 8, 2021.  Considering the SF-7 zone in which the Home is located, it seems nearly

incontrovertible that Plaintiffs' "proposed use" of the Home "is quite similar to surrounding uses

expressly permitted by the zoning code"—as such, demonstrating that the accommodation would

cause a fundamental alteration in Plano's zoning scheme is challenging.  *Schwarz*, 544 F.3d at

1221.  Because Plaintiffs proffer credible evidence on this facet of reasonableness and Plano

38

presents practically no evidence on this point, *see Oxford House, Inc. v. Twp. of Cherry Hill*, 799 F. Supp. 450, 462 (D.N.J. 1992), the Court finds that Plaintiffs have met their burden whether their requested accommodation requires Plano to fundamentally alter its zoning scheme.

Worth briefly noting, the disparity between the parties as to the stakes at issue here further confirms the reasonableness of Plaintiffs' request.  Plaintiffs' reasonableness argument finds subtle yet powerful support in the benefits that would accrue if the accommodation were granted.  When an individual with a SUD cannot adequately address the disorder, the SUD's chronic nature can become an albatross around their neck, even tragically leading them to an early grave.  It is all too possible that WESL may literally be the difference between life and death for some.  Trial Test. of Dr. John Majer, Feb. 9, 2021. By contrast, Plano offers little, if any, justification for its position on the reasonableness element other than its *ipse dixit*.

Accordingly, after closely considering the evidence at trial, the Court finds Plaintiffs to have established the reasonableness element.

### c.  Conclusion: Plaintiffs Have Proved Their Reasonable-Accommodation Claim

Accordingly, in light of the conclusions of law, *supra* pts. III, VI, and the findings of fact, the Court concludes that Plaintiffs have successfully proven their reasonable-accommodation claim under the FHA and ADA by a preponderance of the evidence.

## VII.   Remedies

Plaintiffs request various measures of damages and equitable relief resulting from Plano's failure to reasonably accommodate (*see* Dkt. #29 at pp. 20–24).  After due consideration, the Court grants in part Plaintiffs' request for equitable relief and defers making full findings on damages until the Court hears additional evidence.

### a. Equitable Relief

Beginning with equitable remedies, the FHA and ADA permit courts to grant appropriate equitable relief when a discriminatory practice has occurred.  42 U.S.C. § 3613(c)(1); *id.* § 12133; *see* 29 U.S.C. § 794a(a)(1).  Plaintiffs request several forms of equitable remedies, but the Court focuses on their request for a permanent injunctive relief.

Before a court may grant a permanent injunction, a plaintiff must demonstrate:

(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  Other than duration, permanent injunctions differ from preliminary injunctions in a key way—the former requires success on the merits rather than *likelihood of* success on the merits.  *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394–96 (1981).  Given the above findings of fact and conclusions of law, the Court determines that Plaintiffs have satisfied this four-part test and that a tailored permanent injunction is therefore appropriate.

The Court has "broad discretionary power" when issuing equitable relief.  *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973).  But invoking this authority must be done with care and precision since "[t]here is no power the exercise of which is more delicate" and that "requires greater caution, deliberation, and sound discretion."  *Bonaparte v. Camden & Amboy R.R. Co.*, 3 F. Cas. 821, 827 (C.C.D.N.J. 1830) (No. 1,617); *see Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case.").  Accordingly, the Court grants Plaintiffs' request for equitable relief as stated in the Order language.

### b. Damages

Next, Plaintiffs request both compensatory and punitive damages.  The Court takes each in turn.

### i. Compensatory Damages

The FHA and ADA permit courts to award compensatory damages when a discriminatory practice has occurred.  42 U.S.C. § 3613(c)(1); *id.* § 12133; *see Windham v. Harris Cnty., Tex.*, 875 F.3d 229, 235 n.5 (5th Cir. 2017).  Given the above findings of fact and conclusions of law, the Court determines that an award of compensatory damages may be appropriate for Swanston or WESL.[16]

Therefore, at a date to be determined, the parties will file briefs on the following questions: (1) are Swanston or WESL entitled to compensatory damages as a result of Plano's failure to reasonably accommodate under the FHA or ADA?; and (2) if so, in what amount?  Following briefing, the Court, if necessary, will conduct a hearing.

### ii. Punitive Damages

The FHA expressly permits courts to award punitive damages when a discriminatory practice has occurred.[17]   42 U.S.C. § 3613(c)(1); *see Cook Cnty., Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) ("Since municipalities' common law resistance to punitive damages still obtains, 'the general rule today is that no punitive damages are allowed unless expressly authorized by statute.'" (brackets omitted) (quoting *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 260 n.21 (1981)).  However, in the Fifth Circuit, "a punitive damages award

---

[16] The parties stipulated in the Joint Final Pre-Trial Order that Jones does not seek any damages (Dkt. #75, Exhibit 1 at p. 2).

[17] At summary judgment, the Court determined that Plaintiffs could not recover punitive damages in a suit brought under Title II of the ADA.  *Swanston v. City of Plano, Tex.*, No. 4:19-CV-412, 2020 WL 7047313, at *2 (E.D. Tex. Dec. 1, 2020).

under the FHA cannot stand absent an actual damages award, unless there was a violation of a constitutional right." *Lincoln v. Case*, 340 F.3d 283, 291 (5th Cir. 2003).   Because a constitutional-rights violation was not alleged, the only way Swanston or WESL can recover punitive damages is if the Court determines that compensatory damages under the FHA are warranted for Plano's failure to reasonably accommodate.

Therefore, at a date to be determined, the parties will file briefs on the following questions: (1) if the Court awards Swanston or WESL compensatory damages for Plano's failure to reasonably accommodate under the FHA, are Swanston or WESL entitled to punitive damages as a result of Plano's failure to reasonably accommodate under the FHA?; and (2) if so, in what amount?  Following briefing, the Court, if necessary, will conduct a hearing.

### c.   Attorney's Fees

The FHA and ADA permit courts to award a reasonable attorney's fee and costs to the prevailing party.   42 U.S.C. § 3613(c)(2); *id.* § 12205.   To qualify as a "prevailing party," a plaintiff must "make three interrelated showings: '(1) the plaintiff must achieve judicially-sanctioned relief, (2) the relief must materially alter the legal relationship between the parties, and (3) the relief must modify the defendant's behavior in a way that directly benefits the plaintiff at the time the relief is entered.'"[18]  *Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565, 576 (5th Cir. 2018) (quoting *Davis v. Abbott*, 781 F.3d 207, 214 (5th Cir. 2015)). Given the above findings of fact and conclusions of law, the Court determines that Plaintiffs satisfy this three-part test and will award reasonable attorney's fees and costs.

---

[18] The prevailing-party analysis is the same under the FHA and ADA.  *McQueary v. Conway*, 614 F.3d 591, 597 (6th Cir. 2010) (Sutton, J.); *see Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598, 610–16 (Scalia, J., concurring).

Therefore, at a date to be determined, counsel for Plaintiffs will separately submit documents detailing a sum that represents their respective attorney's fees and costs associated with this action.

## CONCLUSION

For the reasons explained in these findings of fact and conclusions of law, the Court finds in favor of Plaintiffs on their failure-to-accommodate claim under the FHA and ADA, and otherwise finds in favor of Defendant City of Plano.

It is therefore **ORDERED** that Defendant City of Plano, its officers, employees, agents, attorneys and successors, and all persons in active concert or participating with any of them are **PERMANENTLY ENJOINED** from (1) restricting the occupancy of the home located at 7312 Stoney Point Drive in Plano, Texas, to less than fifteen residents as long as the property operates as an FHA- and ADA-compliant sober living home, and (2) enforcing any other restriction on the use of the property as a sober living home that violates the FHA or ADA.

It is **FURTHER ORDERED** that Defendant City of Plano, its officers, employees, agents, attorneys and successors, and all persons in active concert or participating with any of them are **PERMANENTLY ENJOINED** from retaliating against Plaintiffs for having pursued housing-discrimination complaints under the FHA and ADA.

It is **FURTHER ORDERED** that the parties shall meet and confer to establish a post-trial briefing schedule addressing the following questions:

- Are Constance Swanston or Women's Elevated Sober Living LLC entitled to compensatory damages as a result of Defendant City of Plano's failure to reasonably accommodate under the FHA or ADA?
  - If so, in what amount?
- If the Court awards Constance Swanston or Women's Elevated Sober Living LLC compensatory damages for Defendant City of Plano's failure to reasonably

accommodate under the FHA, are Swanston or Women's Elevated Sober Living LLC entitled to punitive damages as a result of Plano's failure to reasonably accommodate under the FHA?

  o  If so, in what amount?

Following briefing, the Court will set a hearing, if necessary, on these issues.  Until briefing is completed, the Court defers issuing findings on damages.

It is **FURTHER ORDERED** that Plaintiffs' counsel will submit documents detailing a request for attorney's fees and costs associated with this action.

It is **FURTHER ORDERED** that all other relief requested by the parties is hereby **DENIED**.

**IT IS SO ORDERED.**

 **SIGNED this 27th day of August, 2021.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE