IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| CONSTANCE SWANSTON and WOMEN'S ELEVATED SOBER LIVING LLC., and SHANNON JONES, | § § § § | |
| Plaintiffs, | § § § | |
| v. | § § | CASE NO. 4:19-CV-00412-ALM |
| CITY OF PLANO, TEXAS, and CITY OF PLANO'S BOARD OF ADJUSTMENT, | § § § | JUDGE: AMOS L. MAZZANT |
| Defendants. | § § § | |

## DECLARATION OF CHRISTOPHER MCGREAL AND SUMMARY OF TESTIMONY

1.      My name is Christopher McGreal. I am over 18 years of age, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2.      I am an attorney licensed to practice in the State of Texas.

3.      Plaintiff Shannon Jones retained me to represent her them in this suit based on discrimination under the Federal Fair Housing Act ("FHA"), Americans with Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act") against Defendants City of Plano, Texas, and City of Plano's Board of Adjustment. I have personal knowledge of this case and the work performed.

4.      All the time spent on this case was done as an employee of Disability Rights Texas. Disability Rights Texas is the federally designated legal and protection advocacy organization for individuals with disabilities in Texas. Disability Rights Texas is a non-profit, public interest

law firm organized under § 501(c)(3) of the Internal Revenue Code, and has been designated as the "protection and advocacy" organization in the State of Texas. Any fee awarded for my work will be paid directly to Disability Rights Texas and used to support legal assistance to other individuals with disabilities.

5.     The following describes my experience and expertise in this area of the FHA, ADA, Rehabilitation and in enforcing other federal statutes and implementing federal regulations. I have been a practicing attorney for fifteen years. I have been employed by Disability Rights Texas since March 14, 2011. During that time, I have concentrated primarily on disability rights in the field of fair housing, with a particular emphasis on disability discrimination under the Federal Fair Housing Act and land use. I have conducted numerous education and training seminars for individuals with disabilities, and for advocates for such individuals, including attorneys, regarding the FHA and land use. Further, I have litigated several federal cases involving community land use discrimination against group homes for persons with disabilities, such as is the case in this matter. This list includes, but is not limited to: *Harmony Haus Westlake, LLC v. Parkstone Property Homeowners Associations, Inc.*, Civil Action No. 1-19-CV-1034-XR, W.D. Tex. 2021; *My Royal Palace v. Capella Park Homeowners' Association, Inc.*, 2017 WL 5898407 (Tex. App.—Dallas 2017, no pet.); *Kappele v. Village Creek of Eldorado Homeowners' Association, Inc.*, No. 4:17-CV-769, E.D. Tex. 2018; *Ramirez-Alanis v. LSR Homeowners Association, Inc.*, 4:17-CV-01011, N.D. Tex. 2018; *Stinson v. Willow Meadows Civic Club, Inc.*, No. 4:17-cv-1547, S.D. Tex. 2017; *United States v. City of Beaumont, Texas*, No. 1:15-CV-201, E.D. Tex. 2016 (represented intervenors); *McBride v. Westwood (Leander) Homeowners' Association, Inc.*, No. 1:16-CV-576, W.D. Tex. 2016. The area of land use and group homes for persons with disabilities is a highly specialized subset of the FHA,

ADA, and 504, which involves few practitioners representing persons with disabilities in this field that have the necessary expertise.

6.      Before my employment with Disability Rights Texas, I was a trial attorney with the U.S. Department of Justice ("DOJ"), Civil Division, for over four years. With the DOJ, I handled over one hundred appeals in the various United States Circuit Courts of Appeals. At the DOJ, I concentrated my work on enforcing the Immigration and Nationality Act ("INA") and its implementing regulations. The FHA involves a complex statutory structure intertwined with its implementing regulations and developing case law. I drew extensively on my DOJ experience in federal immigration law to understand the FHA and its regulations and case law, in order to bring this cause of action. Further, like the INA, the FHA's case law is constantly developing and involves new areas that have not been fully or heavily litigated, such as the issues involved in this case.

7.      It was necessary for Ms. Jones to retain an attorney to represent her in this matter.

8.      Whenever possible, I noted my activities contemporaneously and then recorded it on the standard timekeeping system used by Disability Rights Texas. On those occasions when I was working outside of the office, I noted the activity immediately on my return to the office and then recorded it on the timekeeping system. All time calculations were noted in the percentages of an hour.

9.      The time records which are set forth in Attachment A reflect that I am claiming 159.1 hours. This is not the total amount of hours myself and others in my organization spent on this case. In total, I estimate that I omitted, deleted, or reduced at least approximately 10.2 hours of my time and did not count my co-counsel's time of Ms. Rachel Cohen-Miller, which totaled 20.4 hours.

10.     The legal issues in this case were novel. The FHA, ADA, and 504 issue in this case regarding an accommodation for 15 individuals in recovery to reside together in therapeutic setting. Ms. Jones is one a few individuals with a disability in the United States to have brought and secured a favorable judgment on liability on such a matter as mainly it is only the group home providers themselves that bring the lawsuits.

11.     The novelty of the questions involved in this cause of action required me to spend 159.1 hours prosecuting this cause of action by (1) investigating and researching claims, (2) drafting pleadings, motions, appeals and judgments, (3) attending hearings and trials, and (4) taking other necessary actions to perform my legal services properly.

12.     Litigating Ms. Jones case against Defendant precluded me from accepting cases during this period of time that I normally would have taken. Disability Rights Texas is a non-profit agency serving individuals who typically have very limited resources, and who certainly have a mental or physical disability. The litigation of this case also took place during the height of the SARS_2_COV ("Covid-19) pandemic, where housing stability was and continues to be at the forefront to the point the Centers for Disease Control issued a year-long moratorium on evictions. Therefore, the demand for our services is considerably high, and unfortunately, at times we have to turn clients away due to our lack of resources. Given the time and resource commitment involved in litigating a case, accepting a case for litigation, such as Ms. Jones, impacted the number of other cases that I might work for the disability community.

13.     The attorney services and fees charged in this case were necessary, were reasonable, and were incurred in the prosecution of this suit.

14.     To the best of my knowledge, the fees I charged in this case are below that which are customarily charged in this area for same or similar services for an attorney with my experience,

reputation, and ability, considering the type of controversy, the time limitations imposed, and the results obtained.

15.     For the purposes of this case, I am using the hourly attorney rate of $250.00 per hour for myself. To reach this number, I used the State Bar of Texas, Department of Research & Analysis 2019 ("Fact Sheet"). *See* Attachment B. According to the Fact Sheet, the average rate for Dallas County is $308.00 per hour. *See* Attachment B at page 10. The rate used for fees in this case is lower than the Fact Sheet for Dallas County, where I practice. To further support this hourly rate, I provide with this declaration a submission of fees sought in a land use case in 2018 with accompanying materials, including affidavit and court order awarding fees. *See* Attachment C. At the time, my rate was $240.00, and the affidavit explains how I came to the reasonableness of that rate by using the 2015 Texas Bar Hourly Fact Sheet. At that time, I had approximately 12-13 years of experience. Per the 2015 Texas Bar Hourly Fact Sheet, for an attorney with 11-14 years of practice in the Dallas area, the average hourly rate is $300.00. I recognize that inflation of $240.00 from June 2018 to now June would be an increase to approximately close to $250.00 from my claimed hourly rate in 2018.

16.     Therefore, in my opinion, the reasonable value of attorney fees reasonably and necessarily incurred by Ms. Jones services is $39,250.00, for representing Ms. Jones in this matter and through entry of judgment (159.1 hours multiplied by $250.00). *See* Attachment A.

17.     Non-profit legal services organizations, such as Disability Rights Texas, are entitled to legal fees at the normal, market rate. *See Blum v. Stenson*, 465 U.S. 886, 892-94, 104 S. Ct. 1541, 1545-47 (1984) (holding nonprofit legal aid organization that represented prevailing Civil Rights Act litigant was entitled to recover attorney's fees calculated under prevailing market rate

rather than cost-related basis, even if the fee so calculated exceeded the salaries and expenses of staff counsel).

18.     I am also seeking necessary costs expended by my firm, Disability Rights Texas, in the amount of $11,076.80. *See* Attachment D. Reasonable costs of experts and depositions are plainly recoverable in section 42 U.S.C. 3613 fee awards.

I declare under penalty of perjury that the foregoing is true and correct.

Signed on November 16, 2021.

/s/ Christopher McGreal
Christopher McGreal
Attorney for Plaintiff Ms. Shannon Jones

# Attachment A
## Attorney Time Records

| Date | Hours Worked | Activity |
|---|---|---|
| 6/7/2019 | 1.70 | Call w/ R. Hunt; drafted amended complaint s/ S. Jones info included; drafted rep agreement |
| 1/3/2020 | 1.70 | Drafted ROGs and RFPs to City of Plano |
| 2/4/2020 | 0.30 | Preliminary review of D's ROGs and RFPs to Ms. Jones |
| 2/5/2020 | 0.50 | Reviewed discovery responses |
| 2/5/2020 | 0.60 | Reviewed discovery requests |
| 2/6/2020 | 2.00 | Continued review of discovery requests to Ms. Jones and discovery responses from the City of Plano |
| 2/7/2020 | 0.50 | Call with RH about discovery responses; economic burden to recovery provider; expert testimony to support therapeutic necessity; adding BoA as defendant |
| 2/11/2020 | 1.70 | Went over ROGs with Ms. Jones |
| 2/11/2020 | 2.10 | Objections and preliminary responses for ROGs |
| 2/13/2020 | 0.60 | Responded to ROGs in light of information gathered from Ms. Jones |
| 2/14/2020 | 0.70 | Answered ROGs based on meeting with Ms. Jones |
| 2/21/2020 | 0.50 | Call with R. Hunt regarding discovery matters |
| 2/24/2020 | 2.50 | Meeting with Ms. Jones concerning ROGs; discussions with RCM concerning case |
| 2/25/2020 | 0.50 | Call w/ R. Hunt re: discovery affirmative and defensive |
| 2/26/2020 | 0.70 | Continued work on ROGs |
| 3/3/2020 | 0.50 | Update on discovery |
| 3/10/2020 | 0.60 | Call w/ Ms. Jones about gathering next week; outreach to Oxford House/S. Polin for application document; attended meet & confer on discovery from Elevated to City of Plano; discussed discovery responses with MM |
| 3/11/2020 | 3.10 | Objections and Responses to RFPs from Plano; revised ROGs |
| 3/12/2020 | 0.40 | Continued work on discovery responses |
| 3/17/2020 | 2.10 | Worked on discovery responses; coordinated with client to receive verification page for ROGs |
| 3/24/2020 | 0.40 | Review of discovery to be produced (ROGs and RFP); call with client to obtain feedback on medical docs to be produced |

| 3/26/2020 | 0.50 | Court hearing on motion to compel |
|-----------|------|-----------------------------------|
| 4/8/2020 | 0.40 | Prep call with R. Hunt before hearing on compel identities of recovery home residents; e-mail to opposing counsel confirming availability for hearing |
| 4/9/2020 | 0.30 | Attended hearing on issue of revealing identities of other residents |
| 4/9/2020 | 0.30 | Follow up call with R. Hunt after hearing to discuss next steps; e-mail to HTD on status of hearing |
| 4/13/2020 | 0.40 | Brainstormed how to defend deposition in new environment |
| 4/28/2020 | 0.20 | Call with Ms. Jones regarding depo prep |
| 5/5/2020 | 0.50 | Call w/ R. Hunt about upcoming depositions |
| 5/5/2020 | 1.50 | Depo preparation w/ client; prep before zoom call with client |
| 5/6/2020 | 0.10 | Follow up e-mails based on first prep with Ms. Jones for her deposition |
| 5/11/2020 | 1.50 | Drafted 30(b)(6) notice for Board of Adjustment |
| 5/14/2020 | 0.50 | Defending depo prep |
| 5/15/2020 | 0.30 | Follow up call with R. Hunt on depos and 30b6 topics to Plano |
| 5/15/2020 | 0.50 | Call with opposing counsel on outstanding discovery issues |
| 5/18/2020 | 0.10 | e-mail to RCM and SJ regarding virtual v. in person depo by Plano |
| 5/18/2020 | 0.40 | Zoom virtual prep with MM |
| 5/18/2020 | 0.20 | e-mail exchange with R. Hunt on 30(b)(6) topics to Board of Adjustment |
| 5/18/2020 | 0.70 | Finalized 30(b)(6) topics and sent to Board of Adjustment counsel |
| 5/19/2020 | 0.50 | Internal call to discuss in-person v. virtual deposition |
| 5/20/2020 | 0.50 | Internal depo prep |
| 5/20/2020 | 0.90 | Drafted e-mail to opposing counsel regarding virtual depos; call with R. Hunt about virtual depo |
| 5/26/2020 | 1.50 | Continued depo prep |
| 6/1/2020 | 0.30 | Analyzed developments in depo matter in case |
| 6/2/2020 | 0.30 | Preparation for depo prep with client |
| 6/2/2020 | 1.00 | Deposition prep with client |

| 6/4/2020 | 0.20 | Call with Ms. Jones about deposition; call with opposing counsel regarding modifying notice of depo to include virtual deposition option |
|---|---|---|
| 6/5/2020 | 0.40 | Review of objections to 30(b)(6) and other witnesses from Plano |
| 6/8/2020 | 0.60 | Depo prep call internally |
| 6/9/2020 | 0.20 | Update on deposition technology; update on privilege objections |
| 6/12/2020 | 0.70 | Depo prep; call to BE; discussed more logistics with MM |
| 6/15/2020 | 2.80 | Deposition preparation; including client prep; logistics w/ MM |
| 6/16/2020 | 8.00 | Attended depositions |
| 6/17/2020 | 0.50 | Last minute depo prep with client |
| 6/17/2020 | 7.50 | Defended and attended depositions |
| 6/18/2020 | 3.70 | Follow up brief to the court in advance of telephonic hearing on privilege raised by Defendants |
| 6/23/2020 | 4.00 | Attended deposition of Dr. Majer (witness for recovery home provider) |
| 6/24/2020 | 4.40 | Began drafting opposition to Motion for Protective Order |
| 6/25/2020 | 3.70 | Continued drafting response to Motion for protective order |
| 6/25/2020 | 4.00 | Deposition of group home provider 30(b)(6), and then fact witnesses (owner of group home) |
| 6/26/2020 | 2.60 | Finalization of response to motion for protective order |
| 6/30/2020 | 1.10 | Attended deposition for Michael Martin, of City of Plano |
| 07/07/20 | 0.30 | Call w/ Ms. Jones regarding reviewing her deposition; sent deposition transcript for her review |
| 07/07/20 | 3.80 | Participation in depositions; reviewed observations post-deposition |
| 07/07/20 | 0.30 | Call w/ Ms. Jones regarding reviewing her deposition; sent deposition transcript for her review |
| 07/07/20 | 3.80 | Participation in depositions; reviewed observations post-deposition |
| 07/09/20 | 2.30 | Drafted mediation position statement; drafted settlement letter per Court's Mediation offer to OC |

| 07/09/20 | 2.30 | Drafted mediation position statement; drafted settlement letter per Court's Mediation offer to OC |
| 07/17/20 | 0.20 | Attended pre-trial joint conference |
| 07/17/20 | 0.30 | Responded to Defendants' requests for further information on fees; brainstorm for follow up response early next week |
| 07/20/20 | 0.80 | Drafted and assembled appropriate attachments for response to Defendants request for more information about attorney fees claim |
| 07/21/20 | 0.90 | Attended Danny Andino deposition |
| 07/24/20 | 0.30 | Attended call on discovery dispute with Court regarding depositions of BOA 30b6, Plano 30b6, BOA members at time RA denied, and what depositions can go forward at this time |
| 07/29/20 | 0.40 | Pre-mediation conference with M.J. Johnson |
| 07/29/20 | 0.90 | Remote depo of C. Day |
| 07/30/20 | 0.50 | Update call with Ms. Jones regarding mediation, settlement offer and counter-offer, and dates for trial |
| 07/30/20 | 1.20 | Deposition of J. Norton |
| 07/31/20 | 1.30 | Review of MSJ's filed by Defendants; began counter-argument brainstorming |
| 08/03/20 | 0.60 | Review of MSJs filed by Defendants; began counter-argument brainstorming and outlining |
| 08/04/20 | 0.10 | Letter to Mediator/MJ on interrogatories |
| 08/04/20 | 0.30 | Call w/ R. Hunt pre-mediation to discuss |
| 08/04/20 | 0.30 | Call with Ms. Jones pre-mediation to discuss |
| 08/05/20 | 0.20 | After mediation call with Ms. Jones to discuss next steps |
| 08/05/20 | 2.40 | Mediation session |
| 08/06/20 | 0.70 | Joint stipulations draft |
| 08/13/20 | 3.90 | Response to MSJ for Failure to accommodate/res judicata and standing claim |
| 08/18/20 | 2.30 | Drafted MSJ response on damages and misc./injunctive additional relief |
| 08/21/20 | 1.20 | Assistance with reviewing and editing final drafts of MSJ responses |
| 08/26/20 | 1.10 | Deposition of Pat Morgan |
| 09/01/20 | 0.90 | Deposition of Robert Miller |
| 09/02/20 | 1.80 | Attended deposition of Plano 30(b)(6) (Mr. Mata) |

| 09/21/20 | 1.40 | Attended deposition of C. Day 30(b)(6) |
|---|---|---|
| 11/20/20 | 0.50 | Discussion of deposition costs w/ RH |
| 11/30/20 | 0.30 | Discussion w/ BE about requesting remote appearance |
| 12/08/20 | 0.30 | Telephonic conference with court to set trial date for bench trial: set for week of Feb.8 |
| 01/12/21 | 0.50 | Trial prep call with R. Hunt |
| 01/28/21 | 0.80 | Initial prep call for direct examination |
| 01/29/21 | 1.50 | Call with PH and BE regarding direct examination and cross examination tips |
| 02/03/21 | 1.10 | Continued prep for trial and client's examination |
| 02/03/21 | 1.30 | Trial prep: direct examination prep for client |
| 02/05/21 | 0.40 | Additional work on direct examination outline |
| 02/05/21 | 3.30 | Re-reviewed Pltfs/Defs exhibits; depo exhibits; designations; pre-trial order |
| 02/07/21 | 1.40 | Trial prep: direct examination for client |
| 02/08/21 | 8.40 | Bench trial attended via zoom; prep during breaks for direct examination of client; reviewed notes of running matters at the trial; attended via remote |
| 02/09/21 | 9.80 | Bench trial attended via zoom; reviewed notes of running matters at the trial; attended via remote; |
| 02/15/21 | 1.70 | Preliminary research of cases to use for post-trial brief |
| 02/15/21 | 1.80 | Began work on post-trial brief |
| 02/16/21 | 2.10 | Continued work on post-trial brief |
| 02/23/21 | 1.70 | Continued work on post-trial brief |
| 02/24/21 | 2.30 | Continued work on post-trial brief |
| 02/26/21 | 1.60 | Final review of post-trial brief and filed with the Court by 5:00 pm deadline |
| **Total** | **159.1** | |

# Attachment B

SBOT Income and Hourly Rates 2019

# 2019 INCOME AND HOURLY RATES

The following report is published periodically to provide insight on the economics of the practice of law in Texas. The information for this report was collected in the 2019 Texas Attorney Survey.

*Please note that the income and hourly rate information is not intended to set appropriate attorney fees or incomes.*



# INTRODUCTION

The income and hourly rate report is published periodically to provide insight on the economics of law practice in Texas.

The State Bar's Department of Research and Analysis conducted the Texas Attorney Survey – Status 2019 on October 13, 2020, and completed data collection on November 3, 2020.

This report presents data collected on licensed and practicing full-time attorneys who provided information for the calendar year 2019.

The report provides detailed breakdowns of incomes by sex, race, ethnicity, age, law firm size, years of experience, area of practice, and region of the state. A comparison to historical data is also provided for select demographics.

The questionnaire was emailed on October 13, 2020, to all active State Bar of Texas attorneys who have not opted out of taking surveys. A total of 83,140 received the survey. A total of 6,990 attorneys responded to the survey.  This response gave the survey a margin of error of ±1.1%.

A more detailed description of the methodology and a copy of the questionnaire are included at the end of this report (see appendix).

## Responses by Metropolitan Statistical Area (MSA)

| Metropolitan Statistical Area | Texas Attorney Population | Percent of Attorney Population | Respondents | Percent of Respondents |
|---|---|---|---|---|
| Houston-The Woodlands-Sugar Land MSA | 29,193 | 32.0% | 1,630 | 27.5% |
| Dallas-Fort Worth-Arlington MSA | 28,034 | 30.7% | 1,738 | 29.3% |
| Austin-Round Rock MSA | 12,486 | 13.7% | 889 | 15.0% |
| San Antonio-New Braunfels MSA | 7,077 | 7.8% | 524 | 8.8% |
| El Paso MSA | 1,292 | 1.4% | 93 | 1.6% |
| Corpus Christi MSA | 1,056 | 1.2% | 93 | 1.6% |
| Beaumont-Port Arthur MSA | 757 | 0.8% | 44 | 0.7% |
| Central Texas MSAs | 1,101 | 1.2% | 101 | 1.7% |
| East & NE Texas MSAs | 2,227 | 2.4% | 173 | 2.9% |
| South Texas MSAs | 1,997 | 2.2% | 149 | 2.5% |
| West Texas MSAs | 2,581 | 2.8% | 222 | 3.7% |
| Non-Metro | 3,443 | 3.8% | 269 | 4.5% |

# SUMMARY FINDINGS

## 2019 Income and Hourly Rate Summary



# $122,666
Median Income

# $291
Median Hourly Rate

## INCOME

The median income for respondent full-time Texas attorneys was $122,666.

In 2019, 41% of respondent full-time Texas attorneys saw an increase in their annual income.

Texas attorney income has increased steadily since 2011, but has not reached a pre-2008 recession high of $129,322 yet.

Men and white attorneys reported higher incomes than their counterparts. Men reported a median of $146,328 and white attorneys reported a median of $132,919.

Median income increases with more experience. Attorneys licensed 2 or fewer years reported a median income of $72,982 compared to a median of $163,481 for those licensed over 25 years.

The highest incomes were reported in the largest metro areas. In Dallas-Fort Worth-Arlington MSA, the median income was $129,623, and in Houston-The Woodlands-Sugar Land MSA, the median was $129,526.

## HOURLY RATES

Hourly rates are the most common method for private practitioners to charge for their services. 90% reported hourly rates as a method for charging.

The median hourly rate for respondent full-time private practitioners in 2019 was $291.

Like income, the highest hourly rates were reported in the largest metro areas. In Dallas-Fort Worth-Arlington MSA, the median income was $308, in the Austin-Round Rock MSA, the median was $299, and in Houston-The Woodlands-Sugar Land MSA, the median was $297.

# SUMMARY FINDINGS CONTINUED

## Jobs, Satisfaction, and Law School Debt Summary





Career Satisfaction



Law School Satisfaction

**$91,766**

Median Law School Debt for all Full-Time Attorneys

**$105,889**

Median Law School Debt for Attorneys Licensed 2 or fewer Years

Attorneys were asked how long, since they were first admitted to practice law, did it take them to obtain their first full-time job providing legal services.

The level of career and law school satisfaction was measured on a 5-point scale, from extremely dissatisfied to extremely satisfied.

Additionally, attorneys were asked how much law school debt they carried at this point in their career as of 2019. The median reported was $91,766.

### Career Satisfaction by Years of Experience



Satisfaction percents are for those who reported they are moderatley or extremely satisfied.

# INCOME

## Income Change

Attorneys were asked how their income changed over the past year (2018 to 2019).

41% reported seeing an increase in their annual income in 2019 compared with 23% who reported a decrease.



## Median Income by Year



The median income for respondent full-time Texas attorneys has increased steadily since 2011 but has not reached a pre-2008 recession high of $129,322.

In addition to income, some attorneys received a bonus in 2019. The median reported was $16,945.

## $16,945

Median Bonus

# INCOME CONTINUED

## Median Income by Sex and Race/Ethnicity

The median income for respondent full-time Texas attorneys was $122,666 in 2019.

Men and white attorneys reported higher incomes than their counterparts. Men reported a median income of $146,328 and white attorneys reported a median of $132,919.

The median for women was $106,491, and non-white attorneys reported a median of $102,895.



# INCOME CONTINUED

## Median Income by Sex and Race/Ethnicity and Years of Experience

Men and white attorneys report a higher income over the course of their careers in comparison to their counterparts.

Income reported by men licensed 2 or fewer years is 10% greater than that reported by women. For those licensed over 25 years, the difference is 22%.

White attorneys licensed 2 or fewer years reported an income 10% greater than that reported by non-white attorneys. For those licensed over 25 years, the difference is 35%.



# INCOME CONTINUED

## Income by Metropolitan Statistical Area (MSA)

| Metropolitan Statistical Area (MSA) | Median Income |
|---|---|
| Houston-The Woodlands-Sugar Land MSA | $129,526 |
| Dallas-Fort Worth-Arlington MSA | $129,623 |
| Austin-Round Rock MSA | $119,207 |
| San Antonio-New Braunfels MSA | $118,965 |
| El Paso MSA | $121,428 |
| Corpus Christi MSA | $105,682 |
| Beaumont-Port Arthur MSA | $114,062 |
| Central Texas MSAs | $105,882 |
| East & NE Texas MSAs | $115,908 |
| South Texas MSAs | $115,384 |
| West Texas MSAs | $119,642 |
| Non-Metropolitan Counties | $97,999 |

In general, the larger the MSA the larger the median income reported.

For example, the Dallas-Fort Worth-Arlington MSA had a median income of $129,623. This compares to the lowest median income of $97,999 in non-metropolitan areas.

# HOURLY RATES

## Hourly Rate Trends

Hourly rates charged by respondent full-time private practitioners in 2019 were 29% higher than they were in 2007. During the same period, the median income reported declined by 5%.

With respect to fees, 90% of private practitioners reported they charge an hourly rate. Attorneys also reported collecting flat fee and contingency fees. 25% and 26% of respondents reported collecting fees with these methods, respectively.

### Median Hourly Rate by Year





Percents will not add up to 100%. Respondents could select multiple fees.

# HOURLY RATES CONTINUED

## Hourly Rates by Metropolitan Statistical Area (MSA)

| Metropolitan Statistical Area (MSA) | Median Hourly Rate |
|---|---|
| Houston-The Woodlands-Sugar Land MSA | $297 |
| Dallas-Fort Worth-Arlington MSA | $308 |
| Austin-Round Rock MSA | $299 |
| San Antonio-New Braunfels MSA | $285 |
| El Paso MSA | $228 |
| Corpus Christi MSA | $238 |
| Beaumont-Port Arthur MSA | $250 |
| Central Texas MSAs | $247 |
| East & NE Texas MSAs | $268 |
| South Texas MSAs | $232 |
| West Texas MSAs | $279 |
| Non-Metropolitan Counties | $239 |

Hourly rate trends closely mirror that of incomes. The larger the MSA, the larger the median hourly rate reported.

For example, the Dallas-Fort Worth-Arlington MSA had a median hourly rate of $308. This compares to the lowest median hourly rate reported of $228 in El Paso.

# APPENDIX

## Methodology



### Method

### Data Collection
Attorney economic information was collected in the Texas Attorney Survey – Status 2019. The questionnaire was emailed on October 13, 2020, to 83,140 active attorneys licensed by the State Bar of Texas, maintaining active membership in the State Bar of Texas, and who did not opt out of receiving survey mailings.

The survey's results are presented in part by geographic region, which is broken down into 13 economic areas. The metropolitan areas (Metropolitan Statistical Areas or MSAs) were defined by the Federal Office of Management and Budget. There were 1,630 responding attorneys from the Houston-The Woodlands-Sugar Land and 1,738 from the Dallas-Fort Worth-Arlington MSAs, 889 attorneys from the Austin-Round Rock MSA, 524 attorneys from the San Antonio-New Braunfels MSA, and 1,144 attorneys from the remaining regions.

### Response Rate
The survey ended November 3, 2020. As of the deadline there were 6,690 completed responses. This response gave the survey a margin of error of ±1.1%.

This means that if 40% of the respondents answered "yes" to a question, we can be 95% confident that the actual proportion of the population who would answer "yes" to the same question is 2 percentage points lower or higher than 40% (39 to 41%).

# APPENDIX CONTINUED

## Metropolitan Statistical Area

**Houston-The Woodlands-Sugar Land MSA**
Austin
Brazoria
Chambers
Fort Bend
Galveston
Harris
Liberty
Montgomery
Waller

**Dallas-Fort Worth-Arlington MSA**
Collin
Dallas
Denton
Ellis
Hood
Hunt
Johnson
Kaufman
Parker
Rockwall
Somervell
Tarrant
Wise

**Austin-Round Rock MSA**
Bastrop
Caldwell
Hays
Travis
Williamson

**San Antonio-New Braunfels MSA**
Atascosa
Bandera
Bexar
Comal
Guadalupe
Kendall
Medina
Wilson

**El Paso MSA**
El Paso
Hudspeth

**Corpus Christi MSA**
Aransas
Nueces
San Patricio

**Beaumont-Port Arthur MSA**
Hardin
Jefferson
Newton
Orange

**Central Texas MSAs**
**Waco MSA**
McLennan
Falls
**Killeen-Temple MSA**
Bell
Coryell
Lampasas

**East & NE Texas MSAs**
**College Station-Bryan MSA**
Brazos
Burleson
Robertson
**Longview MSA**
Gregg
Rusk
Upshur
**Sherman-Denison MSA**
Grayson
**Texarkana MSA**
Bowie
**Tyler MSA**
Smith
**Victoria MSA**
Goliad
Victoria
**Wichita Falls MSA**
Archer
Clay
Wichita

**South Texas MSAs**
**Brownsville-Harlingen MSA**
Cameron
**Laredo MSA**
Webb
**McAllen-Edinburg-Mission MSA**
Hidalgo

**West Texas MSAs**
**Abilene MSA**
Callahan
Jones
Taylor
**Amarillo MSA**
Armstrong
Carson
Oldham
Potter
Randall
**Lubbock MSA**
Crosby
Lubbock
Lynn
**Midland MSA**
Martin
Midland
**Odessa MSA**
Ector
**San Angelo MSA**
Irion
Tom Green

# APPENDIX CONTINUED

**Non-Metropolitan Counties**

| | | |
|---|---|---|
| Anderson | Foard | Lipscomb |
| Andrews | Franklin | Live Oak |
| Angelina | Freestone | Llano |
| Bailey | Frio | Loving |
| Baylor | Gaines | Madison |
| Bee | Garza | Marion |
| Blanco | Gillespie | Mason |
| Borden | Glasscock | Matagorda |
| Bosque | Gonzales | Maverick |
| Brewster | Gray | McCulloch |
| Briscoe | Grimes | McMullen |
| Brooks | Hale | Menard |
| Brown | Hall | Milam |
| Burnet | Hamilton | Mills |
| Calhoun | Hansford | Mitchell |
| Camp | Hardeman | Montague |
| Cass | Harrison | Moore |
| Castro | Hartley | Morris |
| Cherokee | Haskell | Motley |
| Childress | Hemphill | Nacogdoches |
| Cochran | Henderson | Navarro |
| Coke | Hill | Nolan |
| Coleman | Hockley | Ochiltree |
| Collingsworth | Hopkins | Palo Pinto |
| Colorado | Houston | Panola |
| Comanche | Howard | Parmer |
| Concho | Hutchinson | Pecos |
| Cooke | Jack | Polk |
| Cottle | Jackson | Presidio |
| Crane | Jasper | Rains |
| Crockett | Jeff Davis | Reagan |
| Culberson | Jim Hogg | Real |
| Dallam | Jim Wells | Red River |
| Dawson | Karnes | Reeves |
| Deaf Smith | Kenedy | Refugio |
| Delta | Kent | Roberts |
| De Witt | Kerr | Runnels |
| Dickens | Kimble | Sabine |
| Dimmit | King | San Augustine |
| Donley | Kinney | San Jacinto |
| Duval | Kleberg | San Saba |
| Eastland | Knox | Schleicher |
| Edwards | Lamar | Scurry |
| Erath | Lamb | Shackelford |
| Fannin | La Salle | Shelby |
| Fayette | Lavaca | Sherman |
| Fisher | Lee | Starr |
| Floyd | Leon | Stephens |
| | Limestone | Sterling |

# APPENDIX CONTINUED
# Questionnaire

**INSTRUCTIONS**

Each question can be answered by simply selecting a response or filling in a blank. These questions are for information related to calendar year 2019.

Completion of the survey should take, on average, eight minutes.

**Please complete this questionnaire by 5 p.m. CDT Tuesday, November 3, 2020.**

Thank you for your participation.

---

\*

Please provide your bar card number below. This information will only be used to validate each response and to enter you in a chance to win one of thirty $100 Amazon gift cards. Your bar card number will not be associated with your responses.

_____

**PRIMARY OCCUPATION**

---

Q For 2019, what was your primary occupation?

○ Private law practice  (1)

○ For-profit corporate/in-house counsel  (2)

○ Nonprofit corporate/in-house counsel  (3)

○ Full-time judge  (4)

○ Other judicial branch  (5)

○ Government attorney  (6)

○ Law faculty  (7)

○ Public interest lawyer  (8)

○ Other law related  (9)

○ Non-law related  (10)

○ Unemployed/looking for work  (11)

○ Unemployed/not looking for work  (12)

○ Retired/not working  (13)

○ Was not licensed to practice in 2019  (14)

○ Other  (15) _____

---

Q If applicable, what was your job title in 2019?

_____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q   In calendar year 2019, did you work:

▼ Full time (1) ... Other (4)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q   Please provide the following financial information for calendar year 2019:
_____ Gross personal income (including any bonus) (1)
_____ If applicable, bonus received (2)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q   How has your income changed in the past year?

▼ Increased significantly (1) ... Decreased significantly (5)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q Did you provide professional services other than legal services in 2019?

▼ Yes (1) ... No (2)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q    If yes, what other types of professional services did you provide?

☐        Real Estate Sales/Development Management  (1)

☐        Insurance Sales  (2)

☐        Accounting  (3)

☐        Financial Planning  (4)

☐        Investment Adviser  (5)

☐        Registered Securities Representative  (6)

☐        Other  (7) _____

---

Q Do you carry any of the following types of insurance?

☐        Professional Liability ("Legal Malpractice") Insurance  (1)

☐        Other Non-Legal Professional Liability ("E&O") Insurance  (2)

☐        Cyber Breach Liability Insurance  (3)

☐        Business Owners Insurance  (4)

☐        Employment Practices Liability Insurance  (5)

☐        Other  (6) _____

---

Q    What professional licenses or certificates, if any, do you have other than your law license?

_____

## Q **PRIVATE PRACTITIONER - PRACTICE AREA INFORMATION**

Q  For 2019, how many attorneys, including yourself, worked in your firm?

_____

Q For 2019, if you worked as a private law practitioner, please provide the typical rate or fee you charged for all applicable billing methods.

|  | Hourly Rate (1) | Flat Fee (2) | Contingency Fee (3) | Other (4) |
|---|---|---|---|---|
| Typical Rate or Fee (1) |  |  |  |  |

Q Please provide the following information on the average number of actual and billable hours worked per week, as an attorney, in 2019:

○ Average hours worked per week  (1)
_____

○ Average billable hours worked per week  (2)
_____

Q Please specify your position in calendar year 2019 as a private practitioner:

▼ Sole Practitioner (1) ... Other (14)

---

Q **PRO BONO**

The State Bar of Texas defines legal services to the poor as the provision of the following without an expectation of payment or at a substantially reduced fee:

- legal services to the poor or to a charitable organization that addresses the needs of the poor,
- services that improve the legal process or availability of legal services to the poor,
- legislative, administrative or advocacy for the poor,
- unsolicited, involuntary court appointments.

The State Bar's pro bono policy does not define "poor"; however, it encourages attorneys to serve clients that would qualify for legal aid who live at or below 125% of the federal poverty guidelines ($15,175 for single person, $31,375 for a family of four).

Did you provide any of the above pro bono services in calendar year 2019?

▼ Yes (1) ... No (2)

---

Q **PRO BONO**

Please take a moment to answer a few questions on the pro bono services you performed in 2019. This data will be used to highlight how Texas attorneys are doing their part to help low-income people in our state. Historically, Texas attorneys perform about 2.4 million hours of pro bono services each year.

Q Did you provide any free legal services to the poor in 2019?

▼ Yes (1) ... No (2)

✳

Q Please indicate approximately how many total hours of free legal services you provided?

_____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q Please indicate approximately how many hours were for:

*(Note that these categories do not need to sum to the total hours provided.)*

|  | Hours (1) |
|---|---|
| Civil Matters (1) | |
| Criminal Matters (2) | |
| Legal services to a charitable organization for the poor (4) | |
| Legal services to simplify or improve quality of legal services to the poor (5) | |
| Legislative, administrative or advocacy for the poor (6) | |
| Unsolicited Court Appointments (3) | |

Q Did you provide any legal services at a substantially reduced fee that benefited the poor in 2019?

▼ Yes (1) ... No (2)

Q Approximately how many total reduced fee hours were for:

*(Note that these categories do not need to sum to the total hours provided.)*

| | Hours (1) |
|---|---|
| Civil Matters (1) | |
| Criminal Matters (2) | |
| Legal services to a charitable organization for the poor (4) | |
| Legal services to simplify or improve quality of legal services to the poor (5) | |
| Legislative, administrative, or advocacy for the poor (6) | |
| Unsolicited Court Appointments (3) | |

Q What is your hourly rate for reduced fee legal services to the poor?

| ▼ Less than $50.00 (1) ... More than $150.00 (5) |
|---|

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q Did you make any direct financial contribution related to legal services to the poor in 2019?

| ▼ Yes (1) ... No (2) |
|---|

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q What was the approximate total amount of the financial contribution you paid in 2019?
_____ Approximate total amount of financial contribution (1)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q Did you pay actual out-of-pocket expenses related to pro bono or legal services to the poor in 2019?

| ▼ Yes (1) ... No (2) |
|---|

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q What was the approximate total amount of out-of-pocket expenses you paid on pro bono or reduced fee legal services in 2019?
_____ Approximate total amount of out-of-pocket expenses paid (1)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q If you have any comments or suggestions about pro bono services please provide them below:

_____

_____

_____

_____

_____

---

Q **LAW SCHOOL/CAREER SATISFACTION**  The following questions are designed to study the economic and non-economic value of a law degree and the associated attorney satisfaction with their careers and decisions to attend law school. Your answers will help provide prospective law students and members of the bar with important information about legal careers in Texas.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q Which of the following best describes your class rank upon graduation from law school?

| ▼ Top 10th percentile (1) ... Don't know (5) |
|---|

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q At this point in your career, how much remaining law school debt do you have?

| ▼ None (1) ... $100,000 or more (6) |
|---|

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q Please provide your level of satisfaction on the following:

| | Extremely satisfied (1) | Somewhat satisfied (2) | Neither satisfied nor dissatisfied (3) | Somewhat dissatisfied (4) | Extremely dissatisfied (5) |
|---|---|---|---|---|---|
| How satisfied are you with your decision to have attended law school? (1) | ○ | ○ | ○ | ○ | ○ |
| How satisfied are you with your career? (2) | ○ | ○ | ○ | ○ | ○ |

Q After being admitted to practice law, how long did it take you to obtain your first full-time job providing legal services?

▼ 0 to 6 months (4) ... 15 (15)

✳

Q Including your current employer, how many employers have you had since you graduated from law school?

_____

Q **VOLUNTARY DEMOGRAPHICS**
The following voluntary demographic information is used to provide detailed economic trends and measure diversity in the practice of law in Texas. The State Bar of Texas follows the U.S. Census Bureau and U.S. Equal Employment Opportunity Commission guidelines for collecting information on sex and race/ethnicity.

Q Please provide the following geographic information on where a majority of your work was performed in 2019:

|  | Texas County | Out-of-State/Country | | Other |
|---|---|---|---|---|
|  |  | Yes (1) | No (2) | Please specify (1) |
| Geography (1) | ▼ Anderson County (1 ... Zavala County (254) | ○ | ○ |  |

Q Years of experience and age (up to and including calendar year 2019):

|  | Years of Experience and Age (1) |
|---|---|
| Years of Experience (as an attorney) (1) |  |
| Age (2) |  |

Q Ethnicity:

▼ Hispanic or Latino (1) ... Not Hispanic or Latino (2)

Q Race:

▼ White (1) ... Other (7)

Q Sex:

▼ Male (1) ... Female (2)

Q If you have any additional comments regarding the information collected with this survey, please provide them below:

_____

_____

_____

_____

_____

# Attachment C
## *Cappella Park v. Walls* (2018)

# Attachment C-1

## Affidavit of Christopher McGreal

CAUSE NO. 13-14480

| | | |
|---|---|---|
| CAPELLA PARK HOMEOWNERS' | § | IN THE DISTRICT COURT |
| ASSOCIATION, INC. | § | |
|     Plaintiff and Counter-Defendant, | § | |
| | § | |
| | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| WILLIE E. WALLS, III, | § | |
| MELODY HANSON, and MY ROYAL | § | |
| PALACE, LLC., | § | |
|     Defendants and Counter-Plaintiffs, | § | |
| | § | |
| DAVID WAYNE WHITAKER and | § | |
| ASHUNTIS GRISBY, | § | |
|     Plaintiff-Intervenors. | § | 162ND JUDICIAL DISTRICT |
| | | |
| STATE OF TEXAS | § | |
| DALLAS COUNTY | § | |

## AFFIDAVIT OF CHRISTOPHER MCGREAL AND SUMMARY OF TESTIMONY

1.      My name is Christopher McGreal.  I am over 18 years of age, of sound mind, and capable of making this affidavit.  The facts stated in this affidavit are within my personal knowledge and are true and correct.

2.      I am an attorney licensed to practice in the State of Texas.

3.      Plaintiffs, Ashuntis Grisby and David Wayne Whitaker, by and through their next of friends, retained me to represent them in this suit based on discrimination under the Texas and Federal Fair Housing Acts ("FHAs") against Capella Park Homeowners' Association, Inc. ("Defendant").  I have personal knowledge of this case and the work performed.

4.      All the time spent on this case was done as an employee of Disability Rights Texas. Disability Rights Texas is the federally designated legal and protection advocacy organization

**AFFIDAVIT OF CHRISTOPHER MCGREAL – Page 1**

for individuals with disabilities in Texas.  Disability Rights Texas is a non-profit, public interest law firm organized under § 501(c)(3) of the Internal Revenue Code, and has been designated as the "protection and advocacy" organization in the State of Texas.  Any fee awarded for my work will be paid directly to Disability Rights Texas and used to support legal assistance to other individuals with disabilities.

5.      The following describes my experience and expertise in this area of the ADA, and in enforcing other federal statutes and implementing federal regulations.  I have been a practicing attorney for more than eleven years.   I have been employed by Disability Rights Texas since March 14, 2011.  During that time, I have concentrated primarily on disability rights in the field of fair housing, with a particular emphasis on disability discrimination under the Federal Fair Housing Act.  I have conducted numerous education and training seminars for individuals with disabilities, and for advocates for such individuals, including attorneys, regarding ADA transportation.   Further, I have litigated several federal cases involving community land use discrimination against group homes for persons with disabilities, such as is the case in this matter.   This list includes, but is not limited to: *Kappele v. Village Creek of Eldorado Homeowners' Association, Inc.*, No. 4:17-CV-769, E.D. Tex. 2018; *Ramirez-Alanis v. LSR Homeowners Association, Inc.*, 4:17-CV-01011, N.D. Tex. 2018; *Stinson v. Willow Meadows Civic Club, Inc.*, No. 4:17-cv-1547, S.D. Tex. 2017; *Humphries v. City of Beaumont, Texas*, No. 1:15-CV-201 , E.D. Tex. 2016; *McBride v. Westwood (Leander) Homeowners' Association, Inc.*, No. 1:16-CV-576, W.D. Tex. 2016.  The area of land use and group homes for persons with disabilities is a highly specialized subset of the FHA, which involves few practitioners representing persons with disabilities in this field that have the necessary expertise.

**AFFIDAVIT OF CHRISTOPHER MCGREAL -- Page 2**

6.      Before my employment with Disability Rights Texas, I was a trial attorney with the U.S. Department of Justice ("DOJ"), Civil Division, for over four years.  With the DOJ, I handled over one hundred appeals in the various United States Circuit Courts of Appeals.  At the DOJ, I concentrated my work on enforcing the Immigration and Nationality Act ("INA") and its implementing regulations.  The FHA involves a complex statutory structure intertwined with its implementing regulations and developing case law.  I drew extensively on my DOJ experience in federal immigration law to understand the FHA and its regulations and case law, in order to bring this cause of action.  Further, like the INA, the FHA's case law is constantly developing and involves new areas that have not been fully or heavily litigated, such as the issues involved in this case.

7.      It was necessary for Mssrs. Whitaker and Grisby to retain an attorney to represent them in this matter.

8.      The paralegals and assistants assigned to this case (1) are qualified by education, experience, and training to perform the services required, (2) have knowledge of the legal system, principles, and procedures, (3) were supervised by an attorney, (4) performed that are traditionally done by an attorney, and (5) performed services that were reasonable and necessary.

9.      Whenever possible, I noted my activities contemporaneously and then recorded it on the standard timekeeping system used by Disability Rights Texas.  On those occasions when I was working outside of the office, I noted the activity immediately on my return to the office and then recorded it on the timekeeping system.  All time calculations were noted in the percentages of an hour.

**AFFIDAVIT OF CHRISTOPHER MCGREAL – Page 3**

10.     The time records which are set forth in Attachment A reflect considerably less time than I and others in my organization spent on the case.  I have not charged for any activities or services provided before the filing of this action.  I have also deleted instances where there was duplication.  In total, I estimate that I omitted, deleted, or reduced at least approximately fifty-one (51) hours of actual time spent on this case.

11.     The legal issues in this case were novel.  The FHA issue in this case, mainly whether private restrictive covenant that incorporates a spacing rule for group homes for persons with disabilities, as well as prohibition against for-profit group home operates, violates the FHA, has not been extensively litigated in the private homeowners context versus the local municipality/city situation.  Mssrs. Grisby and Whitaker are one a few individuals in the United States to have brought and secured a favorable judgment on liability on such a matter.

12.     The novelty of the questions involved in this cause of action required me to spend 85.7 hours prosecuting this cause of action by (1) investigating and researching claims, (2) drafting pleadings, motions, appeals and judgments, (3) attending hearings and trials, and (4) taking other necessary actions to perform my legal services properly.

13.     Litigating Mssrs. Grisby and Whitaker case against Defendant precluded me from accepting cases during this period of time that I normally would have taken.  Disability Rights Texas is a non-profit agency serving individuals who typically have very limited resources, and who certainly have a mental or physical disability.  Therefore, the demand for our services is considerably high, and unfortunately, at times we have to turn clients away due to our lack of resources.  Given the time and resource commitment involved in litigating a case, accepting a case for litigation, such as Mssrs. Grisby and Whitaker's matters, impacted the number of other cases that I might work for the disability community.

**AFFIDAVIT OF CHRISTOPHER MCGREAL – Page 4**

14.     In my opinion, the reasonable value of attorney fees, costs, and expenses reasonably and necessarily incurred by Mssrs. Grisby and Whitaker for mine and my paralegal's services is $25,836.00, for representing Mssrs. Grisby and Whitaker in this matter and through entry of judgment. *See* Attachment A.

15.     The attorney services and fees charged in this case were necessary, were reasonable, and were incurred in the prosecution of this suit.

16.     To the best of my knowledge, the fees I charged in this case are below that which are customarily charged in this area for same or similar services for an attorney with my experience, reputation, and ability, considering the type of controversy, the time limitations imposed, and the results obtained.

17.     For the purposes of this case, I am using the hourly attorney rate of $240.00 per hour for myself.  To reach this number, I used the State Bar of Texas, Department of Research & Analysis 2015 Hourly Fact Sheet ("Fact Sheet").  *See* Attachment B.  According to the Fact Sheet, the rate for attorneys with 11 years of experience in Dallas County is $258.00 per hour. *See* Attachment B at page 3.  The rate used for fees in this case is lower than the Fact Sheet for Dallas County.

18.     For the purposes of this case, I am using the hourly attorney rate of $120.00 per hour for my paralegal.  To reach this number, I used the State Bar of Texas, Department of Research & Analysis 2014 Paralegal Division Compensation Survey ("Survey Sheet").  *See* Attachment C. According to the Fact Sheet, the rate for paralegals in Dallas County is $126.00 per hour.  *See* Attachment C at page 16.  The $120.00 rate used for fees in this case is lower than the numbers in the Survey Sheet for Dallas County.

**AFFIDAVIT OF CHRISTOPHER MCGREAL – Page 5**

19.     Non-profit legal services organizations, such as Disability Rights Texas, are entitled to legal fees at the normal, market rate.  *See Blum v. Stenson*, 465 U.S. 886, 892-94, 104 S. Ct. 1541, 1545-47 (1984) (holding nonprofit legal aid organization that represented prevailing Civil Rights Act litigant was entitled to recover attorney's fees calculated under prevailing market rate rather than cost-related basis, even if the fee so calculated exceeded the salaries and expenses of staff counsel).

 

Christopher McGreal
Attorney for Plaintiff


STATE OF TEXAS            §
DALLAS COUNTY             §


Sworn to and subscribed before me by Christopher McGreal on May 23ʳᵈ, 20 18


LETICIA DE LA TORRE
Notary Public, State of Texas
Comm. Expires 03-11-2019
Notary ID 11411518

Notary Public in and for State of Texas

My commission expires:


**AFFIDAVIT OF CHRISTOPHER MCGREAL – Page 6**

# Attachment C-2
## Final Judgment

CAUSE NO. DC-13-14480

| | | |
|---|---|---|
| **CAPELLA PARK HOMEOWNERS'** | § | **IN THE DISTRICT COURT** |
| **ASSOCIATION, INC.** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **DALLAS COUNTY, T E X A S** |
| | § | |
| **WILLIE E. WALLS, III,** | § | |
| **MELODY HANSON, and MY ROYAL** | § | |
| **PALACE, LLC.,** | § | |
| **Defendants.** | § | **162ⁿᵈ JUDICIAL DISTRICT** |

## FINAL JUDGMENT

On May 6, 2016, a final judgment was entered in this lawsuit after a bench trial. Judgment was in favor of Capella Park Homeowners' Association, Inc. ("Plaintiff/Counter-Defendant") and against Willie E. Walls, III, Melody Hanson and My Royal Palace, LLC ("Defendants/Counter-Plaintiffs") and David Wayne Whitaker and Ashuntis Grisby ("Intervenors"). Thereafter, the Defendants/Counter-Plaintiffs and Intervenors appealed the final judgment.

On November 30, 2017, the Dallas Court of Appeals issued an opinion that Defendants/Counter-Plaintiffs and Intervenors requested a reasonable accommodation from Plaintiff/Counter-Defendant and that the reasonable accommodation was unlawfully denied. The Court of Appeals decided as a matter of law that it was necessary for Plaintiff/Counter-Defendant to refrain from enforcing the restrictive covenant so that the residents may have the same opportunity as non-disabled persons to reside on the lots in question.

After considering the Agreed Statement of Facts and Exhibits and the opinion of the Court of Appeals,

IT IS ORDERED, ADJUDGED, AND DECREED that Plaintiff/Counter-Defendant's requests for injunctive relief and attorney's fees are denied.

---

**FINAL JUDGMENT-PAGE 1**

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Plaintiff/Counter-Defendant is permanently enjoined from continuing the discriminatory practice of refusing to make the reasonable accommodation requested:  Refrain from enforcing against Defendants/Counter-Plaintiffs and Intervenors the restrictive covenant that provides that community or group homes must comply with Section 123 of the Texas Human Resources Code.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendants/Counter-Plaintiffs shall recover from Plaintiff/Counter-Defendant their reasonable attorneys' fees and costs in the amount of $38,025.00.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Intervenors shall recover from Plaintiff/Counter-Defendant their reasonable attorneys' fees and costs in the amount of $38,025.00.

This judgment disposes of all parties and all claims and is final and appealable.

SIGNED on this __13__ day of __September__, 2018.

_____
HON. MARICELA MOORE
162ND DISTRICT COURT

# Attachment C-3

Opinion from Texas Court of Appeals

Walls v. Capella Park Homeowners' Association, Inc., Not Reported in S.W. Rptr. (2017)

2017 WL 5898407

2017 WL 5898407
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

Court of Appeals of Texas, Dallas.

Willie E. WALLS, III, Melody Hanson,
and My Royal Palace, David Wayne
Whitaker, and Ashuntis Grisby, Appellants
v.
CAPELLA PARK HOMEOWNERS'
ASSOCIATION, INC., Appellee

No. 05–16–00783–CV
|
Opinion Filed November 30, 2017

**On Appeal from the 162nd Judicial District Court, Dallas
County, Texas, Trial Court Cause No. DC–13–14480**

**Attorneys and Law Firms**

Rachel Cohen–Miller, Christopher McGreal, for David
Wayne Whitaker and Ashuntis Gris.

Sean Pevsner, Mark Whitburn, for Willie E. Walls, III, et al.

Chad E. Robinson, Dean A. Riddle, for Capella Park
Homeowners' Association, Inc.

Before Justices Lang, Evans, and Schenck

**MEMORANDUM OPINION**

Opinion by Justice Schenck

**\*1** Willie E. Walls, III, Melody Hanson, My Royal
Palace, David Wayne Whitaker, and Ashuntis Grisby appeal
the trial court's judgment granting a permanent injunction
and awarding attorney's fees in favor of Capella Park
Homeowners' Association, Inc. ("HOA") and denying claims
of discrimination in violation of federal and state law.

Walls and Hanson own two homes (the "Group Homes")
in which they operate a for-profit residential program,
My Royal Palace, that provides support and services to
persons with physical and intellectual disabilities, including

residents Whitaker and Grisby. The lots on which the Group
Homes are situated are subject to restrictive covenants
(the "Declaration"), including one such restrictive covenant
("Restrictive Covenant"), which provides that community or
group homes must comply with Section 123 of the Texas
Human Resources Code. *See* TEX. HUM. RES. CODE ANN.
§§ 123.001–.010 (West 2013 & Supp. 2016). At trial and on
appeal, appellants assert the right "to use and enjoy housing
in ... the community they choose to live in" in the same
way those without disabilities are able to do. The asserted
right proceeds from state and federal fair housing legislation
enacted to combat discrimination in the housing market on the
basis of disability that has the effect of excluding the disabled.

Appellants contend the HOA is required by law to refrain
from enforcing any restrictive covenants against appellants
on account of disability and treat them as if they were not
disabled or operating homes for the disabled. The HOA
argues their obligation to those wanting to use a home as
a community or group home begins and ends with Section
123 of the human resources code, which protects the disabled
and mandates accommodation of group homes maintained
by government or nonprofit operators. No party addressed
whether not enforcing the Restrictive Covenant on account
of any reason foreclosing application of Section 123 would
place an undue burden on the HOA.

Appellants' second issue is their central argument, that they
are entitled to an accommodation in the form of an exemption
from the Restrictive Covenant insofar as it applies because
they are disabled or operating a residence for the disabled. [1]
Because we conclude they are, we reverse the trial court's
judgment.

**BACKGROUND**

**I. Factual Background**

The Group Homes consist of two residential structures
situated adjacent to each other in the Capella Park
development. Appellants Whitaker and Grisby, suffer severe
intellectual and physical disabilities requiring the constant
presence of a nurse and the occasional presence of other
professionals. They also receive residential support services
from Walls and Hanson. At all times, three workers are
present at the Group Homes. The lots on which the Group
Homes are situated are subject to the Restrictive Covenant,
which provides as follows.

2017 WL 5898407

    **\*2**  In addition to uses which are inconsistent with applicable zoning or are prohibited or restricted by other recorded covenants, conditions, restrictions or easements, the following uses and activities are prohibited within the Neighborhood without the prior written approval of the Board: a community or group home unless such home meets the qualifications imposed under Section 123.004, et. seq. of the Texas Human Resources Code, as the same may be amended from time to time.

The Group Homes do not qualify as a community home under Section 123 of the human resources code. Section 123 assures the disabled the right to housing and facilities maintained by the government and charities, and makes the right to such housing automatic provided the one-half mile spacing requirement is maintained. *See* TEX. HUM. RES. CODE ANN. §§ 123.004, 123.008.

In February 2013, Walls and Hanson received a letter from the HOA advising that the Group Homes violated the Declaration by conducting a commercial or home business. Over the following months, Walls and the HOA exchanged correspondence in which Walls asserted that the Group Homes provided residential services to disabled individuals and were protected by the federal Fair Housing Act independent of Section 123 of the human resource code. Walls also requested the HOA cease any and all legal or other administrative actions against him. The HOA maintained that the Group Homes were in violation of the Restrictive Covenant and did not qualify as community homes under Section 123 of the human resources code, and, on that basis, could not be permitted to operate.

## II. Procedural Background

On December 10, 2013, the HOA filed suit against Walls, Hanson, and My Royal Palace, asserting breach of restrictive covenants and seeking declaratory judgment and a permanent injunction. The following month, Walls, Hanson, and My Royal Palace filed a counterclaim, asserting the HOA had violated the Texas and the Federal Fair Housing Acts.

Whitaker and Grisby intervened, joining in the counterclaims against the HOA for violations of state and federal fair housing statutes. The parties jointly submitted the case for judgment on an agreed statement of facts and exhibits, including the Declaration and related amendments and copies of the correspondence between the HOA and Walls. The parties agreed to submit evidence concerning attorney's fees by way of post-judgment motions.

At trial, the HOA argued the Group Homes violated the Restrictive Covenant because they were not community homes qualified under Section 123 of the human resources code. The HOA urged that Section 123 protects community homes that met certain qualifications, but, by negative implication, it does not prohibit enforcement of restrictive covenants against community or group homes that do not meet those qualifications. It urged below, as here, that a restrictive covenant that does not violate Section 123 is by necessity lawful. The HOA asserted that appellants had failed to prove the requested accommodation of not enforcing the Restrictive Covenant was necessary to afford the disabled persons an equal opportunity. [2]  The HOA argued there was no evidence in the stipulated facts that living in a residential community ameliorated the disabilities at issue.

    **\*3**  Walls, Hanson, and My Royal Palace conceded the inapplicability of Section 123, as noted, but urged that the state and federal fair housing acts assure the right of disabled to residential housing of their choosing, which is wholly barred by the Restrictive Covenant except insofar as Section 123 would apply. In particular, they argued that without services provided by the Group Homes, disabled individuals would not be able to reside in the community setting and that state and federal discrimination statutes protected such individuals from being isolated and segregated. They asserted that through correspondence with the HOA, My Royal Palace had requested a reasonable accommodation from the HOA of refraining from enforcing the Restrictive Covenant. They also made the point that the purpose of the fair housing statutes was to require "reasonable accommodations ... in policies ... to allow disabled individuals to use and enjoy housing in ... the community they choose to live in." Whitaker and Grisby asserted that the law developed under the Fair Housing Act was to allow the disabled to live in the community of their choice and that the defense "they can go live somewhere else" had no support in discrimination case law.

After considering the stipulated facts and exhibits and the parties' arguments and pleadings, the trial court found in favor

2017 WL 5898407

of the HOA and against appellants. The trial court conducted a subsequent hearing on the HOA's requests for attorney's fees and ultimately awarded $58,498.21 in attorney's fees against Walls, Hanson, and My Royal Palace. Appellants moved for new trial, which the trial court denied.

### III. Arguments of the Parties

No party addressed whether not enforcing the Restrictive Covenant—and the requirements of Section 123—would place an undue burden on the HOA. Accordingly, we must address whether the applicability of Section 123 controls the outcome.

During oral argument, appellants argued the Restrictive Covenant was discriminatory on its face. In their briefs, appellants limit their arguments to whether by seeking to enforce the Restrictive Covenant, which requires group homes be in compliance with Section 123, the HOA refused to grant appellants a reasonable accommodation necessary to afford them an opportunity to use and enjoy—or provide for the use and enjoyment of a disabled resident—a dwelling. We will limit our review to the appellants' reasonable-accommodation argument.

### DISCUSSION

### I. Standard of Review

The case was tried on stipulated facts pursuant to Rule 263. Rule 263 provides in its entirety:

> Parties may submit matters in controversy to the court upon an agreed statement of facts filed with the clerk, upon which judgment shall be rendered as in other cases; and such agreed statement signed and certified by the court to be correct and the judgment rendered thereon shall constitute the record of the cause.

TEX. R. CIV. P. 263.

An agreed statement of facts under rule 263 is similar to a special verdict; it is the parties' request for judgment under the applicable law. *Addison Urban Dev. Partners, LLC v. Alan Ritchey Materials Co., LC*, 437 S.W.3d 597, 600 (Tex. App.–Dallas 2014, no pet.). In a rule 263 agreed case, the only issue on appeal is whether the district court properly applied the law to the agreed facts. *Id.* Such a review is less deferential to the trial court, because a trial court has no discretion in deciding what the law is or in properly applying it. *Id.* If the trial court

files findings of fact in an agreed case, they are disregarded by the appellate court. *Id.* at 600–01.

### II. Applicable Law

In response to a history of national discrimination against individuals with disabilities, Congress enacted the Fair Housing Amendments Act ("FHAA") in 1988. *Groome Res. Ltd., L.L.C. v. Par. of Jefferson*, 234 F.3d 192, 200 (5th Cir. 2000). The purpose of the FHAA was to prohibit discrimination in the national housing market for handicapped individuals. *Id.* at 200–01. The FHAA responded to a recognized prejudice against those with physical disabilities and illness and against people who have been excluded because of stereotypes about their capacity to live safely and independently. *Id.* at 201. Congress found that neutral rules and regulations, even those involving commercial/noncommercial zoning distinctions, nonetheless had a discriminatory effect that resulted from the fact that the disabled were not able to live safely and independently without organized, and sometimes commercial, group homes. *Id.* at 201–02. In 1993, the Texas Legislature enacted the Texas Fair Housing Act ("TFHA") to provide rights and remedies substantially equivalent to those granted under federal law. *See* TEX. PROP. CODE ANN. § 301.002(3) (West 2014).

**\*4** Both the Fair Housing Act ("FHA") and the TFHA broadly prohibit discrimination in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap, or disability, of that buyer or renter or a person residing in that dwelling. *See* 42 U.S.C.A. § 3604(f)(1); TEX. PROP. CODE ANN. § 301.025(a) (West 2014). The FHA and the TFHA define discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C.A. § 3604(f)(3)(B); TEX. PROP. CODE ANN. § 301.025(c)(2) (West 2014). The parties have focused their briefs on the federal statute and federal opinions interpreting it and have not identified any difference in how either statute is interpreted by federal or Texas state courts. We will therefore begin our analysis with an evaluation of the federal authorities.

The FHA's reasonable accommodation provision prohibits (1) refusal to make (2) reasonable accommodations in rules policies, practices, or services, when such accommodations (3) may be necessary to afford such person equal opportunity

2017 WL 5898407

to use and enjoy a dwelling. *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1219 (11th Cir. 2008). We address refusal, reasonableness, and necessity—the three elements of a reasonable accommodation claim—in that order.

## III. Application of Law to Facts

### A. Refusal

To show a refusal of a requested accommodation, a plaintiff must simply establish that he or she requested an accommodation and the defendant refused it. *Oxford House, Inc. v. City of Baton Rouge, La.*, 932 F. Supp. 2d 683, 693 (M.D. La. 2013). Included as an exhibit to the stipulated facts agreed to by the parties is a letter from Walls to the HOA in which he asserted the protections provided by the FHA and asked that the HOA "cease any and all legal and/or administrative actions against Mr. Walls." Appellants argue that they requested a reasonable accommodation by requesting that the HOA not enforce the Restrictive Covenant and that the HOA refused such request by filing the instant lawsuit. Under similar facts, courts have found that the attempted enforcement of restrictive covenants constituted refusals to make reasonable accommodations necessary to afford plaintiffs an equal opportunity to use and enjoy the dwellings of their choice. *Martin v. Constance*, 843 F. Supp. 1321, 1323, 1326 (E.D. Mo. 1994) (after learning of State of Missouri's intentions to purchase a dwelling for a group home, residents of designated historic neighborhood filed action to enforce restrictive covenant prohibiting use of residence for business purposes).

### B. Reasonableness

The determination of whether an accommodation is reasonable is highly fact-specific and determined on a case-by-case basis. *Advocacy Ctr. for Persons with Disabilities, Inc. v. Woodlands Estates Ass'n, Inc.*, 192 F. Supp. 2d 1344, 1348, 1350 (M.D. Fla. 2002) ("In the instant case, the Court finds that Defendant did not reasonably accommodate Plaintiffs, in violation of the FHAA, when it failed to waive the enforcement of its deed restrictions [prohibiting business use of lots] contained in the Declarations."). In determining whether the reasonableness requirement has been met, a court may consider as factors the extent to which the accommodation would undermine the legitimate purposes and effects of existing regulations and the benefits that the

accommodation would provide to the disabled. *See Bryant Woods Inn, Inc. v. Howard Cty., Md.*, 124 F.3d 597, 604 (4th Cir. 1997). It may also consider whether alternatives exist to accomplish the benefits more efficiently. *Id.* And in measuring the effects of an accommodation, the court may look not only to its functional and administrative aspects, but also to its costs. *Id.* "Reasonable accommodations" do not require accommodations which impose undue financial and administrative burdens or changes, adjustments, or modifications to existing programs that would be substantial, or that would constitute fundamental alterations in the nature of the program. *Id.* Thus, for example, even though a prohibition of pets in apartments is common, facially neutral, and indeed reasonable, the FHA has been read to require a relaxation of it to accommodate a service dog for a deaf person because such an accommodation does not unduly burden or fundamentally alter the nature of the apartment complex. *Id.*

**\*5** Here, the agreed facts state that three workers drive vehicles to the Group Homes and park them adjacent to the Group Homes and that ambulances have serviced the Group Homes in connection with medical emergencies. The facts also state that only three workers are present at the Group Homes, thus no more than three vehicles would be routinely parked at any one time. Additionally, three individuals routinely reside in each Group Home. All readily admit that the HOA permits group or community homes that comply with Section 123 of the human resources code, which permits as many as six residents and two supervisors to reside in one home at the same time to operate on properties subject to the Restrictive Covenant. TEX. HUM. RES. CODE ANN. § 123.006(a) (West 2013). Moreover, the HOA's deed restrictions, which were admitted as an exhibit to the agreed facts, permit up to three "unrelated [non-disabled] persons to live together as a single housekeeping unit." *See Schwarz*, 544 F.3d at 1221 (explaining that "if the proposed use is quite similar to surrounding uses expressly permitted by the zoning code, it will be more difficult to show that a waiver of the rule would cause a 'fundamental alteration' of the zoning scheme"); *Oxford House*, 932 F. Supp. 2d at 693. Likewise, the restrictions permit property owners to lease their homes to unrelated people. Accordingly, the proposed use of the dwellings in question is similar to the uses already permitted by the HOA, the only difference being the fact that the unrelated persons are disabled. On these facts, we conclude the requested accommodation is reasonable. *See Bryant Woods*, 124 F.3d at 604.

**Walls v. Capella Park Homeowners' Association, Inc., Not Reported in S.W. Rptr. (2017)**

2017 WL 5898407

### C. Necessary to Afford Equal Opportunity

This case is somewhat unusual as the requested accommodation and concomitant necessity analysis turns on the appellants' ability to be present at all. In most cases, the question is framed around a request to obtain an accommodation from a facially neutral requirement concerning limitation on parking, [3] the presence of pets, [4] or the number of residents in a structure. [5] Here, the question is whether appellants may operate a facility at all.

The "necessary" element—the FHA provision mandating reasonable accommodations which are *necessary* to afford an equal opportunity—requires the demonstration of a direct linkage between the proposed accommodation and the "equal opportunity" to be provided to the disabled person. *Bryant Woods*, 124 F.3d at 604. This requirement has attributes of a causation requirement. *Id.* And if the proposed accommodation provides no direct amelioration of a disability's effect, it cannot be said to be "necessary." *Id.*

The HOA argued at trial and at oral argument that appellants cannot satisfy this necessity requirement because the care the residents require could be done "in a commercial setting" or "anywhere" else. We reject this argument because the essential question in reasonable accommodation cases is whether the disabled have an equal opportunity to live in the dwellings *of their choice*, not simply an opportunity to live somewhere, like the state or charitable facilities the HOA would permit as the exclusive alternatives to those seeking to provide living arrangements to the disabled. *See Schwarz*, 544 F.3d at 1225; *see also Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002) ("When a zoning authority refuses to reasonably accommodate these small group living facilities, it denies disabled persons an equal opportunity to live in the community of their choice.").

Thus, in this case, "equal opportunity" the appellants seek is the opportunity for disabled persons to live on lots subject to the Restrictive Covenant. The agreed facts indicate Whitaker and Grisby are individuals with disabilities as defined by the FHA, and that three individuals with disabilities routinely reside in each of the Group Homes. *See* 42 U.S.C. § 3602(h). Their physical and intellectual disabilities require the constant presence of a nurse and the occasional presence of other personnel. The agreed facts also state that the Group Homes provide services to persons with disabilities as defined by the FHA and that their staff is present twenty-four hours a day. Thus, the stipulated facts establish that the residents of the Group Homes require the services provided by the Group Homes to directly ameliorate the effects of their disabilities. *See Oconomowoc Residential Programs*, 300 F.3d at 784 ("Often, a community-based residential facility provides the only means by which disabled persons can live in a residential neighborhood, either because they need more supportive services, for financial reasons, or both."). While the HOA urges that the facts do not demonstrate living in Capella Park is necessary to ameliorate their disabilities in view of the potential access to other "countless places in Dallas" or to state facilities within the reach of Section 123, this showing is not necessary and in fact is precisely what the fair housing acts were meant to avoid. *See Schwarz*, 544 F.3d at 1225; *id.*; *Groome Res. Ltd.*, 234 F.3d at 200–02; *see also* PROP. § 301.002(3).

**\*6** We turn now to whether appellants have shown a direct linkage between the proposed accommodation and the equal opportunity to be provided to Whitaker, Grisby, and the other disabled persons residing in the Group Homes. The correspondence between Walls and the HOA demonstrates a request that the HOA not proceed with enforcing the Restrictive Covenant. The record demonstrates that the HOA sought and obtained a permanent injunction ordering Walls, Hanson, and My Royal Palace to cease operating the Group Homes on the lots in question. As noted above, the residents need the services provided by the Group Homes to ameliorate the effects of their disabilities. By forcing the Group Homes to cease operations, the residents will no longer be able to live in the dwelling of their choice. Put differently, we conclude that, under these facts, it is necessary for the HOA to refrain from enforcing the Restrictive Covenant so that the residents may have the same opportunity as non-disabled persons to reside on the lots in question. *See Oxford House*, 932 F. Supp. 2d at 694 ("Oxford House has also shown that the requested accommodation may be necessary for equal opportunity because 'a modification of the definition of a "family" ... is warranted so that [Oxford House] may have the same opportunity to rent a house as do persons without handicaps.' "). Accordingly, we conclude the necessity element has been met. We sustain appellant's first issue. [6]

### CONCLUSION

We reverse the judgment of the trial court, dissolve the permanent injunction, and remand this case for proceedings consistent with this opinion.

2017 WL 5898407

**All Citations**

Not Reported in S.W. Rptr., 2017 WL 5898407

Footnotes

1   Appellants' first issue is whether a homeowners' association may enforce restrictive covenants which have the effect of discriminating against people with disabilities residing in a group home when that group home does not meet the requirements of Section 123. However, appellants did not argue that the restrictive covenant had a discriminatory effect at the trial court below. Even if they had, we need not address this issue based on our resolution of their second issue. *See* TEX. R. APP. P. 47.1.

2   "[T]here are countless places in Dallas that are not residential neighborhoods that are not deed restricted and this home would be fine in any of those."

3   *E.g.*, *Bryant Woods*, 124 F.3d at 602.

4   *E.g.*, *Bronk v. Ineichen*, 54 F.3d 425, 429 (7th Cir. 1995).

5   *E.g.*, *Oxford House*, 932 F. Supp. 2d at 687.

6   We do not assume that the TFHA is necessarily coterminous of the FHA, nor do we view the language of the state statute as mere surplusage. However, in view of our determination of appellant's first issue under the Federal Housing Act, we pretermit any analysis of the Texas Federal Housing Act as unnecessary. TEX. R. APP. P. 47.1. In a third issue, appellants challenge the award of attorney's fees against Walls, Hanson, and My Royal Palace, but given our disposition of the second issue, we need not address the third. *See id.*

**End of Document**                                         © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Attachment C-4

## SBOT Fact Sheet 2015

# STATE BAR OF TEXAS

## DEPARTMENT OF RESEARCH & ANALYSIS



*2015 HOURLY FACT SHEET*

Published August 2016
Analysis by Invariance Dynamics Consulting – Nils Greger Olsson, PhD

*P.O. Box 12487, Austin, TX  78711    (800) 204-2222, ext. 1724 or (512) 427-1724    research@texasbar.com*

## *Introduction*

This hourly rate report is published periodically about the economics of law practice in Texas. To make such information available to attorneys, the State Bar's Department of Research and Analysis conducted the Texas Attorney Survey – Status 2015 on March 21, 2016. A goal of the survey was to obtain information on hourly rates charged in 2015 by Texas attorneys.

This report presents the data collected on the hourly rates of 4,260 licensed and practicing, full-time private practitioners who provided hourly rate information for the calendar year 2015. The report provides detailed breakdowns of hourly rates by sex, race, ethnicity, age, law firm size, years of experience, area of practice, and region of the state. A comparison to 2013 hourly rates is also provided for select demographics.

The questionnaire was emailed on March 21, 2016, to all active State Bar of Texas attorneys who have not opted out of taking surveys (N = 94,150). The survey's response rate was 12.5 percent, with a total of 11,793 attorneys responding to at least a portion of the survey. A more detailed description of the methodology and a copy of the questionnaire are included at the end of this report (Appendix A).

This report on hourly rates displays the median hourly rates by category. The median hourly rate is the preferred measure of average hourly rates, rather than the mean, because it more accurately represents the typical rates. Rates are only reported on categories with 6 or more responses.

## 2015 and 2013 Overall Hourly Rates[1]: Distribution Statistics

This *distribution statistics* table on the right shows the following statistics of 2015 hourly rates:

    i. The **mean (average):** of reported hourly rates.
    ii. The **75th percentile**[2]: 75 percent of attorneys charge at or less.
    iii. The **median (50th percentile)**: the hourly rate charged at the midpoint of a rank ordering of attorneys' rates (50 percent of attorneys charge the median or less).
    iv. The **25th percentile**, the rate that 25 percent of attorneys charge at or less than.

When possible, the 2013 hourly rate medians are shown for the comparison.

[1]If an attorney's hourly rate varied by area of practice, a simple average for that attorney was calculated.

| 2015 Hourly Rate | Private Practitioners (n= 4,260) |
|---|---|
| Average (Mean) | $288 |
| 75th Percentile | $350 |
| **Median (50th Percentile)** | **$260** |
| 25th Percentile | $200 |

| 2013 Hourly Rate | Private Practitioners (n= 4,951) |
|---|---|
| **Median** | **$242** |
| Increase or decrease in medians (2015 - 2013) | $18 |
| Percent change in medians (2015 - 2013) / 2013 | 7.4% |

## *Hourly Rate Summary Findings*

Below are summary findings from the 2015 survey. Articles will be published in the *Texas Bar Journal* to provide detailed information on notable findings.

All hourly rate information provided in this report is for full-time private practitioners only.

### Hourly Rates by Demographic Category
➢ The median hourly rate reported for all full-time private practitioners increased by 7.4 percent ($242 to $260) from 2013 to 2015.
➢ The median hourly rate reported for women attorneys increased by 9.6 percent ($228 to $250) from 2013 to 2015. This compares to a 11.3 percent ($247 to $275) increase for male attorneys.
➢ The median hourly rate reported for racial minority attorneys increased by 14.7 percent ($218 to $250) from 2013 to 2015. This compares to a 6.1 percent increase ($245 to $260) for white attorneys.
➢ There is a direct relationship between median hourly rates and years of experience, age, and firm size. Information on median hourly rates reported in 2015 for these categories include:
  o Years of experience: Rates increase as attorneys obtain more experience. In 2015, rates ranged from $200 for attorneys who had 2 or less years of experience to $300 for attorneys who had more than 25 years of experience.
  o Age: Rates increase as attorneys age. In 2015, rates ranged from $180 for attorneys who were 21 to 25 years of age to $300 for attorneys who were more than 65 years of age.
  o Firm size: Rates increase as firm sizes increase. In 2015, rates ranged from $250 for attorneys who worked as solo practitioners to $425 for attorneys who were in firms with more than 400 attorneys.
➢ Detailed information on hourly rates reported by practice area can be found on pages 6-7, and 9-11.


### Hourly Rates by Geographic Region
➢ Overall median hourly rate findings by geographic region include:
  o All metropolitan regions: Rates for attorneys in metropolitan regions increased by 8.2 percent ($243 to $263) from 2013 to 2015.
  o Non-metropolitan areas: Rates for attorneys in non-metropolitan areas increased by 20.6 percent ($199 to $240) from 2013 to 2015.
  o Out of state/country: Rates for attorneys out of state/country increased by 9.7 percent ($269 to $295) from 2013 to 2015.
➢ Detailed information on hourly rates by geographic region can be found on pages 8-13.

# Table of Contents

**Hourly Rates by Demographic Category** ........................................................................ **1-7**

Hourly Rate Ranges of Full-Time Private Practitioners ................................................. 1

All Full-Time Private Practitioners .............................................................................. 2

Sex ........................................................................................................................... 2

Race and Ethnicity ................................................................................................... 2

Years of Experience .................................................................................................. 3

Age ........................................................................................................................... 4

Firm Size .................................................................................................................. 5

Practice Area ........................................................................................................... 6-7

**Hourly Rates by Geographic Region** ........................................................................... **8-13**

Region ...................................................................................................................... 8

Practice Area by Region ........................................................................................... 9-11

Region by Years of Experience ................................................................................ 12

Region by Firm Size ................................................................................................ 13

**Appendix** ................................................................................................................... **14-24**

Method ..................................................................................................................... 14

Geographic Regions ............................................................................................... 15-16

**Survey Instrument** .................................................................................................. **17-24**

## Median Hourly Rates by Demographic Category
### *Hourly Rate Ranges of 2015 and 2013 – Full-Time Private Practitioners*



2013 Median Hourly Rate = $242
2015 Median Hourly Rate = $260
2013 to 2015 Percent Change = 7.4%
2013 to 2015 Difference = +$18

| | $75 or less | $76 to $100 | $101 to $125 | $126 to $150 | $151 to $175 | $176 to $200 | $201 to $225 | $226 to $250 | $251 to $275 | $276 to $300 | $301 to $325 | $326 to $350 | $351 to $400 | $401 to $450 | $451 to $500 | More than $500 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2015 | 0.9% | 1.0% | 0.8% | 4.4% | 6.1% | 13.4% | 7.3% | 15.3% | 7.0% | 11.8% | 4.5% | 7.9% | 8.0% | 4.0% | 2.4% | 5.1% |
| 2013 | 1.1% | 1.0% | 1.6% | 6.8% | 7.1% | 14.7% | 7.7% | 15.5% | 6.5% | 11.8% | 4.1% | 5.3% | 6.4% | 3.5% | 2.4% | 4.6% |

*Note: If an attorney's hourly rate varied by area of practice, a simple average was calculated.

## Hourly Rates by Demographic Category
### 2013 and 2015 Median Hourly Rate by Sex, Race, and Ethnicity

| | Median Hourly Rates | | Change from 2013 to 2015 | |
|---|---|---|---|---|
| | 2013 | 2015 | Difference | Percent Change |
| **All Full-Time Private Practitioners** | | | | |
| Full-Time attorneys | **$242**<br>(N = 4,951) | **$260**<br>(N = 4,260) | **$18** | **7.4%** |
| **Sex** | | | | |
| Male | **$247**<br>(N = 3,271) | **$275**<br>(N = 2,749) | **$28** | **11.3%** |
| Female | **$228**<br>(N = 1,458) | **$250**<br>(N = 1,406) | **$22** | **9.6%** |
| **Race** | | | | |
| White | **$245**<br>(N = 3,958) | **$260**<br>(N = 3,730) | **$15** | **6.1%** |
| All Racial Minorities<br>(For 2013, this included Hispanic or Latino) | **$218**<br>(N = 732) | **$250**<br>(N =   371) | **$32** | **14.7%** |
| Black or African American | **$220**<br>(N = 132) | **$250**<br>(N =   110) | **$30** | **13.6%** |
| American Indian or Alaska Native | **$200**<br>(N = 14) | **$250**<br>(N =   24) | **$50** | **25.0%** |
| Asian<br>(above was "Asian/Pacific Islander in 2013) | **$230**<br>(N = 107) | **$250**<br>(N =   89) | **$20** | **8.7%** |
| Native Hawaiian or Other Pacific Islander | **N/A**<br>N/A | ~ | **N/A** | **N/A** |
| Two or More Races | **$233**<br>(N = 65) | **$264**<br>(N =   74) | **$31** | **13.2%** |
| Other Race | **$238**<br>(N = 53) | **$250**<br>(N =   70) | **$12** | **5.0%** |
| **Ethnicity** | | | | |
| Hispanic or Latino | **$203**<br>(N = 361) | **$250**<br>(N =   376) | **$47** | **23.2%** |
| Not Hispanic or Latino | **N/A**<br>N/A | **$265**<br>(N = 3,721) | **N/A** | **N/A** |

If multiple rates provided, by practice area, they were averaged for overall hourly rate. Rates are reported only for groups with six or more observations. Otherwise the tilde is shown (~).

# Hourly Rates by Demographic Category
## *2013 and 2015 Median Hourly Rate by Years of Experience*

| | Median Hourly Rates | | Change from 2013 to 2015 | |
|---|---|---|---|---|
| | **2013** | **2015** | **Difference** | **Percent Change** |
| **Years of Experience** | | | | |
| 2 or less years | **$185** (N = 590) | **$200** (N = 475) | **$15** | **8.1%** |
| 3 to 6 years | **$218** (N = 790) | **$250** (N = 759) | **$32** | **14.7%** |
| 7 to 10 years | **$239** (N = 533) | **$250** (N = 483) | **$11** | **4.6%** |
| 11 to 15 years | **$245** (N = 498) | **$258** (N = 483) | **$13** | **5.4%** |
| 16 to 20 years | **$261** (N = 437) | **$300** (N = 382) | **$39** | **14.9%** |
| 21 to 25 years | **$264** (N = 504) | **$300** (N = 383) | **$36** | **13.6%** |
| Over 25 years | **$281** (N = 1,399) | **$300** (N = 1,194) | **$19** | **6.8%** |

Note: Years of experience based on year first licensed in any jurisdiction.

## Hourly Rates by Demographic Category
### *2013 and 2015 Median Hourly Rate by Age*

| | Median Hourly Rates | | Change from 2013 to 2015 | |
|---|---|---|---|---|
| | **2013** | **2015** | **Difference** | **Percent Change** |
| **Age** | | | | |
| 21 to 25 years | **$150** (N = 26) | **$180** (N =  49) | **$30** | **20.0%** |
| 26 to 30 years | **$192** (N = 624) | **$200** (N =  567) | **$8** | **4.2%** |
| 31 to 35 years | **$227** (N = 686) | **$250** (N =  672) | **$23** | **10.1%** |
| 36 to 40 years | **$237** (N = 512) | **$250** (N =  466) | **$13** | **5.5%** |
| 41 to 45 years | **$240** (N = 499) | **$254** (N =  444) | **$14** | **5.9%** |
| 46 to 50 years | **$262** (N = 500) | **$290** (N =  398) | **$28** | **10.7%** |
| 51 to 55 years | **$268** (N = 530) | **$275** (N =  426) | **$7** | **2.6%** |
| 56 to 60 years | **$269** (N = 546) | **$300** (N =  428) | **$31** | **11.5%** |
| 61 to 65 years | **$270** (N = 397) | **$300** (N =  367) | **$30** | **11.1%** |
| More than 65 years | **$279** (N = 401) | **$300** (N =  325) | **$21** | **7.5%** |

# Hourly Rates by Demographic Category
## *2013 and 2015 Median Hourly Rates by Firm Size*

| | Median Hourly Rates | | Change from 2013 to 2015 | |
|---|---|---|---|---|
| | 2013 | 2015 | Difference | Percent Change |
| **Firm Size** | | | | |
| Solo Practitioners | **$230** (N = 1,539) | **$250** (N = 1,101) | $20 | 8.7% |
| 2 to 5 attorneys | **$237** (N = 1,336) | **$250** (N = 1,101) | $13 | 5.5% |
| 6 to 10 attorneys | **$236** (N = 488) | **$250** (N = 511) | $14 | 5.9% |
| 11 to 24 attorneys | **$231** (N = 468) | **$250** (N = 437) | $19 | 8.2% |
| 25 to 40 attorneys | **$236** (N = 271) | **$250** (N = 264) | $14 | 5.9% |
| 41 to 60 attorneys | **$248** (N = 114) | **$280** (N = 123) | $32 | 12.9% |
| 61 to 100 attorneys | **$266** (N = 129) | **$257** (N = 84) | -$9 | -3.5% |
| 101 to 200 attorneys | **$304** (N = 117) | **$333** (N = 93) | $29 | 9.6% |
| 201 to 400 | **$378** (N = 117) | **$359** (N = 137) | -$19 | -5.1% |
| More than 400 attorneys | **$452** (N = 347) | **$425** (N = 318) | -$27 | -6.0% |

## Hourly Rates by Demographic Category
### *2013 and 2015 Median Hourly Rates by Practice Area*

| Practice Area | Median Hourly Rates | | Change from 2013 to 2015 | |
|---|---|---|---|---|
| | **2013** | **2015** | **Difference** | **Percent Change** |
| Administrative and Public | **$243** (N = 132) | **$271** (N = 88) | $28 | 11.6% |
| ADR | **$278** (N = 65) | **$300** (N = 30) | $22 | 7.9% |
| Antitrust | **$463** (N = 19) | **$485** (N = 13) | $22 | 4.8% |
| Appellate | **$258** (N = 190) | **$295** (N = 162) | $37 | 14.3% |
| Aviation | **$230** (N = 11) | **$310** (N = 11) | $80 | 34.8% |
| Bankruptcy | **$259** (N = 218) | **$300** (N = 106) | $41 | 15.8% |
| Business | **$248** (N = 841) | **$285** (N = 879) | $37 | 14.9% |
| Construction | **$235** (N = 197) | **$250** (N = 215) | $15 | 6.4% |
| Consumer | **$233** (N = 128) | **$243** (N = 88) | $10 | 4.1% |
| Creditor-Debtor | **$211** (N = 200) | **$250** (N = 159) | $39 | 18.5% |
| Criminal | **$190** (N = 519) | **$200** (N = 149) | $10 | 5.3% |
| Elder Law | **$228** (N = 97) | **$250** (N = 58) | $22 | 9.6% |
| Entertainment | **$307** (N = 15) | **$300** (N = 19) | -$7 | -2.3% |
| Environmental | **$321** (N = 59) | **$308** (N = 54) | -$14 | -4.2% |
| Ethics-Legal Malpractice | **$279** (N = 29) | **$273** (N = 30) | -$7 | -2.3% |
| Family | **$227** (N = 1,071) | **$250** (N = 916) | $23 | 10.1% |
| Government/Administrative | **$196** (N = 143) | **$225** (N = 126) | $29 | 14.8% |
| Health Care | **$247** (N = 116) | **$255** (N = 112) | $8 | 3.2% |
| Immigration | **$196** (N = 87) | **$270** (N = 12) | $74 | 37.8% |

Note:  Attorneys could report working in more than one practice area. For example, if an attorney reported working in both family law and criminal law they were counted in both.

## Hourly Rates by Demographic Category
### *2013 and 2015 Median Hourly Rates by Practice Area (Continued)*

| Practice Area | Median Hourly Rates | | Change from 2013 to 2015 | |
|---|---|---|---|---|
| | **2013** | **2015** | **Difference** | **Percent Change** |
| Insurance | **$183** (N = 269) | **$195** (N = 271) | $12 | 6.6% |
| Intellectual Property | **$331** (N = 267) | **$365** (N = 208) | $34 | 10.3% |
| International | **$350** (N = 36) | **$385** (N = 31) | $35 | 10.0% |
| Juvenile | **$147** (N = 47) | **$100** (N = 27) | -$47 | -32.0% |
| Labor-Employment | **$256** (N = 335) | **$278** (N = 282) | $22 | 8.4% |
| Law Office Management | **$241** (N = 15) | ~ | N/A | N/A |
| Litigation: Commercial | **$265** (N = 1,299) | **$283** (N = 1209) | $18 | 6.6% |
| Litigation: Personal Injury | **$189** (N = 599) | **$185** (N = 431) | -$4 | -2.1% |
| Military | ~ | ~ | N/A | N/A |
| Oil & Gas | **$240** (N = 350) | **$255** (N = 302) | $15 | 6.3% |
| Other | **$237** (N = 265) | **$260** (N = 183) | $23 | 9.7% |
| Public Utility Law | **$259** (N = 44) | **$308** (N = 30) | $49 | 18.7% |
| Real Estate | **$237** (N = 731) | **$250** (N = 612) | $13 | 5.5% |
| School Law | **$208** (N = 56) | **$225** (N = 48) | $17 | 8.2% |
| Securities Law | **$338** (N = 83) | **$385** (N = 78) | $47 | 13.9% |
| Social Security Law | **$194** (N = 12) | ~ | N/A | N/A |
| Taxation | **$292** (N = 151) | **$350** (N = 172) | $58 | 19.9% |
| Technology | **$290** (N = 30) | **$375** (N = 25) | $85 | 29.3% |
| Wills-Trusts-Probate | **$232** (N = 867) | **$250** (N = 602) | $18 | 7.8% |

Note:  Attorneys could report working in more than one practice area. Rates are reported only for groups with six or more observations. Otherwise the tilde is shown (~).

# Hourly Rates by Geographic Region
## *2013 and 2015 Median Hourly Rates by Region*

| Region | Median Hourly Rates | | Change from 2013 to 2015 | |
|---|---|---|---|---|
| | 2013 | 2015 | Difference | Percent Change |
| All Metropolitan Regions | $243 (N = 4,234) | $263 (N = 3,644) | $20 | 8.2% |
| Houston-The Woodlands-Sugarland MSA | $249 (N = 1,257) | $275 (N = 1,134) | $26 | 10.4% |
| Dallas-Fort Worth-Arlington MSA | $249 (N = 1,368) | $275 (N = 1,144) | $26 | 10.4% |
| Austin-Round Rock MSA | $259 (N = 574) | $300 (N = 449) | $41 | 15.8% |
| San Antonio-New Braunfels MSA | $225 (N = 358) | $250 (N = 341) | $25 | 11.1% |
| El Paso MSA | $203 (N = 61) | $200 (N = 62) | -$3 | -1.5% |
| Corpus Christi MSA | $229 (N = 59) | $250 (N = 50) | $21 | 9.2% |
| Beaumont-Port Arthur MSA | $218 (N = 46) | $232 (N = 42) | $14 | 6.4% |
| Central Texas MSAs | $199 (N = 55) | $225 (N = 51) | $26 | 13.1% |
| East & NE Texas MSAs | $225 (N = 162) | $250 (N = 139) | $25 | 11.1% |
| South Texas MSAs | $198 (N = 97) | $225 (N = 79) | $27 | 13.6% |
| West Texas MSAs | $224 (N = 197) | $225 (N = 153) | $1 | 0.4% |
| Non-Metro Areas | $199 (N = 191) | $240 (N = 154) | $41 | 20.6% |
| Out of State/Country | $269 (N = 251) | $295 (N = 278) | $26 | 9.7% |

# Hourly Rates by Practice Area by Geographic Region
## *2015 Median Hourly Rates*

| Practice Area by | Houston-The Woodlands-Sugarland MSA | Dallas-Fort Worth-Arlington MSA | Austin-Round Rock MSA | San Antonio-New Braunfels MSA | El Paso MSA | Corpus Christi MSA | Beaumont-Port Arthur MSA | Central Texas MSAs | East & NE Texas MSAs | South Texas MSAs | West Texas MSAs | Non-Metro Areas | Out of State/Country |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Administrative and Public | **$300** (N = 15) | **$250** (N = 13) | **$300** (N = 37) | **$200** | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | **$208** |
| ADR | **$350** (N = 8) | **$385** (N = 8) | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ |
| Antitrust | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ |
| Appellate | **$325** (N = 45) | **$275** (N = 46) | **$340** (N = 19) | **$250** (N = 9) | ~ | ~ | ~ | ~ | ~ | ~ | **$195** (N = 11) | ~ | **$198** (N = 12) |
| Aviation | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ |
| Bankruptcy | **$300** (N = 31) | **$340** (N = 39) | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | **$355** (N = 8) |
| Business | **$300** (N = 240) | **$300** (N = 282) | **$300** (N = 79) | **$278** (N = 62) | **$245** (N = 8) | **$250** (N = 7) | **$275** (N = 9) | **$250** (N = 10) | **$250** (N = 36) | **$250** (N = 11) | **$225** (N = 34) | **$238** (N = 18) | **$305** (N = 63) |
| Construction | **$240** (N = 59) | **$250** (N = 71) | **$275** (N = 21) | **$250** (N = 23) | ~ | ~ | ~ | ~ | ~ | **$200** (N = 8) | ~ | ~ | **$280** (N = 11) |
| Consumer | **$200** (N = 20) | **$225** (N = 25) | **$275** (N = 9) | **$250** (N = 7) | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | **$250** (N = 9) |
| Creditor-Debtor | **$250** (N = 45) | **$265** (N = 45) | **$250** (N = 10) | **$200** (N = 11) | ~ | ~ | ~ | ~ | **$250** (N = 6) | ~ | **$195** (N = 9) | ~ | **$230** (N = 13) |
| Criminal | **$200** (N = 27) | **$238** (N = 30) | **$190** (N = 8) | **$200** (N = 14) | ~ | ~ | ~ | ~ | **$160** (N = 7) | ~ | **$175** (N = 6) | **$175** (N = 20) | **$238** (N = 12) |
| Elder Law | **$233** (N = 8) | **$250** (N = 17) | **$263** | **$225** (N = 7) | ~ | ~ | ~ | ~ | ~ | ~ | ~ | **$225** (N = 6) | ~ |
| Entertainment | ~ | **$300** (N = 7) | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ |

Note:  Attorneys could report working in more than one practice area. Rates are reported only for groups with six or more observations. Otherwise a tilde is shown (~).

# Hourly Rates by Practice Area by Geographic Region (continued)
## *2015 Median Hourly Rates*

| Practice Area by Region | Houston-The Woodlands-Sugarland MSA | Dallas-Fort Worth-Arlington MSA | Austin-Round Rock MSA | San Antonio-New Braunfels MSA | El Paso MSA | Corpus Christi MSA | Beaumont-Port Arthur MSA | Central Texas MSAs | East & NE Texas MSAs | South Texas MSAs | West Texas MSAs | Non-Metro Areas | Out of State/Country |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2015 Median Hourly Rates by Practice Area by Region (Continued)** | | | | | | | | | | | | | |
| Environmental | **$388** (N = 12) | **$418** (N = 6) | **$300** (N = 16) | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | **$330** (N = 12) |
| Ethics-Legal Malpractice | **$350** (N = 7) | **$240** (N = 12) | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ |
| Family | **$260** (N = 219) | **$250** (N = 242) | **$268** (N = 82) | **$225** (N = 98) | **$213** (N = 10) | **$213** (N = 8) | **$200** (N = 7) | **$219** (N = 26) | **$250** (N = 47) | **$250** (N = 17) | **$250** (N = 38) | **$250** (N = 61) | **$250** (N = 23) |
| Government/Administrative | **$250** (N = 24) | **$213** (N = 24) | **$263** (N = 24) | **$238** (N = 6) | ~ | ~ | ~ | ~ | ~ | **$200** (N = 10) | ~ | **$225** (N = 7) | **$225** (N = 8) |
| Health Care | **$200** (N = 17) | **$240** (N = 32) | **$340** (N = 16) | **$180** (N = 15) | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | **$300** (N = 10) |
| Immigration | **$295** (N = 6) | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ |
| Insurance | **$200** (N = 92) | **$185** (N = 61) | **$213** (N = 24) | **$175** (N = 20) | **$175** | ~ | ~ | ~ | ~ | **$200** (N = 7) | **$190** (N = 7) | ~ | **$185** (N = 27) |
| Intellectual Property | **$345** (N = 48) | **$370** (N = 68) | **$400** (N = 39) | ~ | ~ | ~ | ~ | ~ | **$350** (N = 9) | ~ | ~ | ~ | **$400** (N = 25) |
| International | **$435** (N = 13) | **$313** (N = 6) | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | **$525** (N = 7) |
| Juvenile | ~ | **$100** (N = 8) | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | **$100** | ~ |
| Labor-Employment | **$285** (N = 65) | **$280** (N = 81) | **$300** (N = 33) | **$258** (N = 24) | **$205** (N = 10) | ~ | ~ | ~ | **$240** (N = 9) | **$225** (N = 10) | **$225** (N = 6) | ~ | **$300** (N = 21) |
| Law Office Management | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ |
| Litigation: Commercial | **$295** (N = 367) | **$300** (N = 350) | **$300** (N = 101) | **$263** (N = 83) | **$275** (N = 17) | **$250** (N = 13) | **$250** (N = 15) | **$250** (N = 13) | **$250** (N = 38) | **$275** (N = 22) | **$250** (N = 43) | **$250** (N = 31) | **$320** (N = 77) |

Note:  Attorneys could report working in more than one practice area. Rates are reported only for groups with six or more observations. Otherwise a tilde is shown (~).

# Hourly Rates by Practice Area by Geographic Region (continued)
## *2015 Median Hourly Rates*

**2015 Median Hourly Rates by Practice Area by Region (Continued)**

| Practice Area by Region | Houston-The Woodlands-Sugarland MSA | Dallas-Fort Worth-Arlington MSA | Austin-Round Rock MSA | San Antonio-New Braunfels MSA | El Paso MSA | Corpus Christi MSA | Beaumont-Port Arthur MSA | Central Texas MSAs | East & NE Texas MSAs | South Texas MSAs | West Texas MSAs | Non-Metro Areas | Out of State/Country |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Litigation: Personal | $200 (N = 135) | $185 (N = 104) | $200 (N = 20) | $175 (N = 42) | $160 (N = 13) | $160 (N = 11) | $200 (N = 11) | ~ | $160 (N = 9) | $175 (N = 15) | $160 (N = 17) | ~ | $200 (N = 29) |
| Military | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ |
| Oil & Gas | $300 (N = 100) | $268 (N = 48) | $300 (N = 14) | $250 (N = 17) | | $250 (N = 7) | | ~ | $250 (N = 18) | ~ | $245 (N = 34) | $250 (N = 25) | $275 (N = 19) |
| Other | $250 (N = 49) | $278 (N = 36) | $250 (N = 19) | $300 (N = 16) | ~ | ~ | ~ | ~ | $200 | $225 (N = 9) | $283 (N = 12) | $295 (N = 22) | |
| Public Utility Law | ~ | ~ | $320 (N = 12) | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ |
| Real Estate | $275 (N = 150) | $285 (N = 162) | $275 (N = 60) | $250 (N = 57) | $213 (N = 10) | $250 (N = 11) | $250 (N = 9) | $250 | $250 (N = 20) | $250 (N = 11) | $200 (N = 18) | $200 (N = 44) | $275 (N = 35) |
| School Law | $250 (N = 9) | $205 (N = 11) | $249 (N = 6) | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ |
| Securities Law | $400 (N = 26) | $375 (N = 23) | $375 (N = 15) | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | $465 (N = 7) |
| Social Security Law | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ |
| Taxation | $350 (N = 62) | $400 (N = 42) | $325 (N = 20) | $288 (N = 12) | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | $325 (N = 16) |
| Technology | | $350 (N = 9) | $368 (N = 8) | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ |
| Wills-Trusts-Probate | $275 (N = 147) | $275 (N = 134) | $275 (N = 48) | $250 (N = 65) | $225 (N = 7) | $213 (N = 14) | $250 (N = 7) | ~ (N = 11) | $250 (N = 35) | $260 (N = 9) | $250 (N = 32) | $250 (N = 58) | $300 (N = 15) |

Note:  Attorneys could report working in more than one practice area. Rates are reported only for groups with six or more observations. Otherwise a tilde is shown (~).

# Hourly Rates by Geographic Region by Years of Experience
## *2015 Median Hourly Rates*

| Region by Years of Experience | 2015 Median Hourly Rates by Region by Years of Experience | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2 or less years | 3 to 6 years | 7 to 10 years | 11 to 15 years | 16 to 20 years | 21 to 25 years | Over 25 years |
| Houston-The Woodlands-Sugarland MSA | **$213** (N = 145) | **$250** (N = 211) | **$265** (N = 125) | **$257** (N = 130) | **$300** (N = 92) | **$300** (N = 103) | **$300** (N = 322) |
| Dallas-Fort Worth-Arlington MSA | **$217** (N = 155) | **$250** (N = 210) | **$250** (N = 161) | **$300** (N = 113) | **$300** (N = 99) | **$300** (N = 112) | **$350** (N = 292) |
| Austin-Round Rock MSA | **$225** (N = 44) | **$250** (N = 89) | **$300** (N = 52) | **$300** (N = 65) | **$308** (N = 46) | **$350** (N = 41) | **$306** (N = 112) |
| San Antonio-New Braunfels MSA | **$200** (N = 52) | **$200** (N = 68) | **$250** (N = 39) | **$250** (N = 40) | **$284** (N = 32) | **$288** (N = 14) | **$300** (N = 96) |
| El Paso MSA | ~ | **$175** (N = 9) | ~ | **$233** (N = 6) | **$225** (N = 12) | ~ | **$275** (N = 21) |
| Corpus Christi MSA | **$188** (N = 6) | ~ | ~ | ~ | ~ | ~ | **$269** (N = 24) |
| Beaumont-Port Arthur MSA | ~ | ~ | ~ | ~ | ~ | **$250** (N = 6) | **$275** (N = 19) |
| Central Texas MSAs | ~ | **$214** (N = 14) | ~ | **$215** (N = 9) | ~ | ~ | **$259** (N = 14) |
| East & NE Texas MSAs | **$175** (N = 10) | **$200** (N = 21) | **$240** (N = 12) | **$235** (N = 15) | **$263** (N = 12) | **$275** (N = 19) | **$275** (N = 50) |
| South Texas MSAs | **$160** (N = 6) | **$185** (N = 7) | **$225** | **$200** (N = 13) | **$238** (N = 6) | **$231** (N = 14) | **$250** (N = 28) |
| West Texas MSAs | **$180** (N = 20) | **$200** (N = 34) | **$200** (N = 23) | **$238** (N = 16) | **$250** (N = 12) | **$273** (N = 14) | **$275** (N = 34) |
| Non-Metro Areas | **$175** (N = 8) | **$190** (N = 16) | **$250** (N = 11) | **$225** (N = 19) | **$225** (N = 15) | **$250** (N = 7) | **$250** (N = 78) |
| Out of State/Country | **$191** (N = 10) | **$250** (N = 56) | **$280** (N = 29) | **$295** (N = 35) | **$323** (N = 36) | **$260** (N = 28) | **$307** (N = 84) |

Note: Attorneys could report working in more than one practice area. Rates are reported only for groups with six or more observations. Otherwise a tilde is shown (~).

# Hourly Rates by Geographic Region by Firm Size
## *2015 Median Hourly Rates*

| 2015 Hourly Rate Fact Sheet | | | | | | | | | |
| Median Hourly Rates by Firm Size and Region | | | | | | | | | |
| Solo Practitioners | 2 to 5 attorneys | 6 to 10 attorneys | 11 to 24 attorneys | 25 to 40 attorneys | 41 to 60 attorneys | 61 to 100 attorneys | 101 to 200 attorneys | 201 to 400 | Over 400 |
|---|---|---|---|---|---|---|---|---|---|
| **Firm Size by Region** | | | | | | | | | |
| **Houston-The Woodlands-Sugarland MSA** $250 (N = 264) | $250 (N = 306) | $250 (N = 133) | $270 (N = 118) | $250 (N = 65) | $253 (N = 20) | $246 (N = 32) | $350 (N = 33) | $354 (N = 42) | $450 (N = 107) |
| **Dallas-Fort Worth-Arlington MSA** $275 (N = 265) | $270 (N = 301) | $250 (N = 126) | $228 (N = 112) | $250 (N = 86) | $335 (N = 53) | $295 (N = 27) | $360 (N = 25) | $345 (N = 41) | $392 (N = 99) |
| **Austin-Round Rock MSA** $268 (N = 110) | $297 (N = 122) | $300 (N = 58) | $295 (N = 44) | $250 (N = 23) | $285 (N = 11) | $250 (N = 7) | $305 (N = 8) | $408 (N = 22) | $459 (N = 40) |
| **San Antonio-New Braunfels MSA** $250 (N = 107) | $225 (N = 93) | $216 (N = 50) | $215 (N = 40) | $210 (N = 8) | $263 | ~ | ~ | $293 (N = 7) | $421 (N = 16) |
| **El Paso MSA** $250 (N = 17) | $200 (N = 27) | ~ | $171 (N = 8) | ~ | ~ | ~ | ~ | ~ | ~ |
| **Corpus Christi MSA** $250 (N = 27) | $225 | $208 (N = 10) | ~ | ~ | ~ | ~ | ~ | ~ | ~ |
| **Beaumont-Port Arthur MSA** $230 (N = 9) | $225 (N = 14) | $264 (N = 6) | ~ | ~ | ~ | ~ | ~ | ~ | ~ |
| **Central Texas MSAs** $213 (N = 15) | $200 (N = 13) | ~ | $225 (N = 10) | ~ | ~ | ~ | ~ | ~ | ~ |
| **East & NE Texas MSAs** $250 (N = 48) | $250 (N = 54) | $250 (N = 19) | $248 (N = 14) | ~ | ~ | ~ | ~ | ~ | ~ |
| **South Texas MSAs** $225 (N = 27) | $230 (N = 21) | $188 (N = 11) | $200 (N = 14) | ~ | ~ | ~ | ~ | ~ | ~ |
| **West Texas MSAs** $225 (N = 34) | $200 (N = 35) | $224 (N = 22) | $209 (N = 28) | $241 (N = 20) | $205 (N = 10) | ~ | ~ | ~ | ~ |
| **Non-Metro Areas** $200 (N = 79) | $250 (N = 59) | $250 (N = 10) | ~ | ~ | ~ | ~ | ~ | ~ | ~ |
| **Out of State/Country** $256 (N = 52) | $275 (N = 50) | $225 (N = 33) | $288 (N = 26) | $250 (N = 25) | $308 (N = 9) | $270 (N = 9) | $308 (N = 12) | $368 (N = 19) | $465 (N = 39) |

Rates are reported only for groups with six or more observations. Otherwise a tilde is shown (~).

## *APPENDIX*

### Method

### Data Collection

Attorney hourly rate information was collected in the Texas Attorney Survey – Status 2015. The questionnaire (Appendix A) was emailed on March 21, 2016, to 94,150 active attorneys licensed by the State Bar of Texas, maintaining active membership in the State Bar of Texas, and who did not opt out of receiving survey mailings.

The survey's results are presented in part by geographic region, which is broken down into 13 economic areas. The metropolitan areas (Metropolitan Statistical Areas or MSAs) were defined by the Federal Office of Management and Budget.

### Response Rate

The cutoff date of the survey was April 18, 2016. As of the deadline there were 11,793 who completed the questionnaire, for an overall response rate of 12.5 percent. Response rates for each region are shown in the table below. Information below is on respondents who provided information on the county they practiced in.

| | 2015 Hourly Rate Fact Sheet - Response Rates | | | | |
|---|---|---|---|---|---|
| | Active State Bar of Texas Members | % of State Bar Membership | SBOT Survey Respondents | % of Respondents | Response Rate |
| Houston-The Woodlands-Sugarland MSA | 28,224 | 28.6% | 2,711 | 29.1% | 9.6% |
| Dallas-Fort Worth-Arlington MSA | 26,853 | 27.2% | 2,704 | 29.0% | 10.1% |
| Austin-Round Rock MSA | 11,781 | 11.9% | 1,411 | 15.1% | 12.0% |
| San Antonio-New Braunfels MSA | 6,754 | 6.8% | 799 | 8.6% | 11.8% |
| El Paso MSA | 1,278 | 1.3% | 161 | 1.7% | 12.6% |
| Corpus Christi MSA | 1,088 | 1.1% | 134 | 1.4% | 12.3% |
| Beaumont-Port Arthur MSA | 795 | 0.8% | 84 | 0.9% | 10.6% |
| Central Texas MSAs | 1,034 | 1.0% | 140 | 1.5% | 13.5% |
| East & NE Texas MSAs | 2,270 | 2.3% | 284 | 3.0% | 12.5% |
| South Texas MSAs | 1,923 | 1.9% | 219 | 2.3% | 11.4% |
| West Texas MSAs | 2,540 | 2.6% | 332 | 3.6% | 13.1% |
| Non-Metro Areas | 3,417 | 3.5% | 395 | 4.2% | 11.6% |
| Out of State/Country | 10,714 | 10.9% | 1,069 | 11.5% | 10.0% |
| Total attorneys identified by work location | 98,671 | 100.0% | 10,443 | 100.0% | 10.6% |
| Response rate including all attorneys who responded, even if not identified by location | | | 11,793 | | 12.5% |

*Numbers are based on attorneys who have reported the county they practiced in.

# Regions and Counties in Each Region

**1 Houston-The Woodlands-Sugar Land MSA**
- Austin
- Brazoria
- Chambers
- Fort Bend
- Galveston
- Harris
- Liberty
- Montgomery
- Waller

**2 Dallas-Fort Worth-Arlington MSA**
- Collin
- Dallas
- Denton
- Ellis
- Hood
- Hunt
- Johnson
- Kaufman
- Parker
- Rockwall
- Somervell
- Tarrant
- Wise

**3 Austin-Round Rock MSA**
- Bastrop
- Caldwell
- Hays
- Travis
- Williamson

**4 San Antonio-New Braunfels MSA**
- Atascosa
- Bandera
- Bexar
- Comal
- Guadalupe
- Kendall
- Medina
- Wilson

**5 El Paso MSA**
- El Paso
- Hudspeth

**6 Corpus Christi MSA**
- Aransas
- Nueces
- San Patricio

**7 Beaumont-Port Arthur MSA**
- Hardin
- Jefferson
- Newton
- Orange

## Central Texas MSAs

**8 Waco MSA**
- McLennan
- Falls

**9 Killeen-Temple MSA**
- Bell
- Coryell
- Lampasas

## East & NE Texas MSAs

*10 College Station-Bryan MSA*
- Brazos
- Burleson
- Robertson

*11 Longview MSA*
- Gregg
- Rusk
- Upshur

*12 Sherman-Denison MSA*
- Grayson

*13 Texarkana MSA*
- Bowie

*14 Tyler MSA*
- Smith

*15 Victoria MSA*
- Goliad
- Victoria

*16 Wichita Falls MSA*
- Archer
- Clay
- Wichita

## South Texas MSAs

*17 Brownsville-Harlingen MSA*
- Cameron

*18 Laredo MSA*
- Webb

*19 McAllen-Edinburg-Mission MSA*
- Hidalgo

## West Texas MSAs

*20 Abilene MSA*
- Callahan
- Jones
- Taylor

*21 Amarillo MSA*
- Armstrong
- Carson
- Oldham
- Potter
- Randall

*22 Lubbock MSA*
- Crosby
- Lubbock
- Lynn

*23 Midland MSA*
- Martin
- Midland

*24 Odessa MSA*
- Ector

*25 San Angelo MSA*
- Irion
- Tom Green

## 26 Non-Metropolitan Counties

| | | | |
|---|---|---|---|
| Anderson | Franklin | Llano | Terrell |
| Andrews | Freestone | Loving | Terry |
| Angelina | Frio | Madison | Throckmorton |
| Bailey | Gaines | Marion | Titus |
| Baylor | Garza | Mason | Trinity |
| Bee | Gillespie | Matagorda | Tyler |
| Blanco | Glasscock | Maverick | Upton |
| Borden | Gonzales | McCulloch | Uvalde |
| Bosque | Gray | McMullen | Val Verde |
| Brewster | Grimes | Menard | Van Zandt |
| Briscoe | Hale | Milam | Walker |
| Brooks | Hall | Mills | Ward |
| Brown | Hamilton | Mitchell | Washington |
| Burnet | Hansford | Montague | Wharton |
| Calhoun | Hardeman | Moore | Wheeler |
| Camp | Harrison | Morris | Wilbarger |
| Cass | Hartley | Motley | Willacy |
| Castro | Haskell | Nacogdoches | Winkler |
| Cherokee | Hemphill | Navarro | Wood |
| Childress | Henderson | Nolan | Yoakum |
| Cochran | Hill | Ochiltree | Young |
| Coke | Hockley | Palo Pinto | Zapata |
| Coleman | Hopkins | Panola | Zavala |
| Collingsworth | Houston | Parmer | |
| Colorado | Howard | Pecos | |
| Comanche | Hutchinson | Polk | |
| Concho | Jack | Presidio | |
| Cooke | Jackson | Rains | |
| Cottle | Jasper | Reagan | |
| Crane | Jeff Davis | Real | |
| Crockett | Jim Hogg | Red River | |
| Culberson | Jim Wells | Reeves | |
| Dallam | Karnes | Refugio | |
| Dawson | Kenedy | Roberts | |
| Deaf Smith | Kent | Runnels | |
| Delta | Kerr | Sabine | |
| De Witt | Kimble | San Augustine | |
| Dickens | King | San Jacinto | |
| Dimmit | Kinney | San Saba | |
| Donley | Kleberg | Schleicher | |
| Duval | Knox | Scurry | |
| Eastland | Lamar | Shackelford | |
| Edwards | Lamb | Shelby | |
| Erath | La Salle | Sherman | |
| Fannin | Lavaca | Starr | |
| Fayette | Lee | Stephens | |
| Fisher | Leon | Sterling | |
| Floyd | Limestone | Stonewall | |
| Foard | Lipscomb | Sutton | |
| | Live Oak | Swisher | |

 State Bar of Texas Attorney Survey -- Status 2015

**MAILING**

Dear Attorney,

The State Bar of Texas needs your help! **Complete the 2015 Texas Attorney Survey and you could win one of five prizes.** Two-hundred participants will each win $10 gift cards, two participants will win an Apple iPad Pro, and two will receive a pair of tickets to one of the following events:

- Dallas Cowboys Regular Season Home Game (game to be determined once schedule is available)
- Houston Texans Regular Season Home Game (game to be determined once schedule is available)
- NASCAR Chase for the Sprint Cup AAA Texas 500 Race
  - Suite tickets including food and beverage
  - VIP credentials into garage/pit area

The Texas Attorney Survey is conducted every other year to provide Texas attorneys with information about the economics of the practice of law. Reports generated from this survey will include detailed breakdowns of income, hourly rates, pro bono services, law school and career satisfaction, and State Bar of Texas Member Services. Results of this survey will be made available at texasbar.com/research.

This year the State Bar of Texas teamed up with Texas A&M University to include questions that touch on the economic and non-economic value of a law degree and career satisfaction. This information should help to provide prospective law students, law schools, and members of the bar with insight on how legal education affects an attorney's career.

This survey is anonymous, and the process is secure. Your email address will be used for the drawings and will then be deleted and not associated with your responses.

Completion of the survey takes about four to eight minutes, depending on your occupation and pro bono experience. **Please complete the survey by 5 p.m. Monday, April 4, 2016.**

Your participation will help ensure you and other Texas attorneys have the most current economic information available.

If you have any questions please feel free to call us at (800) 204-2222, ext. 1724 or email us at research@texasbar.com. Thank you for your help.

Sincerely,
Cory Squires
State Bar of Texas Department of Research and Analysis

17

## SURVEY QUESTIONS

__INSTRUCTIONS__
Each question can be answered by simply selecting a response or filling in a blank. These questions are for information related to calendar year 2015.

Completion of the survey should take, on average, 5 minutes.

Responses will be saved, you may close the survey and return later to complete if needed.

Please complete this questionnaire by 5 p.m. Monday, April 4, 2016.

Thank you for your participation.

__PRIMARY OCCUPATION__
1.   **For 2015, what was your primary occupation?**
___ Private law practice                    ___ Other law related
___ For-profit corporate/in-house counsel    ___ Non-law related
___ Non-profit corporate/in-house counsel    ___ Unemployed/Looking for work
___ Full-time judge                          ___ Unemployed/not looking for work
___ Other judicial branch                    ___ Retired/not working
___ Government attorney                       ___ Was not licensed to practice in 2015
___ Law faculty                              ___ Other_____
___ Public interest lawyer

2.   **If applicable, what was your job title in 2015?** _____

3.   **In calendar year 2015, did you work:**
      ___Full-time ___Part-time ___By Contract___Not Applicable ___Other

4.   **What was your approximate gross personal income (including any bonus) during calendar year 2015?**
      _____

5.   **If you received a bonus for 2015, what was it?** _____

6.   **How has your income changed in the last year?**
      ___Increased significantly ___Increased moderately ___Remained steady ___Decreased moderately
      ___Decreased significantly

7.   **The State Bar of Texas defines pro bono as the provision of the following without an expectation of payment or at a substantially reduced fee:**

   - **legal services to the poor or to a charitable organization that addresses the needs of the poor,**
   - **services that improve the legal process or availability of legal services to the poor,**
   - **legislative, administrative or advocacy for the poor,**
   - **unsolicited, involuntary court appointments.**

   **The Bar's pro bono policy does not define poor; however, it encourages attorneys to serve clients that would qualify for legal aid who live at or below 125% of the federal poverty guidelines ($14,850 for single person, $30,375 for family of 4).**

   **Did you provide any of the above pro bono services in calendar year 2015?** ___Yes ___No

18

**PRIVATE PRACTITIONER – PRACTICE AREA INFORMATION**
*If not a private practitioner, please proceed to question 12.*

8.   **For 2015, if you were in private law practice, how many attorneys, including yourself, worked in your firm?**
*(Please include attorneys at all locations of your firm in the total.)*

Number of attorneys (*can be approximate*): _____

9.   **For 2015, if you worked as a private law practitioner, please list the areas of practice that account for *25 percent or more of the time you spent practicing law,* how you billed for your services, and the *typical* rate or fee (*if applicable*) you charged in each area.**
*(For billing method please specify whether it was an hourly rate, flat fee, contingency fee, or other)*

| Practice Area | Billing Method | Rate | Percent of Practice |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

10.  **Please provide the following information on the average number of actual and billable hours worked per week, <u>as an attorney</u> in 2015:**
____Actual hours worked per week
____Billable hours worked per week

11.  **Please specify your position in calendar year 2015 as a private practitioner:**
___Sole Practitioner        ___First-Year Associate   ___Second-Year Associate   ___Third-Year Associate   ___Fourth-Year Associate
___Fifth-Year Associate   ___Sixth-Year Associate   ___Seventh-Year Associate   ___Eighth-Year Associate   ___Of Counsel
___Non-Equity Partner    ___Equity Partner           ___Managing Partner         ___Other

12.  **What professional licenses or certificates, if any, do you have other than your law license?**
_____

13.  **Did you provide professional services other than legal services in 2015?** ___Yes ___No

14.  **If yes, what other types of professional services did you provide?**
____Real Estate Sales/Development/Management
____Insurance Sales
____Accounting
____Financial Planning
____Investment Advisor
____Registered Securities Representative
____Other_____

19

**PRO BONO**
*If you answered "no" to question 7, please proceed to question 19.*

**Please take a moment to answer a few questions on the pro bono services you performed in 2015. This data will be used to highlight how Texas attorneys are doing their part to help low-income people in our state. Historically, Texas attorneys perform about 2.4 million hours of pro bono services each year.**

15. **Did you provide any free legal services to the poor in 2015?** (*Do not include cases where your clients failed to pay you.*) ___Yes ___No

    **If so, approximately how many total hours did you provide?** _____

    **Approximately how many hours were for:**
    *Please note that these categories do not need to sum to the total hours provided.*
    ___Civil Matters
    ___Criminal Matters
    ___Unsolicited Court Appointments
    ___Legal services to a charitable organization for the poor
    ___Legislative, administrative, or systems advocacy for the poor
    ___Legal services to simplify or improve quality of legal services to the poor

16. **Did you provide any legal services at a substantially reduced fee that benefited the poor in 2015?**
    (*Do not include cases where your clients failed to pay you.*)
    ___Yes ___No

    **If so, approximately how many total hours did you provide?** _____

    **Approximately how many hours were for:**
    *Please note that these categories do not need to sum to the total hours provided.*
    ___Civil Matters
    ___Criminal Matters
    ___Unsolicited Court Appointments

17. **Did you pay actual out-of-pocket expenses related to pro bono or legal services to the poor in 2015?**
    ___Yes ___No

    If so, what was the approximate total amount of the out-of-pocket expenses that you paid in 2015?
    _____

18. **Did you make any direct financial contributions related to legal services to the poor in 2015?**
    ___Yes ___No

    **If so, what was the approximate total amount of the financial contribution you paid in 2015?**
    _____

18. **If you have any comments or suggestions about pro bono services please provide them below:**

    _____
    _____
    _____

**VOLUNTARY DEMOGRAPHICS**

The following voluntary demographic information is used to provide detailed economic trends and measure diversity in the practice of law in Texas. The State Bar of Texas follows the U.S. Census Bureau and U.S. Equal Employment Opportunity guidelines for collecting information on sex and race/ethnicity.

**19. In which Texas County was a majority of your work performed (in 2015)?**
*If majority was out-of-state or out-of-country, please note that below.*
_____

**20. Years of experience as an attorney, up to and including calendar year 2015:**

___ 2 or less years                          ___ 3 to 6 years
___ 7 to 10 years                            ___ 11 to 15 years
___ 16 to 20 years                           ___ 21 to 25 years
___ More than 25 years

**21. Age:**

___ 21 to 25 years                           ___ 26 to 30 years
___ 31 to 35 years                           ___ 36 to 40 years
___ 41 to 45 years                           ___ 46 to 50 years
___ 51 to 55 years                           ___ 56 to 60 years
___ 61 to 65 years                           ___ More than 65 years

**22. Sex:**

___Male   ___Female

**23. Ethnicity:**

___Hispanic or Latino
___Not Hispanic or Latino

**24. Race:**

___White
___Black or African American
___American Indian or Alaska Native
___Asian
___Native Hawaiian or Other Pacific Islander
___Two or More Races
___Other

**LAW SCHOOL/CAREER SATISFACTION**

The purpose of these questions is to study the economic and non-economic value of a law degree and the associated attorney satisfaction with careers and decisions to attend law school. This information will help provide prospective law students and members of the bar with important information about legal careers in Texas.

**25. Which of the following best describes your undergraduate major?**

___ Business          ___ Humanities
___ Criminal justice or law enforcement  ___ Physical science or mathematics
___ Engineering         ___Social sciences
___ Other_____

**26. Which of the following best describes your class rank upon graduation from college?**

___Top 10th percentile
___Top 25th percentile
___Top 50th percentile
___Top 75th percentile
___Don't know

**27. Which of the following best describes your class rank upon graduation from law school?**

___Top 10th percentile
___Top 25th percentile
___Top 50th percentile
___Top 75th percentile
___Don't know

**28. Approximately how much student loan debt did you incur during law school?**

___None        ___ $100,000 or more
___ $1,000 - $24,999
___ $25,000 - $49,999
___ $50,000 - $74,999
___ $75,000 - $99,999

**29. At this point in your career, how much remaining law school debt do you have?**

___None        ___ $100,000 or more
___ $1,000 - $24,999
___ $25,000 - $49,999
___ $50,000 - $74,999
___ $75,000 - $99,999

**30. On a scale of 1 to 5 please provide your level of satisfaction on the following questions?**

*Please rate your level of satisfaction on a scale of 1 to 5 (1 being Very Dissatisfied and 5 being Very Satisfied).*

___How satisfied are you with your decision to have attended law school?
___ How satisfied are you with your career?

**STATE BAR OF TEXAS MEMBER SERVICES**

The State Bar of Texas offers many services to help attorneys in both their professional and personal lives. Within these services you can find access to hundreds of useful programs. The following questions will help measure both awareness of and satisfaction with the current services available to you. In addition, your feedback will help the State Bar understand what services you would like to see offered in the future.

**31. Please provide information on your experience using the following State Bar of Texas Member Services**

*Please rate your level of satisfaction on a scale of 1 to 5 (1 being Very Dissatisfied and 5 being Very Satisfied).*

[**Satisfaction** scale: 1-Very Dissatisfied, 2-Somewhat Dissatisfied, 3-Neither Satisfied nor Dissatisfied, 4-Somewhat Satisfied, 5-Very Satisfied.
**Awareness** scale: 1-Aware of service but have no experience, 2-I am not aware of this service]

| Service | Are you aware of the service (Y/N) | Satisfaction |
|---|---|---|
| Texas Bar CLE | _____ | _____ |
| Client Attorney Assistance Program (CAAP) | _____ | _____ |
| State Bar of Texas Advertising Review | _____ | _____ |
| Texas Lawyers' Assistance Program (TLAP) | _____ | _____ |
| State Bar of Texas Member Benefit Program | _____ | _____ |
| Texas Bar Journal | _____ | _____ |
| Texas Bar Career Center | _____ | _____ |
| Texas Bar Private Insurance Exchange | _____ | _____ |
| Free Legal Research (Fastcase, Casemaker) | _____ | _____ |
| Lawyer Referral and Information Services (LRIS) | _____ | _____ |
| Law Practice Management Program | _____ | _____ |
| State Bar of Texas Attorney Ethics Hotline | _____ | _____ |

**32. Overall, how would you rate the TexasBarCLE's CLE offerings compared with those of other CLE providers?**

*Please rate the following on a scale of 1 to 5 (1 being Much Worse and 5 being Much Better)*
___Live courses
___Live webcasts
___24/7 online classes
___Downloadable audio MP3s of programs
___Online library of CLE articles
___Course books

**33. Please rate the level of importance of each consideration when choosing a particular CLE program:**

*Please rate the following on a scale of 1 to 5 (1 being Not at all Important and 5 being Very Important)*
___Number of MCLE hours
___Course format
___Registration Fee
___Topics relevant to my practice
___Speakers' reputation or expertise
___Length of course
___Location of course
___Course amenities
___Networking

**STATE BAR OF TEXAS MEMBER SERVICES CONTINUED**

**34. How do you currently obtain your major medical health insurance?**

___Through the Texas Bar Private Insurance Exchange
___Local Agent/Broker
___Direct through Insurance Carrier
___HealthCare.gov
___Through my Employer
___I do not currently have major medical health insurance
___Other_____

**35. Do you carry any of the following types of insurance?**

*Please select all that apply.*

___Professional Liability ("Legal Malpractice") Insurance
___Other Non-Legal Professional Liability ("E&O") Insurance
___Cyber Breach Liability Insurance
___Business Owners Insurance
___Employment Practices Liability Insurance
___Other_____

**36. Please indicate whether you have reached out to the Texas Lawyers' Assistance Program (TLAP), on behalf of a lawyer or judge for one of the following mental health or substance use disorders**

*Check all that apply.*

___Depression
___Anxiety
___Alcohol abuse
___Drug abuse
___Suicidal ideation
___Age-related cognitive impairment
___Have not referred anyone
___Other _____

**37. Please indicate any benefits and/or vendors you would like to see offered through the State Bar of Texas Member Benefit Program.**

_____
_____

**38. If you have any additional comments regarding the information collected with this survey, please provide them below:**

_____
_____

# Attachment D

## Costs Report

## Advanced Expense Search  <u>Print</u>   <u>Save</u>

| | Date | Amount | Expense Type | Reference | Vendor | Client | Ext. Invoice | Code | User |
|---|---|---|---|---|---|---|---|---|---|
| $ | 01/07/2021 | $7,500.00 | Expert Consultant Fees | Jones, Shannon-HS1 | Majer, John M P.h.D. | | | | McNair, Marisol |
| $ | 12/14/2020 | $708.75 | Court Reporter | Jones, Shannon-HS1 | Barnes Video Group, L.L.C. | | 3033 | | McNair, Marisol |
| $ | 08/14/2020 | $2,374.75 | Court Reporter | Jones, Shannon-HS1 | Melody Monk Reporting | | | | McNair, Marisol |
| $ | 08/14/2020 | $493.30 | Court Reporter | Jones, Shannon-HS1 | Stormy Jackson Reporting | | 20-048 | | McNair, Marisol |

| Expense Budgeted | Budget Remaining | Total Amount |
|---|---|---|
| $0.00 | -$11,076.80 | $11,076.80 |