# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| CONSTANCE SWANSTON, WOMEN'S ELEVATED SOBER LIVING LLC, and SHANNON JONES, | § § § § | |
| *Plaintiffs,* | § | Civil Action No. 4:19-cv-412 |
| v. | § § | Judge Mazzant |
| CITY OF PLANO, TEXAS, | § § | |
| *Defendant.* | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are Defendant's Motion to Enter Judgment (Dkt. #154) and Plaintiffs' Motion for New Trial (Dkt. #155). Having considered the Motions, the relevant pleadings, and the applicable law, the Court finds as follows:

1. Defendant's Motion to Enter Judgment (Dkt. #154) should be **GRANTED**; and

2. Plaintiff's Motion for New Trial (Dkt. #155) should be **DENIED**.

## BACKGROUND

The instant Motions come before the Court on the heels of a Fifth Circuit mandate that followed a two-day bench trial that the Court held from February 8–9, 2021 (Dkt. #120). The factual background of this case is fully chronicled in the Court's Memorandum Opinion and Order and Findings of Fact and Conclusions of Law, which the Court fully incorporates herein (Dkt.

#120). However, in the interest of convenience, the Court will summarize the relevant facts underlying the Motions that the Court must decide today.[1]

## I.     Factual Background

This case involves the operation of a sober living home in the City of Plano, Texas. Plaintiffs are Constance Swanston ("Swanston"), Shannon Jones ("Jones"), and Women's Elevated Sober Living LLC ("WESL"). WESL operates a sober living home at 7312 Stoney Point Drive (the "Home") in the City of Plano. Swanston is the owner of the Home and primary operator of WESL. Jones is a caretaker and resident of the Home. The Home is a 5,890 square-foot building located in one of Plano's SF-7 zoning districts. The purpose of the Home is to help individuals recover from substance use disorders ("SUDs"). The Home opened in November of 2018 and offers a therapeutic atmosphere for its residents in recovery, required Alcoholics Anonymous and Narcotics Anonymous meetings, daily drug and alcohol testing, transportation services, and assistance with work and employment opportunities. The Home has seven bedrooms and at one point housed fifteen residents.

In March of 2019, in response to numerous complaints from Plano citizens, the City opened an investigation into the Home's existence and operation. At the conclusion of the investigation, Plano informed WESL that the Home violated Plano Ordinance No. 2009-6-9 (the "Ordinance") because the number of residents in the Home exceeded eight—the maximum number of unrelated individuals permitted to live in a single household in an SF-7 zone. Plano's zoning code classifies the Home as a "Household Care Facility," which the code defines as "[a] dwelling unit that

---

[1] Unless otherwise indicated, the facts summarized below are contained in the Court's Memorandum Opinion and Order and Findings of Fact and Conclusions of Law (Dkt. #120). Thus, the Court does not follow each fact with a citation to the docket because the facts contained herein only summarize the Court's previous recitation.

provides residence and care to not more than eight persons, regardless of legal relationship, who are . . . disabled . . . , living together with no more than two caregivers as a single household."

After learning that the Home violated the Ordinance, WESL filed a reasonable-accommodation request with Plano's Board of Adjustment (the "Board"). Through it, WESL sought a variance from the Ordinance for the following purpose: "[u]se of property as Women's Sober Living with an occupancy of 15 individuals – residents will be disabled addicts in recovery." The request was accompanied by Swanston's Declaration, which asserted that "a sober home with 12 residents creates the necessary family and community atmosphere for the personal accountability and support that makes sober living effective" (Dkt. #112-9 at p. 4). The Board took up WESL's accommodation request at a public meeting on May 28, 2019. There, Plano's code-compliance officer recommended that the Board approve WESL's request. The City's property-standards manager added that, but for the Ordinance, the Home had the capacity to sleep thirty-four individuals. Then, some public outrage ensued. Nearly one hundred Plano citizens attended the meeting, thirty-three of whom voiced their thoughts. All but one recommended that the Board deny WESL's request. The Board unanimously rejected WESL's requested accommodation. Roughly one week later, Swanston and WESL filed their Complaint (Dkt. #1).

## II.    Procedural History

On June 5, 2019, Plaintiffs filed their Original Complaint against the City of Plano (Dkt. #1). Plaintiffs later amended their Complaint twice (Dkt. #2; Dkt. #29). Plaintiffs' Second Amended Complaint asserts disparate treatment and disparate impact under the Fair Housing Act ("FHA"), failure to accommodate under the FHA based on theories of financial and therapeutic necessity, and several violations of the Americans with Disabilities Act ("ADA") (Dkt. #29 at pp.

19–23). The Court presided over a bench trial on these claims on February 8–9, 2021 (Dkt. #120). At trial, Plaintiffs' expert, Dr. John Majer, testified about the necessary occupancy levels in a sober-living home (Dkt. #152 at p. 201). On that point, he stated that having more residents would "increase the richness of the social support available that is going to help individuals connect to recovery" (Dkt. #152 at p. 234). He added that "when you increase the numbers, you're going to increase the therapeutic benefit" (Dkt. #152 at p. 237). However, he also testified that fifteen residents was the minimum number that should live in the Home (Dkt. #152 at pp. 226–27).

On August 27, 2021, the Court issued its Memorandum Opinion and Order and Findings of Fact and Conclusions of Law (Dkt. #120). The Court found in favor of the City of Plano on Plaintiffs' claims for disparate treatment, disparate impact, and failure to accommodate under a theory of financial necessity (Dkt. #120 at pp. 20–27). On Plaintiffs' claim for failure to accommodate under a theory of therapeutic necessity, however, the Court found that the City violated the FHA after concluding that Plaintiffs' proposed accommodation of fifteen residents was therapeutically necessary as compared to the offered alternative of eight residents (Dkt. #120 at pp. 35–36; Dkt. #148). The City appealed the Court's Final Judgment (Dkt. #149).

On appeal, the Fifth Circuit interpreted the meaning of "necessity" under the FHA (Dkt. #156-1). It did so by looking to the term's dictionary definition, which is something "[i]ndispensible, requisite, essential, needful; that cannot be done without, or absolutely required" (Dkt. #156-1 at p. 7) (quoting *Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 105 (3d Cir. 2018) (quoting 10 OXFORD ENGLISH DICTIONARY 275–76 (2d ed. 1989))). Analyzing "necessity" according to its ordinary meaning, the Fifth Circuit held that Plaintiffs' evidence regarding therapeutic necessity did not satisfy the correct legal standard (Dkt. #156-1 at p. 11). The Fifth

4

Circuit reasoned that "a requested accommodation that is preferable to an alternative is not sufficient; it must be essential" (Dkt. #156-1 at p. 7) (citing *Cinnamon Hills Youth Crisis Ctr. v. Saint George City*, 685 F.3d 917, 923 (10th Cir. 2012)). It further observed that:

> A requested accommodation from capacity restrictions must directly ameliorate the effect of the plaintiffs' disabilities, such that the requested number *must* reside together in a dwelling to achieve effective amelioration of their afflictions. Put another way, without the requested accommodation, the ameliorative benefit provided must be so insignificant that it deprives persons with disabilities from the opportunity to use and enjoy the dwelling of their choice as compared to those without disabilities.

(Dkt. #156-1 at p. 7) (cleaned up). Following prior jurisprudence in its sister circuits, the Fifth Circuit held that "the district court improperly applied a standard accepting that proof of greater therapeutic benefit from residents' disabilities was sufficient to establish that the requested accommodation was indispensable to their recovery from SUDs, rather than requiring the plaintiffs to prove that the accommodation was indispensable or essential" (Dkt. #156-1 at p. 8). Thus, the Fifth Circuit reversed the Court's judgment and remanded the case (Dkt. #156-1 at p. 11). Plaintiffs then petitioned the Fifth Circuit for en banc reconsideration, arguing that it adopted too strict a standard for therapeutic necessity under the FHA (Dkt. #162-2). The Fifth Circuit denied Plaintiffs' petition and issued its mandate, which vacated the Court's judgment and remanded the case "for further proceedings in accordance with the opinion of this Court" (Dkt. #156). The instant Motions followed (Dkt. #154; Dkt. #155).

On December 29, 2023, the City filed its Motion to Enter Judgment (Dkt. #154). Plaintiffs, for their part, filed a Motion for New Trial on the same day (Dkt. #155). The City argues that entry of a take nothing judgment is proper because the Fifth Circuit's mandate vacated the Court's prior final judgment in Plaintiffs' favor (Dkt. #154). Plaintiffs, of course, disagree. In their view, a new trial is warranted to allow Plaintiffs the opportunity to present evidence of "necessity" in terms

consistent with the Fifth Circuit's new legal standard (Dkt. #155). The parties exchanged responses, replies, and sur-replies to each Motion (Dkt. #161; Dkt. #163; Dkt. #166; Dkt. #162; Dkt. #164; Dkt. #165).

## LEGAL STANDARD

Under Rule 59(a) of the Federal Rules of Civil Procedure, a new trial can be granted to any party after a nonjury trial on any or all issues "for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court." FED. R. CIV. P. 59(a)(1)(B). "A motion for new trial in a nonjury case . . . should be based upon a manifest error of law or mistake of fact, and a judgment should not be set aside except for substantial reasons." *Garcia v. Ramsis*, No. 4:21-CV-650-SDJ, 2022 WL 1036770, at *2 (E.D. Tex. Apr. 6, 2022) (quoting *Hicks v. R.H. Lending, Inc.*, No. 3:18-CV-0586, 2020 WL 2065637, at *1 (N.D. Tex. Apr. 29, 2020)). "Courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Sibley v. Lemaire*, 184 F.3d 481, 487 (5th Cir. 1999) (quoting *Del Rio Distrib., Inc. v. Adolph Coors Co.*, 589 F.2d 176, 179 n.3 (5th Cir. 1979)). Under this standard, the "analysis often resembles an analysis to alter or amend a judgment in that courts frequently look to see whether there has been a manifest error of law or mistake of fact that justifies setting aside the results of the earlier trial." *Tellez v. GEO Grp., Inc.*, No. SA-15-CV-00465-RCL, 2018 WL 1146398, at *2 (W.D. Tex. Mar. 1, 2018) (internal citations omitted). Furthermore, "[t]he decision to grant or deny a motion for a new trial is generally within the sound discretion of the trial court . . . ." *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982).

## ANALYSIS

The threshold issue before the Court is the application of the law of the case doctrine with respect to the Fifth Circuit's opinion and mandate, which established a new legal standard for what constitutes therapeutic necessity under the FHA (*See* Dkt. #156-1). Under the "law of the case" doctrine, "'a decision of a factual or legal issue by an appellate court establishes the law of the case and must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal in the appellate court . . . .'" *Lyons v. Fisher*, 888 F.2d 1071, 1074 (5th Cir. 1989) (quoting *Goodpasture, Inc. v. M/V Pollux*, 688 F.2d 1003, 1005 (5th Cir. 1982)). The doctrine is "based on the salutary and sound public policy that litigation should come to an end." *Id.* (quoting *Carpa, Inc. v. Ward Foods, Inc.*, 567 F.2d 1316, 1319 (5th Cir. 1978)). Absent certain exceptions that these facts do not implicate, "the law of the case doctrine applies not only to things decided explicitly but also to matters settled 'by necessary implication:' 'those matters that were fully briefed to the appellate court and were necessary predicates to the ability to address the issue or issues specifically discussed are deemed to have been decided tacitly or implicitly, and their disposition is law of the case.'" *Cooper Tire & Rubber Co. v. Farese*, 248 F. App'x 555, 558 (5th Cir. 2007) (quoting *Off. of Thrift Supervision v. Felt*, 255 F.3d 220, 225 (5th Cir. 2001)).

The mandate rule, a corollary to the law of the case doctrine, "prohibits a district court on remand from reexamining an issue of law or fact previously decided on appeal and not resubmitted to the trial court on remand." *United States v. Pineiro*, 470 F.3d 200, 205 (5th Cir. 2006). Like the law of the case doctrine, the mandate rule covers issues decided explicitly and by necessary implication. *Crowe v. Smith*, 261 F.3d 558, 562 (5th Cir. 2001).

Applying these concepts to the case at bar, the Fifth Circuit's mandate is clear: evidence that an accommodation would provide "therapeutically beneficial treatment" is not sufficient to prove that that accommodation is *necessary* under the FHA or ADA (Dkt. #156-1 at p. 9). Instead, to prove necessity, a plaintiff must demonstrate that "without the requested accommodation, they will receive *no* ameliorative effect from their disability, thereby depriving them of the equal opportunity to enjoy the dwelling" (Dkt. #156-1 at p. 9) (emphasis added). Here, that would require Plaintiffs to prove that the accommodation of fifteen residents—as compared to the offered alternative of eight residents—is "indispensable or essential" to the residents' ability to recover from SUDs (Dkt. #156-1 at p. 8). The Court will review the testimony elicited on Dr. Majer's direct and cross examination to determine whether Plaintiffs have met the standard articulated by the Fifth Circuit's mandate. They have not.

## I.    Direct Examination

The Court will lead off by recalling the direct examination of Plaintiffs' expert, Dr. Majer. Plaintiffs contend that Dr. Majer's testimony is "perfectly consistent" with the Fifth Circuit's new legal standard, even if the Fifth Circuit itself determined that it did not meet that standard (Dkt. #155 at p. 2). Therefore, Plaintiffs urge the Court to grant a new trial to allow Plaintiffs to present evidence of "necessity" in a manner that meets the Fifth Circuit's new standard (Dkt. #155 at p. 2). The Court disagrees because the record is already sufficient for the Court to conclude that Dr. Majer's testimony does not adequately prove necessity under the new standard.

On direct examination, Dr. Majer testified regarding the varying degrees of therapeutic benefit provided to sober living home residents based upon the number of residents in the home (Dkt. #152 at pp. 201–48). A few lines of questioning are particularly relevant here. First, Plaintiffs'

counsel asked Dr. Majer about Oxford House, another sober living home (Dkt. #152 at p. 210). Dr.

Majer testified that he reviewed a national dataset among Oxford House residents, which

prompted the following discussion:

> Q:    How did that dataset help form the opinions you're going to testify about today?
>
> A:    They informed me in that it demonstrated having more residents in a recovery home produced greater therapeutic benefits than having less residents living in a recovery home.
>
> Q:    And was that an effect that cut off at some particular number of residents? That is, there was some maximum number after which there was no benefit?
>
> A:    It was looking at residents living in recovery homes of ten or fewer residents versus those living in recovery homes with more than ten residents.
>
> Q:    And from your earlier answer, am I right that there was a benefit to being in a recovery home with 11 or more residents?
>
> A:    Yes.
>
> Q:    Okay. And was that a result that you could extrapolate to larger numbers of residents than just 11? . . .
>
> A:    Yes.
>
> Q:    Okay. And what would your extrapolation be from that data?
>
> A:    That the analysis presented in my report is consistent with some investigations I cited in my report, that adding more residents increases therapeutic benefit in recovery homes. So that tells me when you have more residents in Women's Elevated Sober Living, you're more likely going to produce more therapeutic effect.

(Dkt. #152 at pp. 210–11).

Later, Plaintiffs' counsel narrowed in on Dr. Majer's testimony regarding the requisite size

for a therapeutically beneficial sober living home:

> Q:    [W]hat is the minimum number of recovering alcoholics and addicts who should live in the Stoney Point home in order to have an effective therapeutic result?
>
> A:    The minimum would be 15.
>
> Q:    Is that the ideal number?
>
> A:    No.

9

Q:      What is the ideal number, in your opinion?

A:      Twenty-one.

Q:      Why do you believe that 15 is the minimum and 21 is the ideal for the Stoney Point home?

A:      A recovery home or a sober living [home] needs to maintain a therapeutic atmosphere within a social milieu . . . .

(Dkt. #152 at pp. 226–27).

Dr. Majer continued by discussing the therapeutic importance of each resident having a roommate, especially for newer residents (Dkt. #152 at p. 227 lines 6–12). According to Dr. Majer, this "buddy system" is critical for the residents to hold each other accountable in their sobriety (Dkt. #152 at p. 227 lines 13–18). Dr. Majer then noted the risk of departures from the Home, which would further diminish the number of residents and, in turn, decrease the therapeutic benefit of the Home (Dkt. #152 at pp. 227–29). On that point, he hypothesized that if the Home had a capacity of ten residents and five of them left, "[t]he census of [the Home] would go from ten to five, and among the five who remain, the good probability is that the majority of them will be newbies or midlevel residents" as opposed to the more senior residents (Dkt. #152 at p. 229 lines 3–12). Dr. Majer avers that such a population decrease in the Home would "crush[] the therapeutic atmosphere within that home" (Dkt. #152 at p. 229 lines 12–13). He then played out the same hypothetical with a capacity of fifteen residents:

A:      However, if you have at a minimum 15 residents, then in the situation that I just illustrated, you go from 15 to 10 and chances are better that [among] the ten who remain you're going to have [a] more senior level resident, and I believe that the numbers increase when you try to maintain the level of 21.

Q:      Does that mean that you have to have 15 residents every day all the time in order to have therapeutic benefits for the home?

A:      No.

Q:      Can you have, say, a lack of a roommate for someone for a short time without interfering with the recovery?

10

A:      That's correct.

. . .

Q:      As I understand it, Oxford Houses typically have somewhere around six to ten residents, is that right?

A:      Between six to twelve, six to ten, something like that.

Q:      Okay. And doesn't that mean you can get all the benefits of sober living if you only have eight residents in a house like the one on Stoney Point?

A:      No.

Q:      And why not?

A:      Well, if you have only eight residents at the sober living at Stoney Point, the women will isolate. Due to the size of Stoney Point, it will make it very easy for the residents to go off on their own. And that's very dangerous for people who are trying to become clean and sober on a day-to-day basis and develop a capacity to reintegrate.

. . .

Q:      When you're evaluating the number of people who should be in a sober living home in order for it to be therapeutically effective, do you have to take the size of the home into account?

A:      Yes.

(Dkt. #152 at pp. 229–31).

In Plaintiffs' view, all of the testimony above fits neatly into the new Fifth Circuit standard (Dkt. #155 at p. 2). Not so. In their effort to make it fit, Plaintiffs contort Dr. Majer's testimony by classifying his statement about the positive correlation between the number of residents and the therapeutic benefit those residents receive as a "statement about sober living homes in general" rather than a specific statement about WESL (Dkt. #155 at p. 4). In support, Plaintiffs point to Dr. Majer's testimony that the smaller capacity at Oxford House would not provide "all the benefits of sober living" to the WESL residents (Dkt. #155 at p. 4). Thus, Plaintiffs urge the Court to infer from that testimony that what he *really* meant was that "because the eight residents offered by the City did not provide the ameliorative effect of sober living, the residents of Women's Elevated

would receive no ameliorative effect from their disability if Women's Elevated was not allowed the accommodation it requested for 15 residents" (Dkt. #155 at p. 4). The Court will not take such an inferential leap. Nor will it permit Plaintiffs to rewrite the history of Dr. Majer's testimony to fit into the Fifth Circuit's standard when the record is devoid of any statement to that effect. Thus, based on his direct examination, Dr. Majer's testimony is insufficient under the Fifth Circuit's new standard.

## II.    Cross Examination

The Court next turns to Dr. Majer's testimony on cross examination. Like Dr. Majer's testimony on direct, Plaintiffs fail to see any inconsistencies between Dr. Majer's testimony and the Fifth Circuit's necessity requirements (Dkt. #155). The Court will summarize the relevant testimony elicited on cross examination below and demonstrate that it does not meet the Fifth Circuit's new standard.

First, Defense counsel begins with a discussion on Dr. Majer's interpretation of the word "necessity" (Dkt. #152 at p. 233). Citing to Dr. Majer's expert report, Defense counsel introduces the following discussion:

> Q:    On page two, in the third paragraph [of Dr. Majer's report], you state: I cite scholarly literature and present data to support my opinion that recovery homes, such as those operated by the Women's Elevated Sober Living, LLC, should not be limited in terms of occupancy. In fact, I argue that it is necessary to have a maximum of what the dwelling can accommodate to create a therapeutic milieu. Is that a correct statement of your opinion?
>
> A:    Yes.
>
> Q:    And in that sentence that I just read, you used the word "necessary" and you stated I argue that it is necessary to have a maximum of what the dwelling can accommodate. Can you tell me what the definition of "necessary" was as you used that word in that sentence?

12

> A:      Certainly. I meant that by providing more residents in the sober living, you're going to increase the richness of the social support available that is going to help individuals connect to recovery.
>
> . . .
>
> Q:      [I]s "indispensable" a fair synonym for the word "necessary" as used in that sentence of your report?
>
> A:      No.

Dkt. #152 at pp. 233–35).

Homing in on Dr. Majer's report, Defense counsel next asked about the meaning of the term "therapeutic milieu," which Dr. Majer's report defines as "an atmosphere within the recovery home that is therapeutic in nature, therapeutic to the point that it will lead to beneficial outcomes" (Dkt. #152 at p. 236 lines 7–11). Defense counsel then asked about what number would satisfy the "maximum" threshold of what the dwelling can accommodate to achieve the requisite therapeutic milieu:

> Q:      [Y]ou said that it was necessary to have a maximum of what the dwelling can accommodate. What is your opinion of what the maximum is of what the Stoney Point home could accommodate?
>
> A:      I believe I just testified 21. I mean, you could get more than 21 persons living in there and they could technically live there in relative comfort, but I'm making reference to maximizing the number of residents living in a recovery home or a sober living to engender a richer sense of social support.
>
> Q:      In your deposition do you recall testifying that 24 was the maximum that the Stoney Point residence could accommodate?
>
> A:      I believe I said that.
>
> Q:      [I]s it fair to say that it is your opinion that it is necessary that 24 residents live in the Stoney Point home or else there will be no therapeutic atmosphere such that it will lead to beneficial outcomes?
>
> A:      No.
>
> Q:      Is it your opinion that it is necessary that 21 residents live in the Stoney Point home or else there will be no therapeutic atmosphere such that it will lead to beneficial outcomes?

A:     No. My opinion is simple, that you're going to get therapeutic benefit regardless what number we're talking about, but when you increase the numbers, you're going to increase the therapeutic benefit is sort of my point.

Q:     Is it your testimony then that there would be more therapeutic benefit from 21 residents living in the home than for 15?

. . .

A:     In a sense, yes. If you have 15, that's the minimum number, that the house shouldn't go any lower than 15. It should strive to keep it closer to 21 . . . . And when I say minimum, at 15 we're talking about that seems to be a small enough number where at least residents could share the bedrooms with at least one roommate.

Q:     Is it your opinion that women would not experience therapeutic benefit with 12 residents in the home?

A:     No.

(Dkt. #152 at pp. 236–38). Defense counsel then impeached Dr. Majer with a prior inconsistent statement in which he previously answered the same question "yes" (Dkt. #152 at p. 238 lines 8–24). In response, Dr. Majer clarified his position:

A:     [L]ooking back on it, I will agree that with 12 residents, there will be some therapeutic benefit. But to increase it, to increase the likelihood that they're going to engage and actually stay clean and sober, the greater the number, the greater the chances that they succeed. I mean, you could argue that only two residents in that home would have some therapeutic benefit. . . .

(Dkt. #152 at p. 239 lines 4–12).

Finally, expanding on Dr. Majer's testimony about the importance that each resident in the Home have a roommate to maintain a "buddy system," (Dkt. #152 at p. 227 lines 6–12), Defense counsel walked Dr. Majer through the following calculus:

Q:     [I]s it your opinion that it is necessary for each resident of the Stoney Point home, other than Ms. Jones, to have a roommate?

A:     Yes.

. . .

Q:     And is it your opinion that it is indispensable for there to be three women living in each room rather than just two?

14

. . .

Q:    [(Refreshing recollection with deposition testimony)] Is it your opinion that it is indispensable to have three women in each room rather than just two? And your answer [from Dr. Majer's deposition] was: No. Is that an accurate reflection of your answer?

A:    I believe so, if that's what you said in the official record.

Q:    So in . . . the Stoney Point house, there's seven bedrooms in the home, and we'll take one of those off the table because that's Ms. Jones' room. So there's six bedrooms in the home for residents, and if each of those rooms were to house two women, that would equal 12 total residents, plus Ms. Jones, the house manager, for a total of 13, correct?

A:    Yes.

(Dkt. #152 at pp. 241–42).

In sum, Dr. Majer's cross examination testimony demonstrates the inconsistency in how he views what constitutes "necessity." On one hand, he contests that "it is necessary to have a maximum of what the dwelling can accommodate to create a therapeutic milieu" (Dkt. #152 at p. 233). But at the same time, he denies the proposition that twenty-one or twenty-four residents—both of which he has offered as the "capacity" of the Home—are necessary to create a therapeutic atmosphere that will lead to beneficial outcomes (Dkt. #152 at pp. 236–38). Not only that, but he even concedes that as few as two residents would provide some therapeutic benefit (Dkt. #152 at p. 239 lines 4–12). Then, he suggests that it is necessary for each resident in the Home to have a roommate to achieve the requisite therapeutic atmosphere, while acknowledging that with six open rooms in the Home, that would result in only twelve total residents (Dkt. #152 at pp. 241–42). Hence, Dr. Majer's cross examination yielded testimony that tends to contradict his standalone statement that "the house shouldn't go any lower than 15" (Dkt. #152 at pp. 236–38). These inconsistencies cast doubt on whether a population of fifteen residents is "indispensable or essential to the continued facilitation of the residents' recovery from SUDs" (Dkt. #156-1 at p. 13).

Under the Fifth Circuit's newly articulated standard, Dr. Majer's testimony contains two fatal flaws. *First*, he places therapeutic necessity on a spectrum. According to Dr. Majer, the more residents you add, the greater the therapeutic benefit those residents will receive (Dkt. #152 at pp. 210–11). That trend extends all the way from two residents up to as many as twenty-four (Dkt. #152 at pp. 236–38). But necessity does not exist on a spectrum; it is a binary question. The Fifth Circuit made clear on appeal that the positive correlation between the number of residents and the resulting therapeutic benefit does not equate to necessity under the FHA (*See* Dkt. #156-1 at p. 9) ("To accept evidence that an accommodation would be better or provide a greater benefit to its residents with disabilities constitutes legal error."). To make matters worse, his testimony relies on the wrong definition of necessity (Dkt. #156-1 at p. 9) ("[T]he district court erred by applying a standard accepting that therapeutically beneficial treatment constitutes necessity under the FHA and ADA."). *Second* and relatedly, Dr. Majer never explained exactly why fifteen was the magic number of residents to achieve the requisite therapeutic milieu, below which that benefit disappears. In fact, he testified to the exact opposite (Dkt. #152 at p. 239 lines 4–12) ("[W]ith 12 residents, there will be some therapeutic benefit. But to increase it, to increase the likelihood that they're going to engage and actually stay clean and sober, the greater the number, the greater the chances that they succeed."). That will not do under the FHA. Indeed, "the FHA's necessity element requires that an accommodation be *essential*, not just preferable" (Dkt. #156-1 at p. 10 n.5) (quoting *Vorchheimer*, 903 F.3d at 105) (emphasis added). Dr. Majer's testimony is rife with proof of the preferability of higher occupancy levels but lacks proof of the indispensability of fifteen residents specifically.

Recognizing the deficiencies in Dr. Majer's testimony, Plaintiffs request a new trial to elicit additional testimony from him in what would effectively be a second attempt to match the FHA's necessity standard as articulated by the Fifth Circuit (Dkt. #155). But the circumstances of this case do not demand a new trial, and Plaintiffs' arguments to the contrary are unavailing. Indeed, the record before the Fifth Circuit was sufficient for it to conclude that Plaintiffs failed to satisfy the new burden (Dkt. #156-1 at p. 11). Likewise, the record before the Court—which is not limited to Dr. Majer's testimony—is sufficient to conclude that Plaintiffs did not meet their burden to show that a census of fifteen residents is "indispensable or essential" to achieving WESL's goals of successfully treating residents with SUDs.[2] Thus, as the City observes, the Fifth Circuit rejected Dr. Majer's testimony on substantive grounds, not simply because he failed to say the magic words (Dkt. #156-1 at pp. 10–11; Dkt. #162 at p. 4). No supplementation of Dr. Majer's testimony can cure that deficiency. To demonstrate, if the Court were to grant Plaintiffs a new trial, it would necessarily require Plaintiffs "to introduce testimony *contradicting* Dr. Majer's trial testimony" in which he confirmed that "indispensable" was not a fair synonym for "necessary" as used in his report (Dkt. #162 at p. 4; Dkt. #152 at p. 235 lines 14–17). Hence, a new trial would be futile. Accordingly, the Court will deny Plaintiffs' request for a second bite.

---

[2] In addition to Dr. Majer's testimony, the trial testimony from the Home's residents weighs against a finding that operating the Home with fewer than fifteen residents would provide "no ameliorative effect from their [SUDs]" (Dkt. #156-1 at p. 9). *See, e.g.*, (Dkt. #152 at p. 192) (explaining that "when the number of women in the Stoney Point home was down to 10 or 11," the resident was able to maintain her sobriety); (Dkt. #153 at pp. 10–11) (testifying that despite the fact that the number of residents at the Home averaged between ten to eleven people and reached as low as five people, the resident was able to maintain her sobriety for a year and a half in the Home); (Dkt. #153 at p. 56) (testifying that having ten to eleven residents in the Home still created positive benefits and "was a great environment altogether").

Swanston's Declaration, submitted at trial as Defendants' Exhibit 17A, further illustrates the inconsistencies in Dr. Majer's position (Dkt. #112-9 at p. 4) ("Elevated has retained an expert, Dr. John Majer, who confirms that a sober living home with 12 residents creates the necessary family and community atmosphere for the personal accountability and support that makes sober living effective.").

Yet, Plaintiffs cling to the fact that the Fifth Circuit remanded the case on appeal instead of rendering judgment and interpret that decision as leaving open the possibility of a new trial (Dkt. #161). Plaintiffs' point is well-taken. Indeed, the Court's analysis today would undoubtedly be easier had the Fifth Circuit decided to reverse and render instead of remand. Alas, it did not. But the Court's decision is no less straightforward on remand because the Fifth Circuit has unambiguously decided the issue (*See* Dkt. #156-1). Plaintiffs' evidence at trial was insufficient under the new, stricter, standard for necessity (Dkt. #156-1 at p. 11). The Court is bound to that determination. *See Pineiro*, 470 F.3d at 205; *Crowe*, 261 F.3d at 562. Hence, while the Court has discretion to grant a new trial where appropriate, it will not do so here because Plaintiffs have not shown sufficient prejudice, harmful error, or any other substantial reason to relitigate the issue of necessity. *See Shows*, 671 F.3d at 930; *Garcia*, 2022 WL 1036770, at *2; *Sibley*, 184 F.3d at 487; *Del Rio Distrib., Inc.*, 589 F.2d at 179 n.3.

In conclusion, "[n]ecessity is a demanding legal standard." *Vorchheimer*, 903 F.3d at 103. To meet that standard, the Fifth Circuit required Plaintiffs to show that operating the Home with fewer than fifteen residents would provide "no ameliorative effect from their [SUDs], thereby depriving them of the equal opportunity to enjoy the dwelling" (Dkt. #156-1 at p. 9). Despite the Court's prior Findings of Fact and Conclusions of Law holding otherwise under a different standard, Plaintiffs did not carry that burden under the Fifth Circuit's new standard, which now binds the Court. Thus, following the Fifth Circuit's mandate that "Plaintiffs have failed to establish that their requested accommodation was therapeutically necessary," and after a careful review of Dr. Majer's testimony under the new standard, the Court concludes the same (Dkt. #156-1 at p. 11).

Having determined that a new trial is not warranted and considering the Fifth Circuit's mandate which vacated the Court's prior judgment (Dkt. #156), entry of new judgment is appropriate. In response to the Fifth Circuit's mandate, the City has moved for entry of a final judgment that Plaintiffs take nothing (Dkt. #154). The Court agrees with the City. Therefore, the Court grants the City's Motion to Enter Judgment (Dkt. #154).

## CONCLUSION

It is therefore **ORDERED** that Defendant's Motion to Enter Judgment (Dkt. #154) is hereby **GRANTED.** The Court will enter a final judgment reflecting the foregoing analysis in a subsequent Order.

It is further **ORDERED** that Plaintiff's Motion for New Trial (Dkt. #155) is hereby **DENIED.**

**IT IS SO ORDERED.**

**SIGNED this 19th day of February, 2025.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE